```
 1                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF NEBRASKA
 2
      UNITED STATES OF AMERICA,     )
 3                                  )
              Plaintiff,            )   8:04CR-384
 4                                  )   September 19, 2005
         vs.                        )   8:40 a.m.
 5                                  )   Omaha, Nebraska
      JEROME BASS,                  )
 6                                  )
              Defendant.            )
 7

 8

 9

10                            VOLUME I
                   TRANSCRIPT OF TRIAL PROCEEDINGS
11           BEFORE THE HONORABLE JOSEPH F. BATAILLON
               UNITED STATES DISTRICT JUDGE, AND A JURY
12

13

14                    A-P-P-E-A-R-A-N-C-E-S

15    FOR THE PLAINTIFF:          Jennie Dugan-Hinrichs
                                  Assistant United States Attorney
16                                1620 Dodge Street
                                  Suite 1400
17                                Omaha, Nebraska 68102

18    FOR THE DEFENDANT:          Michael T. Levy
                                  Attorney at Law
19                                P.O. Box 6309
                                  Omaha, Nebraska 68106
20
      COURT REPORTER:             Allan G. Kuhlman
21                                111 S. 18th Plaza
                                  Suite 3122
22                                Omaha, NE 68102
                                  (402) 661-7305
23

24

25    Proceedings recorded by mechanical stenography, transcript
      with computer.
```

1          (At 8:40 a.m. on September 19, 2005, with counsel

2     for the parties and the defendant present, the following

3     proceedings were had out of the presence of the jury:)

4          THE COURT:  This is the case of the United States

5     of America versus Jerome Bass, 8:04CR-384.

6          Would the attorneys please enter their appearance

7     for the record.

8          MS DUGAN-HINRICHS:  Good morning, Judge, Jennie

9     Dugan-Hinrichs for the government.

10          MR. LEVY:  Your Honor, Michael Levy for the

11     defendant, who is present.

12          MS. DUGAN-HINRICHS:  Your Honor, Officer Jeff

13     Gassaway is the case agent in this case and I request that

14     he assist me by sitting at counsel table during this trial.

15          THE COURT:  Your request is granted.

16          MS. DUGAN-HINRICHS:  Thank you, Your Honor.

17          THE COURT:  We're here today for trial.  There are

18     some preliminary matters that we need to take up and we will

19     do that at this juncture.

20          First of all, I've put together a voir dire.  Does

21     anybody have an objection to the questions I have for the

22     voir dire? Ms. Dugan-Hinrichs?

23          MS. DUGAN-HINRICHS:  No, Your Honor.

24          THE COURT:  Mr. Levy?

25          MR. LEVY:  No objections, but I have a suggestion.

1   It seems to me, as in most dry conspiracy cases, the jury is

2   going to hear a lot about plea agreements and departures and

3   mandatory minimums and sentencing guidelines, that kind of

4   stuff.

5           I'm just thinking that it might be a good idea to

6   educate them going into the evidence as to what a mandatory

7   minimum is, what a plea agreement is, what a departure is.

8           THE COURT:  Do you have any objection to that,

9   Ms. Dugan-Hinrichs?

10          MS. DUGAN-HINRICHS:  No, sir, I don't.

11          THE COURT:  Anything else, Mr. Levy?

12          MR. LEVY:  Not in that regard.

13          THE COURT:  Is twenty minutes for voir dire for the

14  government sufficient, Ms. Dugan-Hinrichs?

15          MS. DUGAN-HINRICHS:  Yes, Your Honor.

16          MR. LEVY:  More than sufficient.

17          MS. DUGAN-HINRICHS:  Your Honor, I just noted one

18  suggestion in my notes.

19          Page five of your voir dire you talk about this

20  case involves cocaine.  Could you say crack cocaine?

21          THE COURT:  Sure.

22          MS. DUGAN-HINRICHS:  I believe the same thing is in

23  the jury instructions.

24          THE COURT:  Anything else?  Let's talk about

25  initial instructions.

1    Mr. Levy, I know that you have subpoenaed some

2  witnesses.

3    I think that I would like, if I can, to get from

4  you a list of potential witnesses for the defendant so at

5  least we can run them by the jury.

6    And I'm not going to say the defendant is going to

7  call the witnesses, but at least here are the witnesses that

8  may be called.  Do you have a list?

9    MR. LEVY:  JeVaughn Erwin.  Lamar Bass.  Gregory

10  Tripp.  Bobby Johnson.  Jerome Daniels.  Rashad McKay.

11  Cora Bristol.  Rodney Ronk.

12    THE COURT:  They are all from Omaha?

13    MR. LEVY:  Yes.  There's a records custodian for

14  Cricket Communication.  Paquita Davis.  Son Spurlock.

15  Eric Lee.  Jason Sails.

16    Then I have subpoenaed a custodian of records of

17  the Omaha Police Department and a custodian of records of

18  St. Joe's Hospital, but it's my understanding that the

19  foundation for those documents is going to be waived and so

20  I will not be calling the record custodian to lay

21  foundation.

22    THE COURT:  Is that agreeable, Ms. Dugan-Hinrichs?

23    MS. DUGAN-HINRICHS:  It is, Your Honor.

24    THE COURT:  Any other witnesses then, Mr. Levy?

25    MR. LEVY:  It's hard to tell, but I don't think so.

1          THE COURT:  Let's talk about opening.  How much

2     time do you need for your opening statement?

3     Ms. Dugan-Hinrichs?

4          MS. DUGAN-HINRICHS:  Twenty minutes, half hour

5     tops.

6          THE COURT:  So thirty minutes each?

7          MR. LEVY:  That's more than enough.

8          THE COURT:  Now let's talk about initial jury

9     instructions.

10          You noted that in the jury instructions I said

11     cocaine instead of crack cocaine.

12          MS. DUGAN-HINRICHS:  Instruction 11 I think it

13     appears three times.

14          THE COURT:  It should say cocaine base each time it

15     says cocaine, correct?

16          MS. DUGAN-HINRICHS:  Correct.

17          THE COURT:  Instruction 11, number one, number

18     three, and number four.  Any others that you see?

19          MS. DUGAN-HINRICHS:  I don't believe so.

20          THE COURT:  For the record, we'll change all those.

21          MS. DUGAN-HINRICHS:  Instruction 19 and 24 appear

22     to be the same regarding the credibility of cooperating

23     witnesses.

24          THE COURT:  Instruction 24 being an instruction

25     that we're giving at the close of evidence to see whether it

1    needs to be given again.  It may not have to be.

2         I think the confusion sometimes is whether this is

3    a cooperating witness or -- I don't know cooperating,

4    witnesses and governmental informants, but I don't know.  So

5    let's just wait.  We have it at least once now and we'll

6    talk about whether we need it again at the end of evidence.

7         But I agree with you it generally does not need to

8    be repeated.

9         For the record, we're talking about Instructions 1

10   through 19 for initial instructions.  Any other objections?

11   Ms. Dugan-Hinrichs?

12        MS. DUGAN-HINRICHS:  No, sir.

13        THE COURT:  Mr. Levy?

14        MR. LEVY:  I'm trying to think.  In that regard,

15   there is an instruction on witness testifying under grant of

16   immunity, but I don't think we have that in this case.

17   There's also an accomplice instruction.

18        THE COURT:  If you have one, I'll certainly look at

19   it.

20        MR. LEVY:  It's an Eighth Circuit instruction.

21   I'll have it.

22        THE COURT:  I know there is an instruction on plea

23   agreements, and that's not included here.

24        If you want that you need to let me know, and then

25   you said the accomplice instruction, but if there is one,

1      let me know about that, too.

2              Then there is an instruction on whether somebody is

3      a felon or not.

4              I don't know whether that applies, so I have not

5      done any of these instructions, because I don't know what

6      the government's case in chief is going to be.

7              But you're assuming that there will be plea

8      agreements introduced into evidence, correct?

9              MR. LEVY:  There is a list of them on the exhibit

10     list and I've been furnished with the criminal histories of

11     all the cooperating witnesses and there are persons

12     convicted of felonies as well as crimes of dishonesty.

13             THE COURT:  I think Instruction 19 covers that, but

14     if you want an additional instruction you need to let me

15     know.

16             MR. LEVY:  Would you be inclined to give it as a

17     preliminary?

18             THE COURT:  Absolutely, or before the testimony of

19     the witness that has to do with the plea agreement, but I

20     think Instruction 19 covers that.

21             MR. LEVY:  I don't see in 19 that it does with

22     felons or people who have been convicted of crimes of

23     dishonesty.

24             I ask that that be given.  I think as long as

25     you're going to instruct the jury on things like downward

1     departure and mandatory minimums that the plea agreement

2     instruction be given as well.

3              THE COURT:  I think that's what 19 is.  19 says,

4     "Some of the witnesses may have entered into an agreement

5     with the United States Attorney's Office which will provide

6     in return for their assistance the government may dismiss

7     certain charges or may recommend a less severe sentence."

8              Then it goes on.  That's the standard instruction.

9     Ms. Dugan-Hinrichs, did you find an instruction on prior

10    felony conviction?

11             MS. DUGAN-HINRICHS:  Judge, in Instruction 25,

12    which I know is the closing instruction, deals with

13    impeachment of witness, prior conviction, plea agreements.

14             THE COURT:  Do you want to make that Instruction

15    20?

16             MS. DUGAN-HINRICHS:  Sure.

17             MR. LEVY:  That's fine.

18             THE COURT:  We'll make Instruction 25 Instruction

19    20 and we'll add it to the preliminary instructions.

20             MR. LEVY:  I received a notice of 404(b) evidence.

21    Just to alert you, I prefer that that 404(b) instruction be

22    given at the time that the evidence comes in, which is from

23    witness Jacara Baker.

24             THE COURT:  When is Ms. Baker coming in?

25             MS. DUGAN-HINRICHS:  Tuesday.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1          THE COURT:  We'll prepare the 404(b) instruction.

2          MR. LEVY:  There is testimony, at least in her

3     proffer, testimony regarding marijuana, and I would like an

4     indication whether that testimony will be permitted or not.

5          THE COURT:  In what respect?  You want to bring it

6     out?

7          MR. LEVY:  No.  I don't believe it's relevant.

8          THE COURT:  With respect to buying or selling

9     marijuana from your client?

10         MR. LEVY:  Yes.

11         THE COURT:  And the government's position is that

12    drugs are drugs?

13         MS. DUGAN-HINRICHS:  It is, sir, and the defendant

14    in his own statement to the police officer talks about

15    marijuana.

16         So it will come out in his confession.  It will

17    come out if the defendant takes the stand.

18         THE COURT:  That he was buying and selling

19    marijuana?

20         MS. DUGAN-HINRICHS:  Or delivering marijuana or --

21    I think in the testimony, in his statement to the police

22    officers, he admitted to delivering marijuana.

23         MR. LEVY:  It doesn't have to come out.

24         THE COURT:  May I see the statement?  Part of

25    Mr. Bass's defense is that he was delivering things to

```
 1    people and he didn't know it was crack cocaine.  He thought
 2    it might be marijuana.  How do you get around that?
 3         MR. LEVY:  Ms. Dugan-Hinrichs knows that the
 4    defendant's defense is going to be he didn't say as Officer
 5    Gassaway testifies.
 6         THE COURT:  I think that goes to issues of
 7    credibility, whether it's marijuana or not marijuana.  I am
 8    going to overrule your motion in limine.  Anything else,
 9    Ms. Dugan-Hinrichs?
10         MS. DUGAN-HINRICHS:  Judge, I'm not sure if this is
11    best addressed as an oral 404(b) motion at this time or not.
12         There is going to be some evidence, or I would like
13    to present evidence of the defendant exerting undue
14    influence on the witnesses in this trial to try to prevent
15    them from testifying.
16         And also defendant's witness Lamar Bass exerting
17    influence or threatening witnesses in an attempt to try to
18    get them not to testify at today's trial.
19         I have done some research it on it, sir, and I
20    realize it is not a charge that is contained in the
21    indictment, but that the case law talks about that this is
22    particularly probative to the issue of guilt in this
23    situation.
24         I bring it forward now actually so I know how to
25    handle it when the issue does come up.
```

1          Officer Gassaway conducted interviews of those

2    people regarding things the defendant said.

3          Those witnesses are going to testify to things the

4    defendant said, and also things that Lamar Bass said about

5    not testifying.

6          And so, again I don't know if a formal 404(b)

7    motion is required, or how best to handle this situation.

8          THE COURT:  I think you have to give the defendant

9    notice of what the testimony may or may not be, because -- I

10   don't know.

11         It seems to me you have to give him notice of what

12   it is, whether you do it under 404(b) or not, so that it can

13   be responded to in due course.  I assume there is no report

14   on this issue?

15         MS. DUGAN-HINRICHS:  Well, sir, the defendant did

16   have notice.

17         Just so that you are aware, the two people who had

18   been contacted by Mr. Bass called and left voice mail

19   messages from --

20         THE COURT:  Which Bass?

21         MS. DUGAN-HINRICHS:  Jerome Bass, left voice mail

22   message for Officer Gassaway.

23         He produced a report subsequent to that and a tape

24   which was the recording of those voice mails.  Those were

25   produced to Mr. Levy last week.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1          In preparing witnesses late Friday afternoon there

2    were conversations that took place, a phone call in which

3    one of the witnesses talked directly to the defendant.  It

4    was a three-way call.

5          THE COURT:  The same two people?

6          MS. DUGAN-HINRICHS:  That one deals with Mr. Karlos

7    Harper and Jerome Bass.

8          A witness to that conversation is a lady named

9    Marie Harper.

10          THE COURT:  We have Karlos Harper as one of your

11    witnesses that has been contacted by the defendant allegedly

12    and then who else by the defendant?

13          MS. DUGAN-HINRICHS:  Tamika Rush.

14          THE COURT:  So Rush and Harper have been identified

15    to the defendant, defendant's counsel, that you intend to

16    present this evidence?

17          MS. DUGAN-HINRICHS:  Marie Harper and Tamika Rush,

18    but not Karlos.

19          I didn't know until Friday that Karlos Harper had a

20    conversation with the defendant.

21          Additionally, Judge, the defendant's brother is an

22    individual named Lamar Bass.

23          Lamar Bass is down at CCA.  They were all

24    transported up here together in a van for this trial.

25          Conversations took place in that van between Lamar

1    and Karlos Harper; Lamar Bass and Jerry Coleman.

2            THE COURT:  I'm not inclined to introduce evidence

3    of any conversations that took place in a van on the way up

4    from CCA between Lamar Bass and cooperating witnesses,

5    unless you present me some factual information that I

6    believe is relevant, but generally speaking not.

7            The two sets of witnesses probably should have been

8    sent up individually, as opposed to together.

9            So we've created a situation in which we've

10   basically thrown Bass in the back of a van and waited to see

11   if it was going to smoulder and ignite.

12           If Lamar Bass was in the jail and sought people out

13   and conveyed threats, that's one thing.

14           But for us to put them in a van together and not

15   expect something to happen is a whole different deal.  So I

16   know specifically what you are talking about.

17           MS. DUGAN-HINRICHS:  Sir, he also did seek some of

18   these people out while at CCA before any of this van stuff

19   took place.

20           Just from my perspective, my theory of the case so

21   to speak, sir, Lamar Bass, the defendant's older brother,

22   did a significant number of things to protect his brother

23   and also to train him in this crack dealing game, so to

24   speak.

25           These other people are witnesses to this and so

1   Lamar's influence, not only on the defendant, but on all of

2   these other people, becomes very important.

3        There was some retaliation that Lamar attempted to

4   commit when his little brother was injured.

5        And so Lamar's influence is part of that bigger

6   picture about his influence, not only on the defendant, but

7   on the witnesses, this group of people that we are talking

8   about.

9        So that is why I want to present that evidence, to

10  show his improper influence on these people and there are

11  threats, Judge.

12       He talks to one of the witnesses about when they

13  get out kind of situation.

14       I know this isn't the trial of Lamar Bass, and I'm

15  not trying to make it be such, but it directly affects and

16  corroborates the same kind of thing Jerome is saying, Tamika

17  Rush and Marie Harper and Karlos Harper.

18       THE COURT:  Mr. Levy?

19       MR. LEVY:  Well, as much as I hate to concede any

20  point, I think the law is pretty clear that efforts by the

21  defendant to influence or tamper with or intimidate

22  witnesses comes in as consciousness of guilt.

23       But what Lamar Bass does on his own time is what

24  Lamar Bass does.

25       Unless you can connect it that he's doing it at the

1    defendant's insistence or encouragement --

2         THE COURT:  Here is the problem I have.  It's

3    charged as a conspiracy and Lamar Bass is part of the

4    conspiracy.

5         MR. LEVY:  The conspiracy is over.  Lamar Bass was

6    arrested in December of 2002; he was convicted in 2003.

7         Any conspiracy of which Lamar Bass would have been

8    a member is two years past.

9         THE COURT:  Here is what I am going to do.  If you

10   have evidence of something that Lamar Bass did,

11   Ms. Dugan-Hinrichs, I would like to have a proffer before

12   you enter the evidence.

13        So if you've got a witness that you think you are

14   going to have testify with respect to any threats by Lamar

15   Bass, then I need to hear that outside the presence of the

16   jury.

17        And the other issue is whether Lamar Bass testifies

18   and if he testifies, then, of course, that goes to his

19   credibility.

20        MR. LEVY:  I am not talking about impeachment.

21        THE COURT:  I understand that, and we may be on the

22   edge of that.

23        I don't know the answer, because I don't know

24   whether Lamar Bass is going to testify.

25        MR. LEVY:  He will.

1          THE COURT:  If he testifies, then we have the same

2     problem.

3          MR. LEVY:  I am not saying if he testifies

4     everything is fair game.

5          MS. DUGAN-HINRICHS:  With regards to that, sir, I

6     did find an Eighth Circuit Model Jury Instruction that talks

7     about this issue.  I didn't have time to go pull it.  I'm

8     looking at a case --

9          THE COURT:  Let's just wait.

10         MS. DUGAN-HINRICHS:  It won't come up in the

11    preliminary instructions.

12         THE COURT:  If you have an instruction you want me

13    to give at the close of evidence, then give it to me at that

14    time, and if you have a case, give me a copy and that would

15    be helpful.

16         MS. DUGAN-HINRICHS:  Certainly.

17         THE COURT:  The last issue that I want to take up

18    is with the government.

19         You've got this pled as a conspiracy to distribute

20    over five hundred grams of crack cocaine.

21         How much does the government intend to prove for

22    purposes of sentencing?

23         MS. DUGAN-HINRICHS:  I think it's only fifty,

24    Judge.

25         THE COURT:  I said five hundred?  It's fifty.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1      That's the ten to life cutoff, so that is what I was getting

2      at.

3              How much crack cocaine is the government seeking?

4      Is it just over fifty or more?

5              MS. DUGAN-HINRICHS:  Judge, I think we are closer,

6      on the light end, 78.51 grams.

7              So we're in the last two categories on your verdict

8      form.  At least five hundred, but less than 1.5; or at least

9      1.5.

10             I'm going to argue it's over 1.5, based on some of

11     the evidence I expect to come in.

12             THE COURT:  Any other enhancements the government

13     wishes to pursue in this case?

14             MS. DUGAN-HINRICHS:  Could I have a moment, Judge?

15             THE COURT:  Yes.

16             MS. DUGAN-HINRICHS:  Your Honor, it's our position

17     we would probably be seeking an obstruction enhancement

18     regarding the defendant's attempt to influence witnesses

19     called by the government in this case.

20             THE COURT:  In my opinion the government has two

21     choices.  One is to get them to go along with a non-jury

22     trial in the context of this case or to separately charge

23     obstruction and I think that there is a separate charge for

24     obstruction.

25             MS. DUGAN-HINRICHS:  There is a tampering charge.

 1          THE COURT:  If you want him indicted on that, then

 2     indict him on that, but we are not going to do it here.

 3          MS. DUGAN-HINRICHS:  You are not going to give the

 4     two bumps for obstruction unless I indict him?

 5          THE COURT:  That's correct.  If we do that, I don't

 6     know that we can do that in the context of this trial.

 7          It's a separate issue and I suppose we could have a

 8     separate trial.

 9          At this late date I don't think it would be a good

10     idea to indict him today and then continue the case.

11     Mr. Levy, what is your position?

12          MR. LEVY:  What you just said.  Charge him or

13     forget about it for this trial.

14          THE COURT:  You are not willing to waive a jury

15     trial on that issue?

16          MR. LEVY:  I'm not.

17          THE COURT:  Anything else, Ms. Dugan-Hinrichs?

18          MS. DUGAN-HINRICHS:  Your Honor, I only point this

19     out because I'm not sure -- we can address it as it comes

20     up.  Nothing else preliminarily.

21          THE COURT:  Mr. Levy?

22          MR. LEVY:  Nothing.

23          THE COURT:  We will be in recess until the jury

24     comes up.

25                    (9:20 a.m. - Recess Taken)

```
 1              (At 9:45 a.m. on September 19, 2005, with counsel

 2     for the parties and the defendant present, the following

 3     proceedings were had in the presence of the jury:)

 4              THE COURT:  Welcome to the District of Nebraska for

 5     the Federal District Court.

 6              I understand that you've already been qualified to

 7     sit as jurors by Judge Smith Camp.

 8              So today we will get on with the case that is

 9     already called before the court and that's the United States

10     of America versus Jerome Bass.  8:04CR-384.

11              Is the government prepared and ready for trial,

12     Ms. Dugan-Hinrichs?

13              MS. DUGAN-HINRICHS:  Yes, sir.

14              THE COURT:  Is the defendant prepared for trial,

15     Mr. Levy?

16              MR. LEVY:  Your Honor, the defendant is ready.

17          (Voir Dire Proceedings Reported - Not Transcribed)

18                      (Jury Selected & Sworn)

19              THE COURT:  Please be seated, ladies and gentlemen.

20     At this time I'm going to read to you the initial jury

21     instructions.

22              You will have a copy of these instructions

23     throughout the course of the trial.

24              You also have a pad of paper to write notes on.

25     Some people like to write notes on the jury instructions,
```

1    but if you do that you have to understand that we may take

2    the instructions away because at the end of case the

3    evidence may be a little different than we anticipated, or

4    there may be some changes in the evidence, and we'll take

5    back some of these initial jury instructions and substitute

6    others in their place.

7         So I would suggest that you not write notes on the

8    jury instructions because you might lose them.

9         So with that I'll read the jury instructions and

10   you're welcome to read along or otherwise.

11            (Preliminary Jury Instructions Read)

12        THE COURT:  With that, ladies and gentlemen, the

13   lawyers have an opportunity to give opening statements.

14        What they say is not evidence, but the lawyers are

15   certainly entitled to tell you what they believe the

16   evidence will be to give you an overview of what the case is

17   all about.

18        The government has the burden of proof, so the

19   government will go first.  Ms. Dugan-Hinrichs, you may

20   proceed.

21        MS. DUGAN-HINRICHS:  Thank you, Judge.  May it

22   please the court, counsel.

23        Good afternoon, ladies and gentlemen of the jury.

24   Thank you for your attention thus far in this case.

25        As the judge has told you, my name is Jennie

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    Dugan-Hinrichs and I represent the government.

2         This is a conspiracy case in which a grand jury has

3    returned a one count indictment against the defendant,

4    Jerome Bass, also known as Rommie Bass.

5         The indictment charges that from an unknown date,

6    but at least as early as January 1, 2001, up to and through

7    December 31, 2003, the defendant did knowingly conspire and

8    agree with others to distribute and possess with intent to

9    distribute over fifty grams of crack cocaine.

10        Many witnesses will be called in this case to prove

11   the defendant's role in this case beyond a reasonable doubt.

12        Officer Jeffrey Gassaway will testify in this case

13   and he will tell you about his investigation of Jerome

14   Bass's crack distribution activity.

15        He will also provide some historical or background

16   information about how this case and others like it were

17   indicted as a result of an ongoing investigation of North

18   Omaha gangs.

19        He will explain the investigation techniques that

20   were used in this case and explain why other investigative

21   techniques were not used.

22        Officer Gassaway will specifically talk about the

23   37th Street Gang.

24        He will tell you about their gang-banging

25   activities and define those terms for you.

1        He will talk about its members, the 37th Street

2    Associates, and other gangs the 37th Street Gang did

3    business with, particularly crack business with.

4        Finally, Officer Gassaway will describe to you in

5    the defendant's own words what he said when he was

6    interviewed by Officer Gassaway.

7        In this statement the defendant admitted his

8    involvement in this conspiracy and dealing crack with his

9    co-conspirators.

10        The government will also present to you a witness

11    by the name of Mark Langan.

12        He's a recently retired Omaha Police Department

13    narcotics sergeant and he will share with you some of his

14    twenty-five years of experience, specifically as it relates

15    to crack cocaine.

16        He will help describe how this drug is packaged,

17    the quantities, how it's sold, so that you will have a

18    better understanding of how the crack sales occur in the

19    North Omaha community.

20        You will also hear from a number of cooperating

21    witnesses in this case.

22        There will be men and one woman who are currently

23    serving a federal sentence for crack distribution.

24        Each one of these cooperating witnesses will give

25    you a personal eyewitness account of the defendant's

1    purchase and sale of crack cocaine.

2         They will describe to you in detail what they

3    observed the defendant do and say which implicates himself

4    in this conspiracy.

5         The cooperating witnesses will help you understand

6    the cast of characters and the role they each played in the

7    37th Street conspiracy and also help better explain the

8    defendant's role.

9         All of the cooperating witnesses are former gang

10   members, although not of the same gang.

11        Most have prior criminal histories, and you'll hear

12   about those, and all are testifying pursuant to plea

13   agreements with the government.

14        After I have presented to you all of the evidence

15   in this case by way of the testimony and exhibits, the

16   defendant will have an opportunity to put on their case, if

17   they choose.

18        At the conclusion of all of the evidence I will

19   have the opportunity to come back once again and argue

20   before you what the evidence showed.

21        And it's at that time that I will ask you to return

22   a guilty verdict.  Thank you.

23        THE COURT:  Mr. Levy?

24        MR. LEVY:  If it please the court, Judge Bataillon,

25   Ms. Dugan-Hinrichs, members of the jury, good afternoon.

1          I don't want to overdramatize what is going to

2     happen in this case, but you are about to embark on a

3     journey of seeking the truth.

4          Seeking to answer a question, between January of

5     2001 and December of 2003 was Jerome Bass a drug dealer?

6          If the answer to that question is yes, you will

7     convict him.

8          If you answer that question either no, or I don't

9     know, you will acquit him.

10         Your job will be to pass judgment on a fellow human

11    being.

12         It's an awesome responsibility, but it's a

13    responsibility that is yours.

14         And if you will recall, on voir dire you promised

15    that you would approach this responsibility objectively,

16    without passion, without prejudice, rely on the evidence and

17    nothing more.

18         The evidence is going to show you a series of facts

19    that make it highly unlikely that Jerome Bass is a drug

20    dealer.

21         There will be a picture of Jerome Bass painted that

22    you will have to then go back and ask yourself is this guy a

23    drug dealer?

24         Is what I've heard in this case consistent with a

25    young man dealing drugs?

1          He's not a gang member.  There will be no evidence

2     that he was a gang member.  And, by the way, being a gang

3     member is not illegal.

4          The prosecution will produce for you, I think at

5     last count eight, maybe nine individuals, all of whom are

6     serving hundreds of months in federal prison for doing what

7     Jerome Bass is accused of doing.

8          Each and every one of those individuals has

9     something to gain from testifying for the prosecution.

10          The evidence will not only just come out on direct

11     examination of these witnesses by the prosecutor, but I will

12     be entitled to cross-examine the witnesses, establish if

13     they are inconsistent, the changing of their stories, if

14     they have an ax to grind, and if they are just flat out

15     lying.

16          Let me give you a couple of examples.

17     Ms. Dugan-Hinrichs and I know generally what the case is

18     going to be about.

19          We know what the evidence is going to be.  We know

20     what the testimony is going to be.

21          We don't try cases by ambush, so I know generally

22     what her witnesses are going to say.

23          There is a witness named Karlos Harper.  He is a

24     cousin of Mr. Bass.

25          He was raised by Mr. Bass's mother.  He lived in

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    Mr. Bass's house.

2              I don't know what he's going to tell you.  He has

3    testified three different times in three different

4    directions.

5              He has written letters recanting and signed

6    statements of recantation.

7              That's the kind of thing you are going to have to

8    look at.

9              More than just what the witness testifies to over

10   the next few days, but what has he said in the past?

11             There's a witness named Jerry Coleman.  He's going

12   to testify that Mr. Bass and a gentleman named JeVaugn Erwin

13   were in the crack cocaine business together and they sold

14   and bought from Jerry Coleman.

15             JeVaughn Erwin is a convicted drug dealer.  I have

16   subpoenaed him.

17             He will testify that Jerry Coleman is a liar.  The

18   decision on who to believe is up to you.

19             Jerome Bass is now a 23-year-old young man.  He is

20   accused of being a drug dealer when he was 18 and 19 years

21   old.

22             He will testify.  He will tell you about what he

23   told Officer Gassaway and what he didn't tell Officer

24   Gassaway.

25             And I think there is the crux of the case.    You

1    will have to decide who to believe.

2              THE COURT:  At this time, ladies and gentlemen, we

3    are going to take a break.  When we come back, then we'll

4    start evidence.  We'll be in short recess.

5                        (2:40 p.m. - Recess Taken)

6              (At 3:00 p.m. on September 19, 2005, with counsel

7    for the parties and the defendant present, the following

8    proceedings were had in the presence of the jury:)

9              THE COURT:  Ms. Dugan-Hinrichs, you may call your

10   first witness.

11             MS. DUGAN-HINRICHS:  Thank you, Your Honor, the

12   United States calls Officer Jeffrey Gassaway.

13           JEFFREY D. GASSAWAY, PLAINTIFF'S WITNESS, SWORN

14                        DIRECT EXAMINATION

15   BY MS. DUGAN-HINRICHS:

16   Q.  Could you please state your name and spell your last for

17   the record?

18   A.  Jeffrey Gassaway.  G-A-S-S-A-W-A-Y.

19   Q.  By whom are you employed?

20   A.  City of Omaha as a police officer.

21   Q.  How long have you been with the Omaha Police Department?

22   A.  Eight years.

23   Q.  And are you assigned to a particular unit or division?

24   A.  Yes.  I'm currently assigned to the criminal

25   investigative bureau as a detective in the gang suppression

1   unit.

2   Q.  How long have you been in that unit?

3   A.  This is my second tour of duty with the gang unit.

4   Eighteen months the first time and almost three years this

5   time.

6   Q.  So four and a half years?

7   A.  Yes.

8   Q.  Briefly, sir, could you describe your duties and

9   responsibilities as a member of the gang unit?

10  A.  We are tasked with the identification and tracking and

11  conducting investigations of metro area gang members.

12  Q.  And before you were assigned to the gang unit what part

13  of the police department did you work for?

14  A.  I was assigned to uniform patrol and then to our traffic

15  bureau.

16  Q.  And did you have any law enforcement experience prior to

17  the Omaha Police Department?

18  A.  Yes.  I was on active duty Air Force for twelve years,

19  eight of which I was a criminal investigator with the Air

20  Force Office of Special Investigations, OSI.

21  Q.  With your work at the Omaha Police Department have you

22  received any honors or awards?

23  A.  Yes, I have.

24  Q.  And what are those?

25  A.  I was Crimes Stoppers officer of the year in 2000 and

1    also in 2000 I won the LEEC, law enforcement coordinator

2    award, for top law enforcement officer of the year.

3    Q.  And those were both in the year 2000?

4    A.  2004.

5    Q.  Sir, I would like to talk to you specifically about your

6    job in the gang unit, if I could.

7         With regard to your duties and responsibilities,

8    could you describe them more in depth about how you conduct

9    your investigations?

10   A.  Mostly we find ourselves conducting a lot of narcotics

11   investigations involving metro area gang members.  We do it

12   in several different ways.

13        Once an allegation is received we do it

14   surreptitiously, meaning we use undercover officers if

15   possible, confidential informants, other investigative

16   techniques to prove up the allegation.

17        Or also we do long-term investigations, such as

18   conspiracy investigations, such as this one.

19   Q.  And with regard to the gangs in north Omaha, could you

20   briefly state for us, during your tour of duty as a gang

21   unit member what were the major gangs in North Omaha,

22   Nebraska?

23        MR. LEVY:  Objection, relevance.

24        THE COURT:  Do you intend to tie this up with the

25   evidence in this particular case?

1        MS. DUGAN-HINRICHS:  Yes, sir.

2        THE COURT:  Overruled.

3        THE WITNESS:  There's several major gangs, if you

4    go by population -- not population, but numbers in the gang.

5        37th Street, which we will talk about in this

6    trial, I'm sure.

7        And I should back up.  You're probably more

8    familiar with Bloods and Crips.

9        Omaha is a little bit unique.  A lot of the street

10   gangs go by neighborhoods, which can be a Blood set or a

11   Crip set.

12       So traditionally they go by 37th Street, 40th

13   Avenue, Crown Point, Murder Town Gangsters, 29th Street,

14   Small Street.  There's several more.

15   Q.  Jaynes Street?

16   A.  Jaynes Street.  36th Avenue and 45th Avenue.  Both are

17   Blood sets.

18   Q.  Sir, are you familiar with the rivalries that exist

19   between the gangs that you have just talked about?

20   A.  Yes.  There are some gangs that traditionally do not get

21   along, or traditional rivals, as well as gangs that

22   traditionally do get along.

23   Q.  Which of the gangs that you talked about would be the

24   traditional rivals of the 37th Street Gang?

25   A.  Jaynes Street would be one.  40th Avenue would be an

1    ally type gang set with them.

2    Q.  What about Crown Point?

3    A.  Crown Point Crips would be a rival.

4    Q.  And, sir, the term gang-banging, can you tell us what

5    that word means?

6    A.  Essentially that's committing some sort of gang-related

7    violence, mostly in retaliation to an act that is committed

8    upon your gang set or a gang member in your set.  It could

9    include fighting, assaults, shootings, et cetera.

10   Q.  And could you in your own words describe or define for

11   us what conspiracy means to you?

12   A.  Conspiracy is when two or more individuals enter into an

13   agreement to commit a criminal act and they do something in

14   furtherance of that agreement.

15   Q.  And as it relates to your north Omaha investigations,

16   what typically has that crime been?

17   A.  The distribution of crack cocaine.

18   Q.  And is it specific to that drug?

19   A.  No, not at all.  It also includes marijuana, powder

20   cocaine.

21   Q.  Could you define for us a dry conspiracy?

22   A.  A dry conspiracy is a historical type investigation,

23   meaning there is no actual physical evidence, it's all

24   conspiracy driven and it relies upon statements of

25   co-conspirators or the other people that are involved in the

1   conspiracy at the time.

2   Q.  So the cumulative, if you would, a group of interviews

3   conducted that talk about who dealt with who, would that be

4   fair?

5   A.  Yes.  We'll talk in depth I'm sure about proffer

6   interviews and that's where we solicit the information to

7   build our conspiracy case.

8   Q.  And that is my next question.  Define for me what a

9   proffer interview means to you.

10  A.  A proffer interview is an interview conducted with an

11  individual that has been arrested, indicted in federal

12  court, and agrees to cooperate with the government.

13          We sit down with that individual at which time that

14  individual tells us in great detail about his or her entire

15  drug activity in the past, who they've dealt with, who they

16  have sold to, time frames, any other corroborating

17  information that we can gather.

18          So basically they outline their entire drug

19  activity which led up to their arrest and who participated

20  in it with them.

21  Q.  And who is present at a proffer interview?

22  A.  Initially, almost every proffer interview, the first

23  one, the United States Attorney assigned to the case, the

24  case officer, which would be myself or another gang unit

25  officer, or narcotics officer, the defendant, and his or her

1    attorney.

2    Q.  And when you talked about the different types of

3    information that you glean from the individuals during a

4    proffer, would that also include locations that are

5    specific, for example, houses or neighborhoods?

6    A.  Yes.

7    Q.  Would that also include the cars or other personal

8    information about the people to help identify them?

9    A.  Yes.  We go into great detail to obtain corroborating

10   information so we can accurately identify someone, location,

11   or figure out if that person is telling the truth about a

12   person that we already may have knowledge of.

13   Q.  And how do you go about corroborating that information?

14   A.  It's corroborated by personal knowledge.  All the gang

15   unit officers in our unit have significant experience in the

16   north Omaha area.

17            So we ask them.  We run the proffers by each

18   officer to ensure that they may have something to add.

19            We do data checks.  We do DMV checks.  We do checks

20   on an individual's residence.

21            We run phone numbers.  We do a query of our FI

22   system.

23            Every time an individual is contacted by the

24   police, was there an identification card made, and if that

25   person was identified with another person.  That way we can

1    show a link that they actually did hang out together.

2    Q.  What information would you get from a data check?

3    A.  It tells us the time frame a person was incarcerated.

4    It would tell us the person's criminal history.

5         We can go in and look at reports and pull those

6    reports to see who else was involved in a specific incident.

7    Q.  For example, if you did a proffer of an individual who

8    said he dealt crack cocaine in 2002 and you went and did a

9    data check and found out they were incarcerated in that time

10   frame and couldn't have possibly been out on the street

11   dealing cocaine, that would be a form of corroboration that

12   that person was being untruthful?

13        MR. LEVY:  Objection to the leading basis of the

14   question.

15        THE COURT:  I think because it's preliminary in

16   nature I'm going to overrule the objection.  You may

17   proceed.

18        THE WITNESS:  Yes.  It's proof that maybe they had

19   the dates wrong.

20        It's quite possible that someone had the wrong

21   month or year, or they were not telling the truth, yes.

22   BY MS. DUGAN-HINRICHS:

23   Q.  Do you also conduct surveillance on these houses or

24   locations that you are given to corroborate information?

25   A.  Yes, we do.

1    Q.  Why do you do that?

2    A.  Basically to see what activity is going on there.  If we

3    receive an allegation that someone is selling drugs out of a

4    specific location, the best way to go and find out is to go

5    and set up on that place to see if there is any short-term

6    pedestrian traffic which is indicative of drug sales going

7    on inside the residence.

8    Q.  As an Omaha police officer, what concerns do you have

9    when you set up surveillance at a north Omaha location to

10   try to look for this information?

11   A.  Well, a lot of our officers, including myself, are well

12   known, and so are our vehicles, so sometimes it very

13   difficult to do that.

14   Q.  Because they would know that you are watching, correct?

15   A.  Correct.

16   Q.  Sir, what is a traditional investigative technique that

17   you have utilized in your job that doesn't apply to the gang

18   unit, so the jury can understand what is available to you?

19   A.  Well, I'm not sure if I understand the question.

20   Q.  I can rephrase it.  Are there traditional investigative

21   techniques that you do not use, given the type of

22   investigations you do in north Omaha?

23   A.  Yes.

24   Q.  And what are those investigative techniques?

25   A.  Some of them are controlled buys, for instance, or

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    undercover buys.

2              I worked in an undercover capacity in the past, but

3    in this sort of investigation, or against north Omaha gang

4    members, I can't work undercover because they simply know

5    me.

6              Controlled buys we may not be able to do by using a

7    confidential informant because you have to have access to

8    that group in some way, shape or form.

9              Wiretaps are available, but most of the time aren't

10   feasible to use as depicted on TV.  You just can't go out

11   and get a wiretap.

12   Q.  Are wiretaps successful on cellular phones, or do you

13   know?

14   A.  Yes, they are.

15   Q.  How about trash pulls?

16   A.  We do trash pulls, yes.

17   Q.  What does that entail?

18   A.  We wait until trash day, take their trash, go through it

19   to find any contraband, drugs, and venue items as to who may

20   live inside that residence and that will give us probable

21   cause to get a search warrant signed by a magistrate or

22   judge.

23   Q.  Sir, after you obtain information through proffers, and

24   you have the opportunity to verify or corroborate as much of

25   the information as you can, then what do you do with that

1    information?

2    A.   We sit down with the United States Attorney's Office to

3    see if that's enough information to seek an indictment.

4    Q.   And who decides if there is enough information to seek

5    an indictment?

6    A.   The United States Attorney's Office.

7    Q.   And are you a member, sir, of a task force?

8    A.   Yes.

9    Q.   What is the name of that task force?

10   A.   The Metro Area Task Force.

11   Q.   Who are its members?

12   A.   We have several law enforcement agencies, including

13   federal and state.

14          We have the FBI, Drug Enforcement Administration,

15   ICE, which was formerly INS.

16          We have Omaha police, Sarpy, Douglas County,

17   LaVista, Ralston, are all members.

18   Q.   The whole metro area?

19   A.   Yes, they all have representatives on the task force.

20   Q.   What is the purpose of that task force?

21   A.   To conduct narcotics investigations.

22   Q.   Sir, are you familiar with Operation Alcatraz?

23   A.   Yes.

24   Q.   Explain to us what that is.

25   A.   It's a federally-funded case that myself and another

1    officer initiated in late 2003 after we saw a trend of crack

2    cocaine distribution among gang members in the Omaha area.

3            We saw parallels that indicated that rival gang

4    members were selling crack cocaine to rival gangs, as well

5    as allied gangs.

6            And we sought federal funds to target the

7    distribution networks from the highest level to the street

8    level.

9    Q.  And when you obtain a proffer, does that include who

10   that individual gets their source of crack cocaine from?

11   A.  Yes.

12   Q.  And would you also ask them who they distribute it to?

13   A.  Yes.

14   Q.  And so through the series of proffers is it fair to say

15   that you are developing a hierarchy?

16   A.  Yes.

17   Q.  Is that part of this information that you were learning

18   through this Operation Alcatraz?

19   A.  Yes.

20   Q.  Sir, do you know the number of federal indictments that

21   arose from Operation Alcatraz?

22   A.  I would say in the 18 month time period in the

23   neighborhood of 135 to 150.

24   Q.  Those are individuals, correct?

25   A.  Yes.

1    Q.  And with regard to these gangs that you listed earlier,

2    would those 135 to 150 people be members of all of those

3    gangs?

4    A.  Not all, but a good deal, yes.

5    Q.  Are there people that you indicted that aren't members

6    of a gang?

7    A.  Yes.

8    Q.  Can you define for me what the term plug means?

9    A.  The term plug, which you will hear, is someone that is a

10   source for someone to obtain drugs.  Their supplier, if you

11   will.

12   Q.  And the term swerve?

13   A.  Swerve is an individual who has a severe crack cocaine

14   habit and they buy small amounts on the street as a crack

15   addict.

16   Q.  Is this case one of those that arose out of Operation

17   Alcatraz?

18   A.  Yes.

19   Q.  And are you familiar with an individual named Lamar

20   Bass?

21   A.  Yes.

22   Q.  Is Lamar Bass the older brother of the defendant Jerome

23   Bass?

24   A.  Yes.

25   Q.  And did this case historically derive itself out of

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    Lamar's case?

2    A.   Partly, yes.

3    Q.   Could you explain how that worked?

4    A.   Lamar is a member of the 37th Street Crips--

5              MR. LEVY:  Judge, I object and move to strike on

6    foundational grounds.

7              THE COURT:  Sustained.

8    BY MS. DUGAN-HINRICHS:

9    Q.   Sir, did you have the occasion to indict an individual

10   by the name of Lamar Bass?

11   A.   Yes.

12   Q.   And upon whose proffer information was that indictment

13   partially based?

14             MR. LEVY:  Objection, hearsay; relevance.

15             THE COURT:  I'll sustain that.

16   BY MS. DUGAN-HINRICHS:

17   Q.   In addition to proffer information which was used as

18   part of the basis of Lamar Bass's case, did you utilize

19   investigative techniques in the Lamar Bass investigation?

20   A.   Yes.

21   Q.   Did you combine the proffer and that investigative

22   technique to form that basis?

23   A.   Yes.

24   Q.   And was it presented to the United States Attorney?

25   A.   Yes.

1    Q.  And was it indicted?

2    A.  Yes, it was.

3    Q.  Do you recall when?

4    A.  December of 2002 and he was arrested on New Years Eve of

5    that year.

6    Q.  Was Lamar Bass indicted individually or did he have a

7    co-defendant?

8    A.  He had a co-conspirator.

9    Q.  Who was that?

10   A.  JeVaughn Erwin.

11   Q.  Do you recall when JeVaughn Erwin was arrested on his

12   federal indictment?

13   A.  He was indicted the same time in 2002 and we did not

14   locate him for about a year possibly.

15   Q.  Sir, through your investigations as an officer and the

16   conducting of proffer interviews, are you familiar with the

17   relationship and the hierarchy of the 37th Street Gang?

18   A.  Yes.

19   Q.  Are there family relationships within this gang?

20        MR. LEVY:  Objection, Your Honor, foundation,

21   relevance.

22        THE COURT:   Sustained.

23   BY MS. DUGAN-HINRICHS:

24   Q.  You said Lamar Bass was a 37th Street Gang member?

25        MR. LEVY:  Objection, foundation.

1          THE COURT:  Sustained.

2     BY MS. DUGAN-HINRICHS:

3     Q.  Through your investigative techniques and years of

4     experience in the gang unit, sir, do you know Lamar Bass to

5     be a documented 37th Street Gang member?

6          MR. LEVY:  Same objection, Your Honor.

7          THE COURT:  Sustained.

8     BY MS. DUGAN-HINRICHS:

9     Q.  I believe you testified that Lamar Bass was Jerome

10    Bass's older brother?

11    A.  Yes.

12    Q.  Are you familiar with the relationship between Lamar

13    Bass and JeVaughn Erwin?

14    A.  Yes.

15    Q.  How are you familiar with that?

16    A.  Based on our investigation into the 37th Street set, we

17    came to find out JeVaughn Erwin and Lamar Bass --

18         MR. LEVY:  Judge, I object to anything further than

19    yes, he's familiar, and he was asked then how is he

20    familiar; not what he found out.

21         THE COURT:  I'll sustain the objection.  The

22    information that you've received up to this point is

23    admissible and counsel just needs to ask the next question.

24    You may proceed.

25    BY MS. DUGAN-HINRICHS:

1    Q.  Sir, how are you familiar with this information?

2    A.  We knew that JeVaughn Erwin and Lamar Bass were involved

3    in selling crack cocaine --

4          MR. LEVY:  Objection, move to strike, not

5    responsive; foundation; relevance.

6          THE COURT:  Sustained.

7    BY MS. DUGAN-HINRICHS:

8    Q.  Let me back up.  You had the occasion to conduct a

9    proffer interview of an individual named Jimmy Swain,

10   correct?

11   A.  I did not conduct that proffer, but I'm familiar with

12   it, yes.

13   Q.  And was that one of the proffers used to indict Lamar

14   Bass?

15         MR. LEVY:  Objection, Your Honor, calls for

16   hearsay.  Relevance.

17         THE COURT:  Sustained.

18   BY MS. DUGAN-HINRICHS:

19   Q.  Did you have the occasion to conduct an interview of an

20   individual name Karlos Harper?

21   A.  Yes.

22   Q.  And did Karlos Harper describe for you the family

23   relationships that existed within the 37th Street Gang?

24   A.  Yes.

25   Q.  And was Karlos Harper involved in the crack cocaine

1    conspiracy with other 37th Street members?

2          MR. LEVY:  Objection, foundation, relevance,

3    materiality.

4          THE COURT:  I'm going to sustain that objection.  I

5    believe Mr. Harper is on the witness list.  So I think that

6    is hearsay.

7    BY MS. DUGAN-HINRICHS:

8    Q.  Sir, are you familiar with who the 37th Street Gang was

9    buying and selling crack cocaine with?

10   A.  Yes.

11   Q.  How did you learn that information?

12   A.  Through our investigation.

13   Q.  And who do you know them to sell and buy crack cocaine

14   from?

15          MR. LEVY:  That's objected to as calling for

16   hearsay.

17          THE COURT:  Sustained.

18   BY MS. DUGAN-HINRICHS:

19   Q.  Sir, are you familiar with or were you the case agent

20   for Lamar Bass?

21   A.  Yes, I was.

22   Q.  What about JeVaughn Erwin?

23   A.  Yes.

24   Q.  Jerome Daniels?

25   A.  Yes.

1    Q.  Jimmy Jackson?

2    A.  Yes.

3    Q.  Terrell Jackson?

4    A.  Yes.

5    Q.  Karlos Harper?

6    A.  Yes.

7    Q.  Jacara Baker?

8    A.  Yes.

9    Q.  Deandre Baker?

10   A.  Yes.

11   Q.  Antone Green?

12   A.  Yes.

13   Q.  Jerry Coleman?

14   A.  No, I was not.

15   Q.  Are you familiar with Jerry Coleman?

16   A.  Yes.  I participated in the proffer, but I was not the

17   case agent.

18   Q.  How about Royce Brown?

19   A.  Yes.

20   Q.  Marshall Box?

21   A.  Again, participated in the proffer, but not the case

22   agent.

23   Q.  William Hawkins?

24   A.  No, I'm familiar with the proffer.

25   Q.  And were those individuals that I named indicted on

1   federal conspiracy charges?

2           MR. LEVY:  Objection, relevance.

3           THE COURT:  Overruled.

4           THE WITNESS:  Yes, they were.

5   BY MS. DUGAN-HINRICHS:

6   Q.  And were they involved with the conspiracy together?

7           MR. LEVY:  Objection, foundation, hearsay.

8           THE COURT:  Sustained.

9   BY MS. DUGAN-HINRICHS:

10  Q.  Are you aware, sir, of who the co-conspirators are?

11          MR. LEVY:  Objection, hearsay.

12          THE COURT:  Sustained.

13  BY MS. DUGAN-HINRICHS:

14  Q.  As it specifically relates to this case, sir, before

15  Jerome Bass was indicted, did you know who the main source

16  or supply of crack cocaine was for the 37th Street Gang?

17  A.  Yes.

18  Q.  How did you know that?

19  A.  From information we got from several sources, including

20  the main source himself.

21  Q.  Who was the main source?

22          MR. LEVY:  Objection, hearsay.

23          THE COURT:  Sustained.

24  BY MS. DUGAN-HINRICHS:

25  Q.  Specific to the defendant, Jerome Bass, did people

1   through proffer interviews provide information on him and

2   his crack dealing activities prior to his indictment?

3           MR. LEVY:  Objection, hearsay.

4           THE COURT:  Sustained.

5   BY MS. DUGAN-HINRICHS:

6   Q.  Did you know Mr. Jerome Bass before he was indicted?

7   A.  Yes.

8   Q.  How did you know him?

9   A.  We received information through proffers in which we

10  were able to identify him positively and --

11          MR. LEVY:   Move to strike as hearsay, Your Honor.

12          THE COURT:  Sustained.

13          MR. LEVY:   Ask the jury to disregard everything

14  they have heard.

15          THE COURT:  Well, for this answer, so the objection

16  is sustained and the jury is instructed to disregard his

17  answer.

18  BY MS. DUGAN-HINRICHS:

19  Q.  Sir, do you know what date Jerome Bass was indicted?

20  A.  He was indicted I believe August or September of 2004

21  and arrested on October 13, 2004.

22  Q.  Were you involved with that arrest?

23  A.  Yes.

24  Q.  How did that come about?

25  A.  I had observed Mr. Bass driving on Sorensen Parkway.  I

1    radioed to a marked cruiser to stop him because I knew he

2    had an active felony warrant for his arrest.

3    Q.  And did you observe that cruiser conduct that traffic

4    stop?

5    A.  I was in my personal vehicle going to work and I didn't

6    go to the immediate stop location.

7            I waited until they radioed to me where they

8    stopped him and I stayed a few blocks off.

9    Q.  And so you were in radio contact with them?

10   A.  Yes.

11   Q.  And at some point did you meet up with that cruiser and

12   Jerome Bass?

13   A.  Yes, I instructed them to take him to the 30th and

14   Taylor Street precinct where I would meet them there and

15   conduct an interview with him.

16   Q.  He was under arrest, correct?

17   A.  Yes.

18   Q.  And did you have contact with him at the northeast

19   precinct?

20   A.  Yes, I did.

21   Q.  How did that come about?

22   A.  They had put him inside of an interview room where he

23   waited for me and I went in and conducted an interview with

24   him at that location.

25   Q.  How did that interview begin?

1    A.  It began by I introduced myself to him and told him that

2    he had an active felony warrant for his arrest for

3    conspiracy to distribute crack cocaine and I was there to

4    conduct an interview with him.

5           MS. DUGAN-HINRICHS:  Your Honor, may I approach the

6    witness?

7           THE COURT:  You may.

8    BY MS. DUGAN-HINRICHS:

9    Q.  Sir, after you told him what he was arrested for, how

10   did you conduct your interview?

11   A.  I told him I would like to ask him some questions, but

12   before I did so I would have to read him his Miranda rights.

13   Q.  Did you use anything to assist you?

14   A.  Yes, I did.

15   Q.  What did you use?

16   A.  I used OPD Form 17, the Omaha police rights advisory

17   form.

18   Q.  Directing your attention to Exhibit 14, would you tell

19   me what that is?

20   A.  Again, the Omaha Police Department rights advisory form,

21   it's dated October 13, 2004.  It bears RB number 52781E,

22   which is our records bureau number assigned to this case.

23   Q.  Do you recognize any handwriting on Exhibit 14?

24   A.  Yes.

25   Q.  Whose is it?

1    A.   Mine.

2    Q.   Anyone else's?

3    A.   Mr. Bass's.

4    Q.   Sir, when you utilized Exhibit 14 to assist you, what

5    was the first thing you advised Mr. Bass of on October 13,

6    2004?

7    A.   The first question is, I advised him that I was a police

8    officer and then I read verbatim off the rights advisory

9    form and I asked Mr. Bass for yes or no only answers.

10   Q.   And then you recorded those answers on Exhibit 14?

11   A.   Yes, I did.

12   Q.   Sir, what was the first right that you advised Mr. Bass

13   of?

14   A.   I told him I would like to advise him that I'm a police

15   officer and the next portion of that question is do you

16   understand that?

17   Q.   And what was his response?

18   A.   Yes.

19   Q.   Did you record it?

20   A.   Yes, I did.

21   Q.   What was the second right you advised him of?

22   A.   You have the right to remain silent and not make any

23   statements or answer any of my questions.  Do you understand

24   that?

25   Q.   What was his response?

1     A.  Yes.

2     Q.  Did you record that on Exhibit 14?

3     A.  Yes, I did.

4     Q.  What was the third thing you told Mr. Bass?

5     A.  Anything that you may say can and will be used against

6     you in court.  Do you understand that?

7     Q.  What was his response?

8     A.  Yes.

9     Q.  And did you record that on Exhibit 14?

10    A.  Yes, I did.

11    Q.  What was the fourth right you advised him of?

12    A.  You have a right to consult with a lawyer and have a

13    lawyer with you during questioning.  Do you understand that?

14    Q.  And what was his response?

15    A.  Yes.

16    Q.  And is that recorded on Exhibit 14?

17    A.  Yes.

18    Q.  What was the fifth right you advised him of?

19    A.  If you cannot afford a lawyer, the court will appoint

20    one to represent you.  Do you understand that?

21    Q.  What was his response?

22    A.  Yes.

23    Q.  Did you record that on Exhibit 14?

24    A.  Yes.

25    Q.  And what was the last thing you told him?

1   A.  Knowing your rights in this matter, are you willing to

2   talk to me now?

3   Q.  What did he respond?

4   A.  Yes.

5   Q.  Is that on Exhibit 14?

6   A.  Yes, it is.

7   Q.  Is Exhibit 14, sir, a true and accurate copy of the

8   original as you recall it on October 13, 2004?

9   A.  Yes.

10  Q.  And is it in the same or substantially the same

11  condition as it was on that day?

12  A.  Yes.

13          MS. DUGAN-HINRICHS:  Government offers Exhibit 14.

14          MR. LEVY:  May I examine it?

15          THE COURT:  Yes, you may.

16          MR. LEVY:  No objection.

17          THE COURT:  Exhibit 14 is received.

18          MS. DUGAN-HINRICHS:  May I have permission to

19  publish it?

20          THE COURT:  Yes, you may.

21  BY MS. DUGAN-HINRICHS:

22  Q.  At the bottom of Exhibit 14 there is a signature.  Do

23  you recognize that signature?

24  A.  Yes, I do.

25  Q.  Whose is it?

1    A.   Jerome Bass's.

2    Q.   And how do you know that?

3    A.   I asked him to affix his signature at the bottom of the

4    form to show further voluntary cooperation in the interview.

5    Q.   Why did you do that?

6    A.   It's not mandatory that we do that.  As a common

7    practice I always do that so I can show that the person, I

8    recorded their responses and the person signed the form on

9    their own accord, without any pressure from me.

10   Q.   Do you do that in all cases?

11   A.   I do personally, yes.

12   Q.   After he was advised of his Miranda rights by Exhibit

13   14, did he make a statement to you?

14   A.   Yes, he did.

15   Q.   Can you describe for me his physical appearance during

16   the course of your interview with him?

17   A.   He was coherent, alert, didn't seem to be under the

18   influence of alcohol or drugs.

19        It was 3:00 o'clock in the afternoon.  He was

20   awake.  He seemed a bit nervous.

21   Q.   Sir, at any time was he confused by any of the questions

22   that you asked?

23   A.   No.

24   Q.   Were the responses that he gave you appropriate for the

25   questions that you asked?

1    A.  Some.

2    Q.  Did he complain about anything?

3    A.  No.

4    Q.  At any time during your interview did he refuse to

5    answer any of your questions?

6    A.  No, he did not.

7    Q.  Did he invoke his right to remain silent?

8    A.  No, he did not.

9    Q.  Did he ask for an attorney?

10   A.  No, he did not.

11   Q.  Did you promise him anything during the course of that

12   interview?

13   A.  No, I did not.

14   Q.  Did you offer him any inducements, like talking to the

15   prosecutor on his behalf?

16   A.  No.

17   Q.  Did you threaten him or use physical force in any way?

18   A.  No.

19   Q.  How long did your interview last on October 13, 2004?

20   A.  The interview started at 1525 hours, 3:25 p.m., and we

21   concluded at 4:50 p.m.

22   Q.  Can you describe for me what the defendant said to you

23   during that interview?

24   A.  I started -- the interview was encompassed by four

25   pages, so there was quite a lot of dialogue, but I started

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    the interview --

2             MR. LEVY:  Judge, I believe the officer is reading

3    from his report and I would object to him doing that, unless

4    he wants to refer to it to refresh his recollection.

5             THE COURT:  I'm not sure I understand the

6    objection.  It appears he's reading from his report.

7             MR. LEVY:  I think he's reading from his report.  I

8    object to him reading from his report of the statement,

9    unless he must refresh his recollection from the report.

10            THE COURT:  I'll sustain the objection.

11   Ms. Dugan-Hinrichs, if you would just ask the witness the

12   question.

13            And if he needs to refer to his report, then he

14   needs to advise us that he's doing that.

15            MS. DUGAN-HINRICHS:  Certainly, sir.  I can break

16   it down.

17   BY MS. DUGAN-HINRICHS:

18   Q.  Sir, after you read him his Miranda rights, what was the

19   first thing that you and Jerome Bass talked about during

20   that interview?

21   A.  I told him he was indicted for crack cocaine

22   distribution and that I suspected that he was involved with

23   selling crack cocaine and I asked him, can you tell me about

24   that?

25   Q.  And what was his response to that question?

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1   A.   Initially he denied any involvement.

2   Q.   And after he denied any involvement, what questions did

3   you ask after that?

4   A.   I told him that we had several statements of

5   co-conspirators that indicated him involved in distributing

6   crack cocaine.

7            He then said that he believed that he transported

8   some narcotics, namely marijuana and crack cocaine, to

9   several individuals on behalf of his brother.

10           In other words, his brother Lamar Bass asked him to

11   make deliveries for him.

12   Q.   And did Mr. Jerome Bass recall any specific instances in

13   which he made these deliveries on behalf of his brother

14   Lamar?

15   A.   Yes.

16   Q.   Can you recall the first specific instance that Mr. Bass

17   described to you?

18   A.   Yes.

19   Q.   What did he tell you?

20   A.   He said during 2002 Lamar Bass asked him to deliver some

21   drugs to an individual by the name of Mario Moss.

22           Mr. Jerome Bass said that he delivered marijuana on

23   that occasion to Mario Moss and he said that it was hidden

24   inside of an article of clothing.

25           MR. LEVY:  Excuse me, Your Honor.  I think it would

1    be appropriate at this time to instruct the jury on 404(b).

2           THE COURT:  We don't have an instruction, of

3    course, correct, that we've agreed on?

4           MR. LEVY:  Judge, it's the Eighth Circuit --

5           THE COURT:  We have not agreed on what the

6    instruction is going to be specifically.

7           I think without getting into any particulars I will

8    defer giving the instruction until we have completed at

9    least the direct examination of this witness.  Is that

10   acceptable?

11          MR. LEVY:  That's fine.

12          THE COURT:  You may proceed, Ms. Dugan-Hinrichs.

13          MS. DUGAN-HINRICHS:  Thank you, Judge.

14   BY MS. DUGAN-HINRICHS:

15   Q.  Sir, when Jerome Bass stated that he had delivered

16   marijuana in an article of clothing to Mario Moss, did he

17   say what if anything he got in return for doing that?

18   A.  Yes.  He said that Lamar, I think, gave him gas money

19   for making the trip.

20   Q.  After describing that specific instance, did he describe

21   any other instances in which he delivered controlled

22   substances for his brother?

23   A.  Yes.

24   Q.  And what did he tell you?

25   A.  He said on another specific trip that an individual

1     called Lamar and asked for something.

2            And Lamar sent Jerome to meet an individual who he

3     identified as Sacks, street name Sacks, at BJ's convenience

4     store at 42nd and Ames.

5            He said again the narcotics that he believed was

6     hidden inside of an article of clothing was crack cocaine.

7            I asked him how did he know that it was crack

8     cocaine inside of the jacket.

9            He said that this individual Sacks has a reputation

10    on the street to be a big time buyer and seller of crack

11    cocaine.

12    Q.  Sir, have you been able to identify who Sacks is?

13    A.  No.

14    Q.  After that second instance where he described delivering

15    controlled substances for his brother, specifically crack,

16    did he say anything specifically about other deliveries

17    similar in nature?

18    A.  Yes.  I asked him, of course the next follow-up question

19    was, who else did you deliver crack cocaine to, or you

20    thought you were delivering crack cocaine to.

21            Jerome Bass responded by saying, "Millions of

22    people."

23            And I said, "Millions of people, that has to be an

24    exaggeration."

25            And he responded, "Yeah, not millions," but

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    something to the effect of a lot, and I can refer to my

2    report for the exact terminology.

3    Q.  Would referring to your report refresh your

4    recollection?

5    A.  Yes.

6    Q.  I would ask that you do that for us, please.

7    A.  The exact words were, "A bunch of times."

8    Q.  Did Mr. Jerome Bass indicate if he had delivered crack

9    cocaine for Lamar to the same people more than one time?

10   A.  Yes.

11   Q.  What did he say about that?

12   A.  He said that he, along with the same bunch of times

13   statement that he made, he said he even delivered to the

14   same people multiple times.

15   Q.  Repeat customers?

16   A.  Repeat customers, yes.

17   Q.  Did Mr. Jerome Bass tell you who these people were that

18   he made crack cocaine deliveries to for his brother?

19   A.  Yes, he named a few people.

20   Q.  Who did he tell you?

21   A.  William Hawkins, Karlos Harper, Terrell Jackson,

22   JeVaughn Erwin.

23   Q.  Did he indicate that he knew the names of all of the

24   people he made deliveries to?

25   A.  He said he did not know all the names, but he could

1    recall faces if pictures were shown.

2    Q.  You had the occasion to conduct the proffer interviews

3    of Lamar Bass, correct?

4    A.  Yes.

5    Q.  And after the defendant made the statement regarding who

6    he made deliveries to, did you find that significant?

7    A.  Yes, I did.

8    Q.  Why was that significant?

9          MR. LEVY:  Objection, Your Honor, relevance, what

10   is significant to him.

11         THE COURT:  Sustained.

12   BY MS. DUGAN-HINRICHS:

13   Q.  Did the defendant's confession provide you with

14   corroboration in other ongoing police investigations?

15         MR. LEVY:  Objection, form of the question.

16         THE COURT:  Sustained.

17   BY MS. DUGAN-HINRICHS:

18   Q.  The people that we have talked about, that you've named,

19   William Hawkins, Karlos Harper, JeVaughn Erwin, and Terrell

20   Jackson, at the time that Mr. Jerome Bass gave his statement

21   were those people indicted?

22   A.  Yes.

23   Q.  Were all of these people, including Lamar and Jerome,

24   part of a larger conspiracy?

25         MR. LEVY:  Objection, Your Honor, foundation,

1   relevance.

2            THE COURT:  Sustained.

3   BY MS. DUGAN-HINRICHS:

4   Q.  Sir, after Jerome indicated who he delivered crack to,

5   did he tell you how the transactions would come about and

6   the articles of clothing?

7   A.  Yes.

8   Q.  What did he explain to you about that?

9   A.  He told me typically an individual would call Lamar and

10  use code words.

11           For instance he said they would call and say, "Hey,

12  do you have my suit ready?"

13           Meaning, I know through experience that --

14           MR. LEVY:  I must object on hearsay grounds, move

15  to strike.

16           This is a conversation between an individual and

17  Lamar.  I think he testified it was with Lamar.  Foundation

18  on it as well.

19           THE COURT:  I think this is a conversation between

20  the defendant and the officer concerning code words, that's

21  my recollection, and I'm going to overrule the objection.

22           MR. LEVY:  If that's what it is I'm not going to

23  object.

24           THE COURT:  The objection is overruled.

25           THE WITNESS:  He told me that they would use code

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    words over the cell phone and the type of code words that

2    they would use would be an article of clothing.

3             For instance, a suit would be referred to as a full

4    ounce of crack cocaine.

5             Something other than that would be a smaller

6    quantity, such as pants could be a quarter, or socks could

7    be an eight-ball, 3.5 grams.

8             And the crack would be wrapped in the article of

9    clothing and Jerome Bass would take that to the individual

10   that called for the drugs.

11   BY MS. DUGAN-HINRICHS:

12   Q.  And after he explained to you their use of code words on

13   the phone, what was the next part of your interview, if you

14   recall?

15   A.  If I could look at my report?  Are you asking what the

16   next question was?

17   Q.  Yes.  Would that refresh your recollection, Officer?

18   A.  Yes.

19   Q.  Take a moment and review that.

20   A.  Yes.

21   Q.  After your conversation that concerned the code words

22   that Jerome would use, what was the next thing that you and

23   Jerome Bass talked about?

24   A.  We talked about why he was making these deliveries for

25   his brother.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    Q.  What did he tell you?

2    A.  He said that he loved his big brother and that he felt

3    obligated to him because growing up Lamar would help him

4    with his homework, would give him things, and so he felt

5    obligated to help his big brother out.

6    Q.  After he explained the reasons behind his actions, then

7    what was the next thing that you and the defendant talked

8    about during this interview?

9    A.  I asked him when was the last time that he purchased

10   illegal drugs.

11   Q.  What did he tell you?

12   A.  He said that he had purchased marijuana just a couple

13   days earlier, maybe a week or so prior on two separate

14   occasions.

15   Q.  Did he tell you anything else about that?

16   A.  I asked him then about crack, when was the last time he

17   was involved in crack, and he said that he had not been

18   involved with crack cocaine since his brother went to jail.

19   Q.  I believe you testified that Lamar was arrested when?

20   A.  December 31, 2002.

21   Q.  After he made that comment, did you clarify that

22   specific point with him?

23   A.  Yes.

24   Q.  Why did you do that?

25   A.  Just so we were clear, so I was clear for the police

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1   report what exactly he meant by that.

2   Q.  After you clarified that particular point, then what did

3   you ask the defendant?

4   A.  I asked him what clean meant and he said that he was not

5   involved with the use of crack cocaine.

6          Later he changed that to, I think he just changed

7   it to involved with crack cocaine instead of the term use.

8          After that we talked a little bit more about what

9   use meant as far as his involvement.

10         He said he did not use crack cocaine.  It was just

11  that he was clean, meaning he did not do any more deliveries

12  or distribution.

13  Q.  After clarifying that point of when the defendant said

14  he stopped dealing crack cocaine, then what was the next

15  thing that you and he talked about?

16  A.  I asked him, because of the vague nature of him saying

17  that he knew almost positive that it was crack cocaine in

18  the deliveries, but he wasn't sure, I asked him did he know

19  in fact that he was delivering crack cocaine and he

20  responded by saying it was a possibility.

21  Q.  Did he explain if he still had ongoing relationships

22  with William Hawkins, Karlos Harper, and JeVaughn Erwin?

23  A.  He said at that time he had stopped hanging out with

24  those guys.

25  Q.  What was the next thing that you and Jerome talked about

1    in this interview?

2    A.   If I can refer to my police report for accuracy?

3    Q.   Sure.  Would that refresh your recollection?

4    A.   Yes.  We then talked about -- in the course of my

5    investigation I knew of a location that Lamar Bass and

6    others were selling crack cocaine from.

7         MR. LEVY:  Objection, based on hearsay, unless it's

8    offered not for the truth of the matter asserted.

9         THE COURT:  The officer is asking for a location

10   that he believes somebody is doing drugs and it's not for

11   the truth that it's being done there, it's just based on his

12   belief.  So I'll sustain the objection and overrule it in

13   part.

14        So, ladies and gentlemen, what has just happened is

15   the officer says he believes he thinks there is a site for

16   some drugs being transacted.

17        And he's now inquiring of the defendant about that

18   site and we can certainly explore that.  So you may proceed,

19   Ms. Dugan-Hinrichs

20   BY MS. DUGAN-HINRICHS:

21   Q.   Sir, did you have a specific address that you asked the

22   defendant if he knew if crack was being distributed from

23   that location?

24   A.   Yes.  There were two.

25   Q.   Do you recall the address of the first place?

1   A.  Yes.  It's on the corner of 37th and Spaulding, 3902

2   North 37th Street.

3            And then there was a second house in the area 38th

4   and Grand.  The homeowner's name was Duke.

5            And I asked him was he present at any time at those

6   locations and either being involved with selling crack or

7   observed the selling of crack taking place inside those

8   locations.

9            MS. DUGAN-HINRICHS:  Your Honor, may I approach the

10  witness?

11  BY MS. DUGAN-HINRICHS:

12  Q.  Directing your attention to Exhibit 12, can you tell us

13  what that is?

14  A.  A residence located at 3902 North 37th Street; 37th and

15  Spaulding.

16  Q.  Is that the location you were inquiring of Jerome Bass?

17  A.  Yes.

18  Q.  And have you been by that residence, sir?

19  A.  Yes, I have.

20  Q.  Were you by the residence in the time frame in which

21  this interview was conducted?

22  A.  Yes.

23  Q.  Does Exhibit 12 fairly and accurately represent a

24  photograph of 3902 North 37th?

25  A.  Yes, it does.

1              MS. DUGAN-HINRICHS:  The government offers Exhibit

2    12.

3              MR. LEVY:  I have no objection.

4              THE COURT:  Exhibit 12 is what address?

5              THE WITNESS:  3902 North 37th Street.

6              THE COURT:  Exhibit 12 is received.

7              MS. DUGAN-HINRICHS:  May I have permission to

8    publish it, sir?

9              THE COURT:  Yes, you may.

10   BY MS. DUGAN-HINRICHS:

11   Q.  Sir, with regard to 3902 North 37th Street, I believe

12   you began to testify you talked to the defendant about this

13   house, correct?

14   A.  Yes.

15   Q.  And could you describe for me what that conversation was

16   about?

17   A.  I asked him again if he had been at that location and

18   either involved in selling crack cocaine from there or

19   observing others selling crack cocaine from there.

20   Q.  What did he tell you?

21   A.  He said that he was not involved in the sale of crack

22   cocaine there.

23              However, he was present and observed the short-term

24   traffic coming and going and other members inside that

25   residence passing items back and forth to people that came

1    to the residence.

2    Q.  And I believe you testified that there were two houses

3    that you were asking the defendant about, correct?

4    A.  Yes.

5    Q.  Do you recall the address of the second house?

6    A.  I do not recall it, but it's known to us as a house that

7    was involved in the sale of crack and it's in the area of --

8         MR. LEVY:  Move to strike based on hearsay and

9    foundation.

10        THE COURT:  Sustained.

11   BY MS. DUGAN-HINRICHS:

12   Q.  Did you have the occasion to ask Mr. Bass about another

13   location?

14   A.  Yes.

15   Q.  What did he tell you about the second house, on 39th and

16   Grand Street?

17   A.  38th and Grand, in that area, he said pretty much the

18   same thing as the 3902 Spaulding Street address.

19   Q.  That he had been present at that house?

20   A.  Yes.

21   Q.  And that he observed people coming and going, is that

22   fair?

23   A.  Yes.

24   Q.  Was there anything else that you and Jerome Bass talked

25   about on your October 13th, 2004, interview?

1   A.  No, that was it.

2   Q.  What did you do at the conclusion of that interview?

3   A.  I transported -- prior to transporting Mr. Bass to our

4   central station booking facility, I told him that this was

5   the end of the interview.

6           I told him that I would compile what we talked

7   about in our interview into a police report and I would

8   bring it to detention the next day so he could review it for

9   accuracy.

10  Q.  Did you in fact do that?

11  A.  Yes, I did.

12  Q.  So the next time you saw Jerome Bass was on October

13  14th, 2004, correct?

14  A.  Correct.

15  Q.  And where did you see him?

16  A.  At the booking facility at Omaha police central station

17  in the basement.

18  Q.  And, sir, why did you want to go back and let him review

19  that report?

20  A.  For a couple of reasons.  Fairness to him.  The first

21  reason would be in fairness to him.

22          In our interview we talked about a lot of things

23  and I compiled it in a police report.

24          I wanted him to have a chance to review it and make

25  any changes if he saw fit.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1          The second reason was for why we are here today.  I

2     just wanted to make sure that I was covered and didn't

3     appear to put words into his mouth or write something in the

4     statement that wasn't what he said.

5          MS. DUGAN-HINRICHS:  Your Honor, may I approach the

6     witness?

7          THE COURT:  You may.

8     BY MS. DUGAN-HINRICHS:

9     Q.  When you met with the defendant on October 14, 2004, how

10    did that interview begin?

11    A.  The same as the first.  I read him his Miranda rights

12    verbatim via OPD form 17, rights advisory form.

13    Q.  I have handed you Exhibit 15.  Do you recognize it?

14    A.  Yes.

15    Q.  And what is it?

16    A.  It's Omaha police rights advisory form bearing the same

17    RB number, 52781E, but this one is dated October 14, 2004.

18    Q.  And do you recognize the handwriting on that document?

19    A.  Yes, mine and Mr. Bass's handwriting.

20    Q.  And that's the same form as Exhibit 14 that you've

21    previously described, correct?

22    A.  Correct.

23    Q.  And, sir, when you re-Mirandized him that next day, did

24    you read each right verbatim as you have just described?

25    A.  Yes.

1    Q.  Did you record each and every response on Exhibit 15?

2    A.  Yes, each response was yes and I recorded it as such.

3    Q.  Is Exhibit 15 a fair and accurate copy of the original

4    from October 14, 2004?

5    A.  Yes.

6    Q.  Is it in the same or substantially the same condition as

7    it was that day?

8    A.  Yes, it was.  Yes, it is.

9            MS. DUGAN-HINRICHS:  Government offers Exhibit 15.

10           MR. LEVY:   No objection.

11           THE COURT:  Exhibit 15 is received.

12           MS. DUGAN-HINRICHS:  May I have permission to

13   publish it, Your Honor?

14           THE COURT:  Yes, you may.

15   BY MS. DUGAN-HINRICHS:

16   Q.  Exhibit 15 at the bottom bears a signature, correct?

17   A.  Correct.

18   Q.  And whose signature is this?

19   A.  Jerome Bass's signature.

20   Q.  And did you witness him putting it on there?

21   A.  Yes.  I asked him to affix his signature and I witnessed

22   it.

23   Q.  Is that for the same reasons you earlier described?

24   A.  Yes.

25   Q.  Was that after he said yes, after you advised him of all

1    those rights?

2    A.  That's correct, yes.

3    Q.  Can you describe for me, sir, that second interview on

4    October 14th?

5    A.  Yes, it was not as long as the first.  The simple reason

6    was to go down and to have him review this statement.

7             I didn't ask him any new questions.  I just had him

8    review the statement.

9             And he asked if he could make some corrections and

10   I said yes, he could.

11   Q.  Sir, let me ask you, this isn't the first interview that

12   you've conducted of a defendant, correct?

13   A.  Correct.

14   Q.  And do you often give defendants the opportunity to

15   review your report and make changes?

16   A.  No.

17   Q.  Why did you afford Jerome Bass this opportunity?

18   A.  For the reasons I cited initially.  In fairness to him

19   and, secondly, I have had a lot of experience in federal

20   court and I just wanted to make sure I covered all bases,

21   that this was a voluntary statement.

22   Q.  When you came back to him on that next day did you hand

23   him the report and let him read it?

24   A.  Yes.

25   Q.  Was it then that he requested to make some changes?

1   A.  Yes.

2   Q.  What changes did he make?

3   A.  I gave him an ink pen and there are specific changes, if

4   I can refer to my report.

5   Q.  Would that refresh your recollection?

6   A.  Yes, it would be.

7   Q.  Please do so.

8   A.  Change number one he made one was to page three,

9   paragraph one.

10          The original statement was RO, meaning myself,

11  asked Jerome Bass to clarify the term clean and Jerome Bass

12  responded by saying that he had not been involved with the

13  use of crack cocaine.

14          His correction was he removed the word use and

15  changed it with delivery.

16          And he added that he also stopped socializing with

17  these individuals after Lamar Bass was arrested.

18  Q.  So it wasn't a substantive change to his statement that

19  he didn't deliver crack cocaine, correct?

20  A.  Correct.

21  Q.  It dealt with changing use to delivery, correct?

22  A.  Correct.

23  Q.  And he added the part about when his association or

24  socialization ended, correct?

25  A.  Correct.

1   Q.  Did the defendant make any additional changes, other

2   than the one you've just described?

3   A.  He made one more change.

4   Q.  What was that?

5   A.  That was page three, paragraph two.

6   Q.  What did he change?

7   A.  The original sentence was, "Jerome Bass said he was

8   present and observed numerous 37th Street Crips sell crack

9   cocaine from this residence."

10  Q.  And what did he change that sentence to?

11  A.  The correction was, "Jerome Bass said he was present to

12  observe numerous 37th Street Crips passing items to other

13  people which possibly contained crack cocaine at this

14  residence."

15  Q.  And those two changes that you've just described, sir,

16  what did you do with that information after those changes

17  were given to you?

18  A.  I penned and inked them on the statement, I returned to

19  my office and made the corrections appropriately,

20  highlighted the new corrections in the statement and

21  published the report.

22  Q.  So that your report accurately reflects those changes

23  that he made?

24         MR. LEVY:  Objection, leading.

25         THE COURT:  Sustained.

1    BY MS. DUGAN-HINRICHS:

2    Q.  Sir, the final report you generated, does that

3    accurately reflect the defendant's statement?

4           MR. LEVY:  Objection, relevance.  It's not in

5    evidence.

6           THE COURT:  Sustained.

7    BY MS. DUGAN-HINRICHS:

8    Q.  Sir, after those two changes that you've just described,

9    did the defendant agree with the remaining portions of your

10   report?

11   A.  I asked him was this all the corrections that he wanted

12   to make and he said yes.

13          I told him that I would make the changes,

14   incorporate it in the report, and then publish it.

15   Q.  How long did that second interview take?

16   A.  On Exhibit 15 it says I started at 0937 hours and then

17   it said ended at 0950.

18          There is a mistake on my part about when the time

19   of the rights advisory began.  That should read 0937.

20   Q.  With regard to when you administered his rights?

21   A.  Yes.  The interview started at 0937.  I read him his

22   rights at the same time.

23   Q.  And so when Exhibit 15 says time ended, is that the time

24   you concluded your Mirandizing him or you concluded your

25   interview?

1   A.  That's when I concluded the interview, after I asked him

2   if that was the final changes.

3   Q.  During the second interview which took place on October

4   14, 2004, did the defendant exhibit any signs of impairment?

5   A.  No.

6   Q.  Was he sleepy or confused?

7   A.  No.

8   Q.  Was he coherent?

9   A.  Yes.

10   Q.  Did he understand your questions?

11   A.  Yes.

12   Q.  Did he ever refuse to answer any of your questions?

13   A.  I didn't ask him any new questions, but he didn't refuse

14   anything that we talked about.  He just made the changes.

15   Q.  Did you make him any promises during that second

16   interview?

17   A.  No.

18   Q.  Any threats?

19   A.  No.

20   Q.  Now, when you told the defendant that he was under

21   arrest, you told him what the charges were, correct?

22   A.  Yes.

23   Q.  Did you tell him what time frame that included?

24   A.  No.  I just told him for over the past couple of years.

25   Q.  Did you tell him who his co-conspirators were?

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1   A.  I believe so, yes.

2   Q.  Do you recall any names specifically?

3   A.  I don't know if I told him, but I probably said

4   something to the effect of some of the people from 37th

5   Street.

6           MR. LEVY:  Your Honor, I move to strike that as

7   speculation.  If he doesn't remember, what he probably did

8   is irrelevant.

9           THE COURT:  Overruled.  His qualification speaks

10  for itself.

11  BY MS. DUGAN-HINRICHS:

12  Q.  Sir, one of those individuals was William Hawkins,

13  correct?

14          MR. LEVY:  Objection, leading; relevance.

15          THE COURT:  Overruled.  You can answer.

16          THE WITNESS:  I believe so, yes.

17  BY MS. DUGAN-HINRICHS:

18  Q.  And another one of those people was Karlos Harper,

19  correct?

20  A.  Yes.

21  Q.  JeVaughn Erwin?

22          MR. LEVY:  Same objection, Judge, relevance.

23  Hearsay.  Foundation.  Whatever.

24          THE COURT:  The only one I'm concerned about is the

25  leading question.

1          I'm going to sustain the objection on leading from

2     this point forward, so I'll sustain the objection to this

3     question.

4     BY MS. DUGAN-HINRICHS:

5     Q.  Sir, when you talked to the defendant about his crack

6     distribution activities in your October 13th interview --

7          MR. LEVY:  I object to the form of the question.

8          THE COURT:  Sustained.

9     BY MS. DUGAN-HINRICHS:

10    Q.  When the defendant told you who he made deliveries to,

11    who did he tell you?

12    A.  William Hawkins, Terrell Jackson, Karlos Harper,

13    JeVaughn Erwin.

14    Q.  And he got those items to be delivered from his brother

15    Lamar, correct?

16    A.  Yes.

17    Q.  He told you that?

18    A.  Yes, he did.

19         MS. DUGAN-HINRICHS:  May I have a moment, Judge?

20         THE COURT:  Yes, you may.

21    BY MS. DUGAN-HINRICHS:

22    Q.  Officer Gassaway, I believe you said you were the case

23    agent for Terrell Jackson.

24    A.  Yes.

25    Q.  Did you have the occasion to conduct proffer interviews

1    of Terrell Jackson?

2    A.  Yes.

3    Q.  Were you the case agent in the case of Karlos Harper?

4    A.  Yes.

5    Q.  Did you have the occasion to conduct proffer interviews

6    or an interview with Karlos Harper?

7           MR. LEVY:  That's objected to as having been asked

8    and answered.

9           THE COURT:  I don't believe that it has completely.

10   It has been partially asked and answered, so I'm going to

11   overrule the objection.  You may proceed.

12          MS. DUGAN-HINRICHS:  Thank you, sir.

13          THE WITNESS:  Yes

14   BY MS. DUGAN-HINRICHS:

15   Q.  How about Lamar Bass?

16   A.  Yes.

17   Q.  How many proffers did Lamar Bass give?

18   A.  I believe five.

19   Q.  And you were the case agent in that case?

20   A.  Yes.

21   Q.  Sir, through your interviews, proffer or otherwise, with

22   Lamar Bass, Terrell Jackson, Karlos Harper and Jerome Bass,

23   were you able to establish that hierarchy or familial

24   relationship in this 37th Street Gang?

25          MR. LEVY:  That's objected to as hearsay.

1          THE COURT:  Sustained.

2          MS. DUGAN-HINRICHS:  Your Honor, may we approach?

3          THE COURT:  Yes, you may.

4          (The following proceedings were had out of the

5    hearing of the jury:)

6          MS. DUGAN-HINRICHS:  Your Honor, I'm trying to

7    solicit co-conspirator statements offered in furtherance of

8    the conspiracy to show the organization and the defendant's

9    role in this conspiracy.

10          And I have established in accordance with the

11   Eighth Circuit case law that a conspiracy existed; that he

12   and these declarants are members of that conspiracy, and the

13   officer testified about these proffers were conducted and

14   told who they spoke to, who they dealt with, so they are in

15   furtherance of this conspiracy, and I would like to elicit

16   that information of the co-conspirators.

17          MR. LEVY:  In response, these are all post-arrest

18   statements of maybe former co-conspirators, but they are not

19   conspirators.

20          They are proffer statements of who maybe were

21   conspirators, and that doesn't cover the situation where you

22   have a post-arrest statement of a conspirator unless it

23   perhaps is given to hide the conspiracy or defeat discovery

24   of the conspirators.  This is clearly hearsay.

25          THE COURT:  Can I see the case?  I think I'll

1    dismiss the jury.

2              (The following proceedings were had in the hearing

3    of the jury:)

4              THE COURT:  Ladies and gentlemen, I have an

5    evidentiary issue.  We are going to take about a five minute

6    recess.  We are in recess.

7              (The following proceedings were had out of the

8    hearing of the jury:)

9              THE COURT:  The record should reflect we are

10   outside the presence of the jury.

11             I have had a chance to review the case provided to

12   me by counsel for the government, United States versus

13   Michael Bell, cited at 573 F.2d 1040, a 1978 case, decided

14   in the Eighth Circuit.

15             This is generally the law as I understand it and

16   the case stands for the proposition, and I think that this

17   is still the law, that the court has to make a determination

18   by a preponderance of the evidence that a conspiracy

19   existed; that the defendant and the declarant are members of

20   the conspiracy; and that the declaration was made in the

21   course of and in furtherance of the conspiracy.

22             It's my understanding that the government believes

23   that it has created a prima facie case concerning the

24   conspiracy and the defendant's participation in the

25   conspiracy and therefore any statements made by

1    co-defendants are admissible.  Is that my understanding, Ms.

2    Dugan-Hinrichs?

3           MS. DUGAN-HINRICHS:  That is my argument, yes,

4    Judge.  Just so you know, sir, in reviewing current Eighth

5    Circuit cases in 2005, I was referred back to Bell.  So it's

6    still good law.

7           THE COURT:  That's my understanding.

8           MR. LEVY:  May I be heard?  I don't disagree Bell

9    is the law.

10          What I disagree with is that Bell sets out the

11   procedure for the conditional admission of hearsay which is

12   offered under Rule 801(d)(2)(A).

13          And 801(d)(2)(A) says, as the court just said it

14   says, the statement is not hearsay if it's made by one

15   co-conspirator to another co-conspirator during the course

16   of the conspiracy and in furtherance of it.

17          Well, when you've got a post-arrest proffer by one

18   conspirator, that declarant is hardly a conspirator anymore.

19          He's under arrest, he's under an indictment, it's

20   not in furtherance of a conspiracy which that declarant is

21   no longer a member.

22          THE COURT:  I want to understand what your

23   position is.

24          MR. LEVY:  It's 802(d)(2)(E); not (d)(2)(A).

25   801(d)(2)(E).

1          THE COURT:  A statement by a co-conspirator of a

2     party during the course and in the furtherance of the

3     conspiracy.  I want to be sure what your position is.  If

4     the co-conspirator made a statement --

5          MR. LEVY:  First of all, he must be a

6     co-conspirator of the defendant.

7          He's not a co-conspirator of the defendant because

8     he's under arrest and he's under indictment.

9          THE COURT:  That has to do with whether or not the

10    government has made a prima facie case about the conspiracy.

11         MR. LEVY:  No, but what she's offering is

12    statements made by Hawkins during a proffer.

13         THE COURT:  Right, and Hawkins is going to say

14    blah-blah-blah.

15         MR. LEVY:  Yes.  So at that point Hawkins is not a

16    co-conspirator of Mr. Bass.

17         THE COURT:  What is he?

18         MR. LEVY:  He's a defendant.  The conspiracy is

19    over as far as Mr. Hawkins is concerned.

20         He can't be furthering a conspiracy of which he's

21    no longer a member because he's under arrest.

22         THE COURT:  A statement by a co-conspirator of a

23    party during the course and in the furtherance of the

24    conspiracy.  That's true, because it's post-conspiracy.

25         MS. DUGAN-HINRICHS:  But, Your Honor, they are made

1    regarding the activities during the active conspiracy.

2              THE COURT:  Here is the whole problem I have.

3    There is an issue with the confrontation clause.

4              That's the first problem that I have and you want

5    to put in statements by a co-conspirator through a police

6    officer that took a proffer from that co-conspirator.

7              So we are not talking about a statement by a

8    co-conspirator at the time or in furtherance of the

9    conspiracy.

10             We are talking about a proffer statement of a

11   co-conspirator to a police officer who then talks about what

12   the co-conspirator did.

13             And that's where I have a problem with the

14   confrontation clause.

15             The problem with 801, if I had a statement of a

16   co-conspirator about something that the defendant said, or

17   another co-conspirator said in the course of or in

18   furtherance of the conspiracy, I don't think I would have

19   much trouble in introducing it.

20             But here I don't have that.  I have a confession,

21   so to speak, of a co-conspirator given to a police officer.

22             And then the police officer provides that

23   information about what that co-conspirator did.

24             MR. LEVY:  Can I read to you from this Federal

25   Courtroom Evidence?

1          801(d)(2)(E) provides that a statement of a

2   co-conspirator is not hearsay if all of the following

3   requirements are met.

4          There was a conspiracy of which both the declarant

5   and the person against whom the statement is offered were

6   members.

7          The declarant made the statement in the course of

8   that conspiracy.

9          The declarant made the statement in the furtherance

10  of that conspiracy.

11         Now, maybe the first part, there was a conspiracy,

12  is okay, but there certainly is no longer a conspiracy when

13  it's a post-arrest, post-indictment proffer to a police

14  officer and it's certainly not in furtherance of any

15  conspiracy.

16         THE COURT:  Do you have any other case law,

17  Ms. Dugan-Hinrichs?

18         MS. DUGAN-HINRICHS:  No, sir.  That's all I've got.

19  I appreciate and understand where the court and Mr. Levy are

20  coming from, but --

21         THE COURT:  I don't know if I agree with what

22  Mr. Levy is saying.  My problem is with the confrontation

23  issue.

24         MS. DUGAN-HINRICHS:  I understand that.  I guess,

25  Judge, to counter his argument, for purposes of argument,

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    let's say that Officer Gassaway had contact with these

2    co-conspirators while they were still in the conspiracy.

3            Then could he testify to that information they gave

4    him?

5            Or do I have to put the co-conspirators on the

6    stand about that information?

7            THE COURT:  I'm not so sure about the temporality

8    argument that Mr. Levy is making.

9            My problem really does come down to the

10   confrontation issue.

11           And that is I'm not hearing a statement by a

12   co-conspirator who was in the context of the conspiracy.

13           I'm hearing a statement that is basically a

14   confession by a co-conspirator, but I don't hear it from the

15   co-conspirator.

16           He's not subject to cross-examination, and I'm

17   hearing it from a police officer who doesn't have a tape

18   recording of it, doesn't have anything recorded except his

19   memory and a report someplace.

20           And we put it all together after it's all over,

21   after a gun is to everybody's head.

22           I know that may or may not be relevant to what the

23   rule is, but it's certainly relevant to whether the

24   statement is credible or not.

25           I think that what I would like to do is to take

1    this matter under advisement until I have had a chance to do

2    a little research on this issue as opposed to what I have

3    right here.

4             Officer Gassaway is here and he's your

5    representative throughout the course of the trial.

6             And then once I have a little bit more evidence

7    about what the conspiracy is, because I'm not sure you've

8    made a prima facie case on the conspiracy to begin with, and

9    I get a better idea of where your witnesses are coming from,

10   if you want to use Officer Gassaway to impeach some of those

11   witnesses with respect to their testimony you're certainly

12   able to do that, and if you can't get a witness in, or there

13   is a problem with a witness and you want to use Officer

14   Gassaway to testify on that part of the evidence, then I'll

15   reconsider this matter.

16            But right now I'm not prepared to allow him to

17   testify about statements that are made in a post-arrest

18   situation that are basically confessions of other

19   co-conspirators about their conduct or somebody else's

20   conduct.  So for the time being your objection is sustained.

21            Do you have any further interrogation of Officer

22   Gassaway at this juncture?

23            MS. DUGAN-HINRICHS:  I do have a couple additional

24   questions for Officer Gassaway.

25            THE COURT:  We will bring the jury back out.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1              (The following proceedings were had in the hearing

2      of the jury:)

3              THE COURT:  Officer, you are still under oath.  You

4      may proceed, Ms. Dugan-Hinrichs.

5              MS. DUGAN-HINRICHS:  Thank you, Your Honor.

6                    DIRECT EXAMINATION (CONT'D)

7      BY MS. DUGAN-HINRICHS:

8      Q.  Officer Gassaway, you had the occasion to conduct an

9      interview with the defendant, Jerome Bass, on October 13th,

10     correct?

11     A.  Yes.

12     Q.  That was the first interview?

13     A.  Yes.

14     Q.  And, sir, was that interview tape recorded or video

15     recorded?

16     A.  No, the interview room, there is no recording capability

17     at 30th and --

18             MR. LEVY:  Move to strike the last part of the

19     answer as not responsive.  Everything after no.

20             THE COURT:  Overruled.

21     BY MS. DUGAN-HINRICHS:

22     Q.  Sir, had you chosen to conduct a recorded interview of

23     Mr. Bass, where would you have had to go?

24     A.  I would have had to transport him to central station, to

25     our CIB fourth floor.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1  Q.  And why did you choose not to do that?

2  A.  Because I wanted to conduct the interview right away, or

3  the interrogation right away.  I didn't want to wait some

4  thirty minutes to conduct the interview.

5  Q.  And why did you make that tactical decision?

6  A.  Well, the purpose of an interrogation is to elicit a

7  confession, and I wanted to employ the strategy of talking

8  to Mr. Bass right away, rather than transporting him to

9  central station and taking a chance that an interview room

10  wasn't available and having him sit and wait for an unknown

11  amount of time.

12  Q.  So the fact that it was close in time to when he was

13  arrested on the federal indictment was important to you?

14         MR. LEVY:  Objection, leading.

15         THE COURT:  Sustained.

16  BY MS. DUGAN-HINRICHS:

17  Q.  Sir, the second interview with the defendant, was that

18  recorded?

19  A.  No.

20  Q.  How come?

21  A.  I wasn't going to ask him any further questions.  I just

22  wanted him to review it and make any changes so I could

23  submit the report.

24  Q.  Sir, after your contact with Jerome Bass on October

25  14th, did you do any further investigation in relation to

1    this case?

2    A.  Yes.

3    Q.  And when did that come about?

4    A.  Just recently.

5    Q.  What happened to prompt additional investigation?

6    A.  I received a phone call from one of the co-conspirator's

7    mother, at which time she told me that --

8              MR. LEVY:  Objection, hearsay.

9              THE COURT:  Sustained.

10   BY MS. DUGAN-HINRICHS:

11   Q.  Who did you get a phone call from?

12   A.  Marie Harper.

13   Q.  Whose mom is she?

14   A.  She's the mother of Karlos Harper.

15   Q.  And he's one of the co-conspirators, correct?

16   A.  Yes.

17   Q.  And after you had that conversation with her, did you do

18   some further investigation?

19   A.  Yes.

20   Q.  How come?

21   A.  I was contacted by her, at which time in our

22   conversation she related that she was contacted on several

23   different occasions by Jerome Bass.

24            And she stated that Jerome Bass was trying to get

25   in touch with Karlos, wanted her to --

 1                MR. LEVY:  Objection, hearsay, what she said.

 2                THE COURT:  Sustained.

 3                MR. LEVY:  Move to strike.

 4                THE COURT:  I'll sustain the motion to strike from

 5     the time that you have interposed the objection.

 6                MR. LEVY:  Very well.

 7     BY MS. DUGAN-HINRICHS:

 8     Q.  Sir, after you had the occasion to talk with Marie

 9     Harper, did you conduct additional investigation to

10     corroborate or verify her information?

11     A.  Yes.

12     Q.  What did you do?

13     A.  I participated in a three-way conversation between

14     Marie Harper, myself, and Jerome Bass.

15     Q.  And when did that occur?

16     A.  The first of September of 2005.

17     Q.  Could you tell us how that came about?

18     A.  I was contacted and it was related that Marie Harper was

19     upset because --

20                MR. LEVY:  Objection, Your Honor, to everything

21     after --

22                THE COURT:  Sustained.

23                MR. LEVY:  -- it was related.

24     BY MS. DUGAN-HINRICHS:

25     Q.  Did you initiate this call to Marie Harper or she to

1    you?

2    A.  She contacted me.

3    Q.  Did you participate in overhearing a conversation

4    between the defendant, Jerome Bass, and Marie Harper?

5    A.  Yes.

6    Q.  And what did the defendant say during that conversation?

7    A.  He said that he wanted to get ahold of Karlos, who was

8    in jail, and wanted to find out what he was going to do,

9    meaning was he going to testify in this trial against him.

10   Q.  And was that the majority of that conversation?

11   A.  Yes.  There was some small talk, but the essence of the

12   conversation, that was pretty much it.

13        Marie Harper responded by saying, "Why do you want

14   to get ahold of him?"

15   Q.  And did Mr. Bass say why he was trying to get in touch

16   with Karlos Harper?

17   A.  Yes.

18   Q.  What did he say?

19   A.  He said he wanted to find out where Karlos was and if he

20   was going to testify against him.

21   Q.  Did he say why that information was important to him?

22   A.  Vaguely he said that, you know, he just wanted to know

23   what he was going to do.

24        I encapsulated it in a police report and I can

25   refresh the exact language.  I can tell you the exact

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1   language if I had a copy.

2   Q.  Would reviewing your report refresh your recollection?

3   A.  Yes.

4           MS. DUGAN-HINRICHS:  May I approach, Your Honor?

5           THE COURT:  Certainly.

6   BY MS. DUGAN-HINRICHS:

7   Q.  Have you had a chance to review your report?

8   A.  Yes.

9   Q.  Does that refresh your recollection as to what the

10  defendant said, why he wanted to get in touch with Karlos?

11  A.  Yes.

12  Q.  What did the defendant say?

13  A.  He added that he wanted to know -- he stated that if

14  Karlos testified that he wouldn't be able to beat his case

15  and he was worried.  He wasn't worried about anyone else but

16  Karlos.

17  Q.  Sir, this individual we have been talking about,

18  Mr. Jerome Bass, is he present in court today?

19  A.  Yes, he is.

20  Q.  Would you please describe where he's seated and what

21  he's wearing?

22  A.  African-American male sitting next to Mr. Levy with blue

23  shirt, blue tie, with suspenders.

24          MS. DUGAN-HINRICHS:  May the record reflect the

25  witness identified the defendant, Jerome Bass?

1          THE COURT:  It shall.

2   BY MS. DUGAN-HINRICHS:

3   Q.  Did Mr. Bass at any time during any one of your contacts

4   with him ever tell you what his nickname was?

5   A.  I don't think so, but I knew that his nickname was

6   Rommie.

7   Q.  Other than Marie Harper, did you have the occasion to

8   conduct any additional investigation after September 1,

9   2005, in relation to this case?

10  A.  Yes.

11  Q.  And what did you do?

12  A.  Again, I was contacted by another individual by the name

13  of Tamika Rush, who is the fiancee of Karlos Harper.

14  Q.  And what did you do with the information that Tamika

15  Rush provided to you?

16  A.  It was left on my voice mail message.  I was out of

17  town.

18          Upon return I listened to the message and

19  encapsulated it in a police report.

20  Q.  What was the substance of that message?

21  A.  Basically --

22          MR. LEVY:  Objection, Your Honor, hearsay.

23          THE COURT:  Sustained.

24          MS. DUGAN-HINRICHS:  May I approach, Judge?

25          THE COURT:  Yes, you may.

1   BY MS. DUGAN-HINRICHS:

2   Q.  Officer Gassaway, I've handed you what I have marked as

3   Exhibit 19.  Can you tell me what that is?

4   A.  Yes.  It's an Omaha police supplementary report dated --

5   the original report date is Wednesday, October 13, 2004,

6   1500 hours.

7           The report was completed on Thursday, October 14,

8   2004, at 1800 hours.

9           It bears RB number 5278E and it is the statement

10  that I wrote in regards to the interview or interrogation

11  with Jerome Bass.

12  Q.  Is that, sir, the report that you have been referring to

13  to refresh your recollection and to make sure that you were

14  accurate in your testimony about what the defendant's words

15  were?

16  A.  Yes.

17          MS. DUGAN-HINRICHS:  The government offers

18  Exhibit 19.

19          MR. LEVY:  The defendant objects on the basis of

20  hearsay, relevance, foundation.

21          THE COURT:  I'm going to take that under

22  advisement.  I am concerned about the authentication issues

23  and I will take that up with counsel outside the presence of

24  the jury.  You may proceed, ma'am.

25          MS. DUGAN-HINRICHS:  Judge, I don't have any

 1    further questions at this time.

 2                THE COURT:  Mr. Levy?

 3                MR. LEVY:  Thank you, Your Honor.

 4                        CROSS-EXAMINATION

 5    BY MR. LEVY:

 6    Q.  While we have Marie Harper fresh in our minds, Officer

 7    Gassaway, you were asked what Jerome Bass said to Marie in

 8    your hearing, correct?

 9    A.  I'm sorry, in the --

10    Q.  Within your hearing?

11    A.  Yes.

12    Q.  And you went to your police report and you told the jury

13    what Marie Bass said as far as you heard?

14    A.  I wanted to be accurate, yes.

15    Q.  I said Marie Bass.  I meant Marie Harper.

16    A.  Yes.

17    Q.  You didn't tell the jury everything Marie Harper said,

18    did you?

19    A.  I answered the question that was posed to me.

20    Q.  In the way you wanted to?

21    A.  No, not at all.

22    Q.  "Jerome Bass responded by saying if Karlos testified he

23    wouldn't beat his case."  You testified to that, correct?

24    A.  That's what I was asked.

25    Q.  But Jerome Bass also said he wasn't worried about anyone

1   else because they were lying, isn't that correct?

2   A.  I did say that.

3   Q.  I'm not going to quibble with you, Officer Gassaway --

4   A.  I'm not going to quibble with you either.

5   Q.  You didn't say that he was not worried about everybody

6   because they were lying; you only said he wasn't worried

7   about everybody, period.

8   A.  I believe I said --

9   Q.  Is that true?

10  A.  I believe I said because he was lying.

11  Q.  Then you didn't tell the jury that in response to Marie

12  Harper saying to Jerome Bass that he was involved in drug

13  dealing, that Jerome Bass denied being involved with drugs,

14  didn't he?

15  A.  Yes, he did.

16  Q.  And Jerome Bass didn't know you were on the line, did

17  he?

18  A.  No, he did not.

19  Q.  But he did also say that everyone was lying on him to

20  get back at Lamar; isn't that true?

21  A.  No, that's not true.

22  Q.  Are you saying that Jerome Bass did not say everyone is

23  lying on him to get back at Lamar?

24  A.  If I can refer to my police report for accuracy.

25  Q.  First paragraph.

1    A.  Yes, he did say that.

2    Q.  So that the jury is clear on this, Jerome Bass said to

3    Marie Harper that everyone was lying on Jerome to get back

4    at Lamar?

5    A.  Yes, he did.

6    Q.  And by that you know that everyone that Lamar has

7    proffered on is going to testify in this case, correct?

8    A.  I assume that's what he was talking about, yes.

9    Q.  And it is a concern of law enforcement in investigating

10   these proffers, these drug dealers who turn on their

11   fellows, that they not do so because of retaliation.  You

12   are aware that that's a possibility, aren't you?

13   A.  I'm not sure.  Can you rephrase that?

14   Q.  I will ask it later.  Now, you testified that you went

15   to see Jerome a second time for two reasons.

16            One, that you wanted to be fair with Jerome, and,

17   two, to make sure you were covered.

18   A.  That's correct.

19   Q.  What do you mean by making sure you were covered?

20   A.  To avoid what you're about to do right now; to ensure

21   that the statement was accurate as he told it to me.

22   Q.  I am glad you know what I'm about to do.  I very seldom

23   know myself.

24            You wanted to be covered against any accusation

25   that you were writing something down that wasn't true?

1    A.   Absolutely, yes.

2    Q.   You wanted to be covered against any accusation that you

3    were writing something down inaccurately?

4    A.   Yes.   I didn't write anything down inaccurately.

5    Q.   Just answer the question.   You wanted to be sure you

6    were covered and not being accused that you had written

7    something down inaccurately?

8    A.   Yes.

9    Q.   You wanted to be covered and not being accused that you

10   were making stuff up?

11   A.   I wasn't making anything up, that's correct.

12   Q.   If you would answer the question.   You wanted to make

13   sure you were covered against the accusation that you were

14   making stuff up?

15   A.   Yes.

16   Q.   All right.   You didn't have a tape recording to make

17   sure you were covered, correct?

18   A.   Correct.

19   Q.   You didn't have a video recording to make sure you were

20   covered, correct?

21   A.   Correct.

22   Q.   You didn't have a partner in the interrogation room to

23   make sure you were covered?

24   A.   Correct.

25   Q.   You didn't keep your notes, did you?

1   A.  No, I did not.

2   Q.  You made handwritten notes of what you claimed Jerome

3   told you on the 13th of October?

4   A.  Yes.

5   Q.  And you took those notes back to the Omaha Police

6   Department, along with Jerome, and from those notes your

7   report was prepared by someone else?

8   A.  I didn't take Mr. Bass with me to prepare my report.

9   Q.  I will try the question again.  As you were talking to

10  Jerome you took handwritten notes?

11  A.  Yes.

12  Q.  You took the notes back to OPD and you had someone type

13  up the report from those notes?

14  A.  Yes.

15  Q.  And then you threw the notes away?

16  A.  Yes.

17  Q.  We don't have those to look at, do we?

18  A.  No, we don't.

19  Q.  You would have been covered a little bit better if we

20  had those notes today, wouldn't you?

21  A.  Not necessarily, no.

22  Q.  You would have been covered a little bit better if you

23  had a tape recording, wouldn't you?

24  A.  There was no facility, no tape recording equipment

25  available.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    Q.  Officer Gassaway, tape recording equipment is available

2    to the gang unit, isn't it?

3    A.  Yes, it is.

4    Q.  You know how to use it, don't you?

5    A.  Yes, I do.

6    Q.  You chose not to, didn't you?

7    A.  I did not have it with me that day.

8    Q.  You chose not to use it, didn't you?

9    A.  That's correct.

10   Q.  Now, back to the statement itself.  The only thing

11   contained in that statement is Jerome Bass telling you he

12   could possibly be involved with crack cocaine, correct?

13   A.  That's not the only thing.

14   Q.  You asked Jerome if he was involved with crack cocaine,

15   he offered several explanations as to why he possibly could

16   be involved with crack cocaine, but he never said proof

17   positive yes, isn't that correct?

18   A.  That's partially correct, yes.

19   Q.  That is correct, isn't it?

20   A.  He mentioned that he thought he was delivering crack

21   cocaine to someone and he gave reasons why he thought it was

22   crack cocaine that he was delivering.

23   Q.  He gave you explanations relative to crack cocaine which

24   were more in the nature of excuses than they were

25   confessions; isn't that true?

1    A.  No, not to me.

2    Q.  Do you remember testifying in this case at a suppression

3    hearing?

4    A.  Yes.

5          MR. LEVY:  Your Honor, may I approach the witness?

6          THE COURT:  You may.

7    BY MR. LEVY:

8    Q.  You were under oath, weren't you?

9    A.  Yes, I was.

10   Q.  Do you recall me asking you a question, "So he gave you

11   explanations which were more in the nature of excuses than

12   they were confessions," and your answer was, "Yes."

13   A.  Yes.

14   Q.  Do you remember that?

15   A.  Yes.

16   Q.  He gave you explanations in which he characterized his

17   involvement as possibilities, not probabilities or

18   certainty?

19   A.  Yes.

20   Q.  After you got out of the Air Force, what was your next

21   employment?

22   A.  I joined the police department.  I have had two jobs

23   since I have been 18.

24   Q.  You joined the Omaha Police Department?

25   A.  Yes.

1    Q.  And you told the jury about certain honors and awards

2    that you have been given.  Who gave those awards?

3    A.  Crime Stoppers here in Omaha, Nebraska, and the law

4    enforcement, basically it's a U.S. Attorney driven award for

5    state law enforcement officers.

6    Q.  The prosecutor gave you an award for being a good police

7    officer?

8    A.  The law enforcement coordinating committee presented the

9    award.

10   Q.  Do you believe it is illegal to belong to a gang?

11   A.  No.

12   Q.  Do you believe Jerome Bass is a member of a gang?

13   A.  He's not a documented member.

14   Q.  Do you believe that he's a member of a gang?  Yes or no.

15   A.  Yes.

16   Q.  Which gang?

17   A.  37th Street.

18   Q.  Do you have any documentation to back you up in that

19   regard?

20   A.  If you are asking if he's officially documented in our

21   gang file, no, he's not.

22   Q.  You do have gang files, don't you?

23   A.  Yes, we do.

24   Q.  Gang files are maintained by officers in addition to

25   yourself?

1   A.  Yes.

2   Q.  As a result of intelligence?

3   A.  Yes.

4   Q.  Obtained as a result of information from other gang

5   members and observations by the police, correct?

6   A.  Yes.

7   Q.  And you don't have any documented evidence that Jerome

8   Bass is a gang member, do you?

9   A.  Not in our gang file, but we have documented evidence

10  that he associates with 37th Street.

11  Q.  Sure.  He associates with his brother, doesn't he?

12  A.  And others, yes.

13  Q.  Whether or not you believe you can use controlled buys

14  or undercover buys, there weren't any undercover buys or

15  controlled buys of narcotics made from Jerome Bass?

16  A.  No.

17  Q.  Or attempted?

18  A.  No.

19  Q.  There was no trash pull from Jerome Bass's residence?

20  A.  No.

21  Q.  By trash pull, you know what I'm talking about, grabbing

22  somebody's garbage and going through it to see if there is

23  evidence of drugs or drug dealing?

24  A.  Yes, as I explained earlier.

25  Q.  You don't have any drug evidence against Jerome Bass, do

1    you?

2    A.  Not other than statements, no.

3    Q.  You don't have any bags of crack?

4    A.  No, sir.

5    Q.  Piles of money?

6    A.  No.  No, sir.

7    Q.  Don't have any surveillance?

8    A.  No, sir.

9    Q.  When Jerome Bass was arrested, did he try to flee?

10   A.  No.

11   Q.  When Jerome Bass was arrested, did he try to resist

12   arrest?

13   A.  No.

14   Q.  When Jerome Bass was arrested, was he searched?

15   A.  Yes.

16   Q.  Were there any drugs found on him?

17   A.  No.

18   Q.  Were any drug records found on him?

19   A.  No.

20   Q.  Were any guns found on him?

21   A.  No.

22   Q.  When you first questioned Jerome Bass about his

23   involvement in crack cocaine, he said he was not involved in

24   the transportation, the use, or possession of crack cocaine,

25   correct?

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    A.  Yes.  He denied being involved in any form, yes.

2    Q.  Wasn't that good enough for you?

3    A.  I didn't believe him.

4    Q.  Obviously.  Why didn't you say just okay, let's go to

5    jail, we have a warrant, why didn't you do that?

6    A.  Because I didn't believe him.

7    Q.  You didn't believe him when he gave you the statement

8    that he gave you, did you?

9    A.  No, not in its entirety.  I think he minimized his

10   involvement.

11   Q.  You didn't believe him?

12   A.  I did not believe him, no.

13   Q.  And you didn't believe him because he didn't admit that

14   he knew that what he was transporting was crack cocaine,

15   correct?

16   A.  Correct.

17   Q.  So what he admitted was smoke but not fire?

18   A.  What he admitted was minimization of his involvement.

19   Q.  And that's not what you wanted to hear?

20   A.  That's not what I believed.

21   Q.  Not what you wanted to hear either, is it?

22   A.  As I stated earlier, the purpose of interrogation is to

23   obtain a full confession.

24   Q.  You didn't do that?

25   A.  He did not confess fully.  He admitted to some --

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    Q.  Possibilities?

2    A.  -- some things.

3    Q.  Possibilities?

4    A.  Yes, possibilities.

5    Q.  But not probabilities and not certainties, correct?

6    A.  Correct.

7              THE COURT:  Mr. Levy, how close are you?

8              MR. LEVY:  Not even.

9              THE COURT:  I didn't think so.  Ladies and

10   gentlemen, I think at this time we will adjourn for today.

11             It's generally my practice to end at 5:00 o'clock

12   because I know some of you have obligations outside of

13   business or work.

14             So if we are going to go long I will try to let you

15   know that at least a day before, but generally speaking

16   we'll end at 5:00.

17             Tomorrow I have a hearing at 8:30 and I have a

18   hearing at 1:00.

19             So we are going to readjourn tomorrow morning at

20   9:00 o'clock and then continue with the evidence.

21             Officer Gassaway will be on the stand.  He'll

22   continue to be under oath.

23             There are a couple of things I want to tell you

24   before you leave.

25             First of all, whatever evidence comes in this case

1     for your consideration can only come inside the courtroom.

2          If you go home and talk to a member of your family

3     or to other persons about what you've heard they will tell

4     you what they think ought to be done.

5          They will give you information that neither of

6     these parties are going to be able to respond to.

7          If you go out and do a little research on the

8     internet, do a little research at the library, you're going

9     to get information that neither one of these parties is

10    going to be able to respond to, and that's what this is all

11    about.

12         Evidence comes in the courtroom.  Both sides get an

13    opportunity to respond to that information so that you can

14    make an informed decision.

15         If you go out and do any research or talk to

16    anybody else, neither one of these parties has the

17    opportunity to respond to that information, and that is not

18    fair to either one of them.

19         So when you go home tonight you shouldn't talk to

20    anybody about the facts of this case, and you should keep

21    your own counsel, and then when the case is over and you've

22    made a decision you can go back and talk to whomever you

23    would like or do whatever research you want to do.

24         But in fairness to both of these parties, while

25    we're in court you need just to keep your own counsel.

1          And then the other thing is that you can't talk

2     among yourselves about this until all the evidence is in and

3     you have to keep an open mind about the evidence until all

4     the evidence is completed.

5          The government puts on its case first and then the

6     defendant has an opportunity to respond, or the government

7     puts on its case first and then there's cross-examination as

8     we're doing today.

9          It's important to keep an open mind until both

10     sides have had an opportunity to present everything that you

11     need to hear.

12          We will see you tomorrow morning at about 9:00 a.m.

13     We are in recess.

14          (The following proceedings were had out of the

15     hearing of the jury:)

16          THE COURT:  Exhibit 19, the statement, generally

17     speaking police reports are not evidence and are not

18     admissible because they are hearsay and the witness that

19     testified to the police report is present in court subject

20     to cross-examination and that is basically the best

21     evidence.

22          I note from the testimony that Officer Gassaway has

23     attempted to make this an authenticated record, much the way

24     as a handwritten confession might be, or a confession that's

25     typed out and then signed by the defendant.

1          It seems to me that if we are going to have a

2     record that is going to be admitted, then the least we ought

3     to have is a signature on it or something else and we don't.

4          And so I am going to sustain the hearsay objection

5     by the defense counsel with respect to Exhibit 19.

6          THE COURT:  Anything further, Ms. Dugan-Hinrichs?

7          MS. DUGAN-HINRICHS:  No.

8          THE COURT:  Mr. Levy?

9          MR. LEVY:  Do you want any authority on the

10    post-arrest?

11         THE COURT:  If you have any I would like to see it

12    and, Ms. Dugan-Hinrichs, if you have some additional

13    authority I would like to see it.

14

15              (5:10 p.m. - Adjournment)

16

17

18

19

20

21

22

23

24

25

```
 1                    C-E-R-T-I-F-I-C-A-T-E

 2

 3          I, Allan G. Kuhlman, a duly-appointed Official

 4     Court Reporter for the United States District Court for the

 5     District of Nebraska, do hereby certify that the foregoing

 6     transcript is a true and accurate transcript of the

 7     proceedings held in this matter.

 8              In witness whereof I hereunto affix my signature on

 9     October 20, 2005.

10

11                              /s/Allan G. Kuhlman

12                              Allan G. Kuhlman

13

14                         I-N-D-E-X

15
                                 Direct     Cross    Redirect
16     WITNESSES:
       FOR THE PLAINTIFF:
17
       Jeffrey Gassaway.............. 27         96
18
       EXHIBITS:                    OFFERED    RULED ON
19
       12  Photograph 3902 N. 37th... 67        67
20     14  Rights Advisory Form...... 52        52
       15  Rights Advisory Form..... 71        71
21     19  OPD Report............... 95        110

22

23

24

25
```