1     IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF NEBRASKA

2

UNITED STATES OF AMERICA,  )

3            )
     Plaintiff,  ) 8:04CR-384

4            ) September 20, 2005
   vs.      ) 9:00 a.m.

5            ) Omaha, Nebraska

JEROME BASS,      )

6            )
     Defendant.  )

7

8

9

10         VOLUME II
     TRANSCRIPT OF TRIAL PROCEEDINGS

11   BEFORE THE HONORABLE JOSEPH F. BATAILLON
    UNITED STATES DISTRICT JUDGE, AND A JURY

12

13

14        A-P-P-E-A-R-A-N-C-E-S

15  FOR THE PLAINTIFF:   Jennie Dugan-Hinrichs
          Assistant United States Attorney

16          1620 Dodge Street
          Suite 1400

17          Omaha, Nebraska 68102

18  FOR THE DEFENDANT:   Michael T. Levy
          Attorney at Law

19          P.O. Box 6309
          Omaha, Nebraska 68106

20

  COURT REPORTER:    Allan G. Kuhlman

21          111 S. 18th Plaza
          Suite 3122

22          Omaha, NE 68102
          (402) 661-7305

23

24

25  Proceedings recorded by mechanical stenography, transcript
  with computer

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1          (At 9:00 a.m. on September 20, 2005, with counsel

2     for the parties and the defendant present, the following

3     proceedings were had out of the presence of the jury:)

4          THE COURT:  We have a couple of matters that we

5     need to take up.

6          First we have the issue of how to handle

7     post-arrest statements by alleged co-conspirators.

8          I did some research last night and then I've also

9     been supplied with a case by Mr. Levy, United States of

10    America versus Jesus Morales Alonzo and Gilbert Alonzo,

11    wherein Mr. Levy supports his temporal theory to the court.

12         It seems to me that the case that he has given me

13    that was decided in 1993 is good law and I assume that it

14    has not been overruled, although I didn't have a chance to

15    review it.

16         But based on my research, and based on my thinking

17    on this matter, it seems to me we still have a confrontation

18    issue.

19         I think that Rule 801 was basically created so that

20    co-conspirators could testify about what other

21    co-conspirators said in furtherance of the conspiracy, so

22    that if I had five conspirators and conspirator A wanted to

23    testify about what conspirator E said about conspirator B,

24    then it might be admissible, because it's in furtherance of

25    the conspiracy.

1          But I don't think that the rule is created so that

2     a third person altogether outside of the conspiracy could

3     testify about what one of the conspirators said about

4     another conspirator or to reiterate confessions by one of

5     the co-conspirators.

6          It seems to me it contravenes the intent of the

7     confrontation clause of the constitution with respect to

8     defendants.

9          So for that reason I'm going to stand by my

10    previous ruling with respect to allowing Officer Gassaway to

11    testify about statements of co-conspirators.

12         Now, the other issue is that Mr. Levy wants me to

13    give an instruction, a 404(b) instruction.

14         I don't know that I really understand what you want

15    me to do, Mr. Levy.

16         I have fashioned a 404(b) instruction from the

17    pattern jury instructions, the model jury instructions for

18    criminal for the Eighth Circuit.

19         At 2.08 there is an instruction for defendant's

20    similar acts that relates to Federal Rule of Evidence

21    404(b).

22         I'm not really sure I understand the purpose of the

23    instruction.

24         It seems to me that Officer Gassaway's

25    characterization is correct; that your client has minimized

1    his role in the alleged conspiracy.

2             And the way he has done it is to testify that he

3    thought that he might be delivering marijuana.

4             And under the circumstances I don't think that

5    that's, quote-unquote, other acts or similar acts as much as

6    it is relevant to whether or not he understood that he was

7    involved in criminal activity.

8             And if you read the instruction I think that that

9    is clear, because I'm not sure what exception it falls under

10   404(b).

11            The closest I thought it came would be knowledge,

12   so that's how I've got this instruction cast.

13            If you want to review it and then let me know

14   whether you want me to instruct the jury with respect to

15   404(b), then I'll be willing to entertain that.

16            MR. LEVY:  I anticipate that witness -- actually

17   there was a notice of intent to introduce 404(b) filed

18   specifically with reference to the testimony, expected

19   testimony, of Jacara Baker on two issues.

20            One would have been sales of crack to her during

21   the period outside of the charged period of the conspiracy

22   and prior to the defendant attaining the age of 18.

23            I think secondly -- I thought there was some

24   marijuana -- no, it was just the crack, there wasn't any

25   marijuana involved.

1          THE COURT:  So why do you want me to give the

2    404(b) instruction at this juncture?

3          MR. LEVY:   Well --

4          THE COURT:  I have not made a ruling on whether the

5    prior acts of Jacara Baker are admissible or not.

6          And I don't think I can make that decision until I

7    hear what the details of the testimony are going to be.

8          MR. LEVY:  I agree.

9          THE COURT:  Do you want to look at this and let me

10   know?

11         MR. LEVY:  Yes.  I am wondering whether we can let

12   it slide as far as Officer Gassaway's testimony about what

13   Bass said to him.

14         THE COURT:  You can ask for the 404(b) instruction.

15   I have fashioned an instruction.

16         I'll give it to my court reporter to make as a part

17   of the official record.

18         And then I'll leave it up to you, after you've seen

19   the instruction, to decide whether or not you want the court

20   to give this particular 404(b) instruction.

21         MS. DUGAN-HINRICHS:  Judge, Jacara Baker is

22   anticipated to testify about crack sales that occurred prior

23   to the defendant's 18th birthday.

24         It was out of an abundance of caution that I filed

25   it because I had the conspiracy beginning on his 18th

1    birthday.

2            But her testimony, that is just part of it.  It

3    continues on through the conspiracy time frame.

4            And so I filed the 404(b) only because I knew part

5    of it was outside of the conspiracy.

6            But she's also going to testify about crack sales

7    between them during the time frame.

8            So that was the purpose of filing it in the first

9    place.

10           And it dealt with the crack and not any other

11   substance or any other types of transactions.

12           So that was my purpose of filing it.  It was

13   provided in the discovery and I just did it out of an

14   abundance of caution so I wouldn't be excluded, but also to

15   bring it to your attention that she starts back in 1999, I

16   think is when her testimony starts.

17           THE COURT:  When is the date of the conspiracy?

18           MS. DUGAN-HINRICHS:  January 1, 2001.

19           THE COURT:  Two years earlier?

20           MS. DUGAN-HINRICHS:  Right, but her testimony

21   continued through her arrest.  So that is why I went ahead

22   and filed that.

23           THE COURT:  Is it your intention to still have her

24   testify about acts that are outside the conspiracy?

25           MS. DUGAN-HINRICHS:  It is, sir.

```
 1          THE COURT:  When we come to Jacara Baker, then

 2     we'll discuss that issue and go.  Are you intending to call

 3     her today?

 4          MS. DUGAN-HINRICHS:  I do, sir.  After Officer

 5     Gassaway I intend to call Terrell Jackson and Jacara Baker

 6     following.

 7          THE COURT:  That will be about the time we have our

 8     mid morning break, I assume.  So we'll have time to talk

 9     about Jacara Baker.  All right.  Is there anything further,

10     Ms. Dugan-Hinrichs?

11          MS. DUGAN-HINRICHS:  No, Your Honor.

12          THE COURT:  Mr. Levy?

13          MR. LEVY:  When I was going through my instructions

14     that I was given late in the day, for some reason I'm

15     missing an Instruction 20.  It goes from 19 --

16          THE COURT:  That's because we gave --

17          MS. DUGAN-HINRICHS:  That's the one we gave twice.

18          THE COURT:  You are missing Instruction 20.

19          MR. LEVY:  19 is credibility of cooperating

20     witnesses.

21          THE COURT:  We substituted I believe 20 or 24.

22          MR. LEVY:  24 is credibility of witnesses.

23          THE COURT:  What happened --

24          MR. LEVY:  25 is credibility of cooperating

25     witnesses.  But there is no 20.
```

1          THE COURT:  What we did was take Instruction 25 and

2     make it the new 20.  You have not received a copy of that.

3          MR. LEVY:   I have not received it as number 20; I

4     received it as 25.

5          THE COURT:  Correct, and then the next set of

6     instructions will start at 21.

7          MR. LEVY:  Does that mean that the duplicate plea

8     agreement instruction won't be given?

9          THE COURT:  Probably, but we'll talk about that

10     before we give it to the jury.

11          MS. DUGAN-HINRICHS:  Your Honor, I did do some

12     research and got a jury instruction with regard to

13     tampering.  I assume we can address that later.

14          THE COURT:  Correct.  If you have it, if you would

15     please provide a copy as soon as possible so that I can

16     evaluate it.  Now we can get the jury.

17          (The following proceedings were had in the presence

18     of the jury:)

19          THE COURT:  Mr. Levy, you were cross-examining

20     Officer Gassaway.

21          Officer Gassaway, you are still under oath.  You

22     may proceed, Mr. Levy.

23          MR. LEVY:  Thank you, Your Honor.

24               CROSS-EXAMINATION (CONT'D)

25     BY MR. LEVY:

1    Q.  Officer Gassaway, let's go back to your general

2    testimony about the investigation of drug trafficking

3    crimes.

4            The term proffer has been used quite extensively up

5    to this point.  Would you tell the jury how you define the

6    term proffer?  What is it?

7    A.  It's a means to provide information, and that is the

8    interview setting that we use to obtain information from an

9    indicted person who has entered into a plea agreement,

10   cooperation agreement.

11   Q.  The proffer is nothing more than a statement given by a

12   defendant or a suspect in the company of his lawyer usually

13   and sometimes in the presence of the prosecutor and one or

14   more law enforcement officers?

15   A.  Yes, that's correct.

16   Q.  The purpose for a proffer is to provide information

17   which will lead investigators to suspect other individuals

18   who they might not otherwise have reasons to suspect?

19   A.  Yes, that's part of it.

20   Q.  And you testified that during this interview process you

21   obtain information in great detail, and you gave us a couple

22   of examples, details as to cars and houses.

23   A.  Yes.

24   Q.  And you do consider the furnishing of details important,

25   do you not?

1    A.  Yes.

2    Q.  Details would include the kind of vehicle a suspect

3    drives?

4    A.  Yes.

5    Q.  Where he lives?

6    A.  Yes.

7    Q.  Where he does his dealing?

8    A.  Yes.

9    Q.  Where deliveries take place, deliveries of drugs?

10   A.  Yes.

11   Q.  When they take place or when they took place?

12   A.  Yes.

13   Q.  What the quantity was?

14   A.  As best a person can remember, yes, sir.

15   Q.  How much money was involved?

16   A.  Yes.

17   Q.  Who was present during the deliveries?

18   A.  If there was another person present, yes.

19   Q.  All these details are considered important by law

20   enforcement as a way to check the accuracy of the person

21   giving the information; isn't that true?

22   A.  Yes.

23   Q.  And the devil being in the details, if the details are

24   later found to be inaccurate or false, then that would call

25   into question the reliability of the statement of the

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1   informant?

2   A.  Yes, if found to be a lie, yes, it would be.  If

3   inaccurate we would try to correct, you know, maybe

4   something would recall their memory in a more accurate

5   fashion.

6           But if it's a lie, yes, it would call their

7   credibility into question.

8   Q.  A lie is more often than not in the mind of the

9   informant, isn't it?

10  A.  I'm not sure I understand that.

11  Q.  Sometimes you would give these people a polygraph test,

12  but sometimes, most times you wouldn't?

13  A.  I have never administered a polygraph test to anyone.

14  Q.  And so you can't look inside the thought process of the

15  informant to determine whether or not the informant is

16  thinking I am going to make a lie?

17  A.  We're talking about two different things.  You are

18  talking about an informant and you are talking about a

19  person that has entered into a plea agreement.

20  Q.  Let me ask it this way.  You obtain proffers before plea

21  agreements are negotiated most of the time, don't you?

22  A.  Yes.

23  Q.  Because the prosecutor wants to know before entering

24  into a cooperation plea agreement what the defendant is

25  prepared to offer?

1   A.  Yes.

2   Q.  Now, Mr. Bass was indicted in August of 2004 and not

3   arrested until October of 2004.  Why the two month delay?

4   A.  We couldn't locate him.  He was in fugitive status after

5   the warrant was issued.

6   Q.  He was in a fugitive status because he knew he had been

7   indicted and was hiding?

8   A.  Once there is a warrant issued for your arrest, and the

9   arrest warrant was issued, he was classified in that status.

10  Q.  You don't mean to infer for the jury that he knew he was

11  indicted?

12  A.  I'm not sure if he did or not.  Some people know they

13  are indicted; some people don't.

14  Q.  As a matter of fact, the indictment was sealed?

15  A.  Yes.

16  Q.  And by sealing it means it was not available for public

17  knowledge?

18  A.  That's correct.

19  Q.  As was the arrest warrant?

20  A.  I believe so, yes.

21  Q.  And you knew where Mr. Bass lived?

22  A.  Yes.

23  Q.  Why didn't you go out and get him?

24  A.  We looked for him.

25  Q.  You just couldn't find him?

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    A.  That's correct.

2    Q.  He wasn't actively hiding from you, was he?

3    A.  I'm not sure.

4    Q.  Do you have any evidence that he was hiding from you?

5    A.  No, I do not.

6    Q.  And the reason that he was arrested was that he was

7    observed by you driving his car on the public streets of

8    Omaha?

9    A.  That's correct.

10   Q.  And he was not driving in a furtive manner trying to

11   hide his face?

12   A.  No.  He didn't see me.

13   Q.  Conceal his identity?  He was just driving, wasn't he?

14   A.  He was just driving and he had no idea I was there.

15   Q.  When did you first begin your investigation of Mr. Bass?

16   A.  Probably when I received the first bit of information

17   that he was involved in the sale of crack cocaine.

18        MR. LEVY:  Move to strike on the basis of

19   non-responsiveness.

20        THE COURT:  Sustained.

21   BY MR. LEVY:

22   Q.  Let me ask you again and perhaps you could be more

23   responsive.

24        When did you begin your investigation of Mr. Bass,

25   and that only calls for a date.

1    A.  I don't recall the date exactly, but it probably would

2    have been a year or two, or year, year and a half, prior to

3    his indictment.

4    Q.  Sometime in the fall of 2003 or as early as the winter

5    of 2003?

6    A.  Without locking myself into an answer I would assume so,

7    but the date would be of the first proffer that we used to

8    indict him.

9    Q.  So Mr. Bass was in your mind a suspect for about a year,

10   year and a half?

11   A.  We were developing information, yes, for that time

12   period.

13   Q.  During that period of time did you or any other police

14   officer, federal or state officer, ever discover Mr. Bass to

15   be in possession of drugs?

16   A.  I did not, no.  I'm not sure what his record would show.

17   Q.  Or money?  Large amounts of money?

18   A.  I did not, no.

19   Q.  Or guns?

20   A.  I did not, no.

21   Q.  Or drug records?

22   A.  No, I did not.

23   Q.  Now there are many traditional techniques utilized by

24   the police in investigating persons suspected of drug

25   trafficking, are there not?

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    A.  Yes.

2    Q.  They would include surveillance, correct?

3    A.  Correct.

4    Q.  Was there any surveillance of Mr. Bass to suggest he was

5    involved in drug trafficking?

6    A.  There was surveillance done and he was seen at some

7    areas that we suspected drug trafficking.

8    Q.  Any surveillance --

9    A.  Yes.

10   Q.   -- that observed Mr. Bass dealing in drugs?

11   A.  Not dealing in drugs, no.

12   Q.  That's what he's charged with here, isn't it?

13   A.  Yes.

14   Q.  Did any trash collection at places where Mr. Bass was

15   living or seen produce any evidence of drug dealing in that

16   year and a half?

17   A.  Well, there was evidence produced, not from Mr. Bass,

18   but from the areas he frequented, yes.

19   Q.  I'm limiting my question to Mr. Bass's involvement; not

20   the involvement of Joe Doe.

21   A.  I don't believe that's what you asked me.

22   Q.  I am asking you then, any trash collection at the places

23   where Mr. Bass was known to live or known to frequent that

24   provided you with evidence that he was involved in drug

25   trafficking?

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1   A.  No.

2   Q.  Any search warrants served that would suggest Mr. Bass

3   was involved in drug trafficking?

4   A.  No.

5   Q.  Any applications for search warrants made to obtain

6   evidence that Mr. Bass was involved in drug trafficking?

7   A.  No.

8   Q.  In order to obtain a search warrant you must show to a

9   judge probable cause that someone or some place is involved

10  in drug trafficking; isn't that true?

11  A.  That is true, yes.

12  Q.  The fact you did not make application for search

13  warrants for Mr. Bass or his place where he was known to

14  live or reside, you didn't have probable cause, isn't that

15  correct?

16  A.  Yes, that's correct.

17  Q.  And probable cause generally is defined as considering

18  all of the circumstances it's more likely than not that a

19  person is involved or a location is involved in drug

20  trafficking?

21  A.  That's correct.

22  Q.  Now, there are various electronic methods employed by

23  the police to gather evidence against someone who is

24  involved in drug trafficking, are there not?

25  A.  Yes, there are some.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1   Q.  Wiretap of either a land line or cell phone?

2   A.  Yes.

3   Q.  Were any of those investigative techniques employed with

4   respect to Mr. Bass?

5   A.  No.

6   Q.  And again, as in the case of a search warrant, you must

7   show probable cause to a judge in an application for

8   electronic surveillance?

9   A.  Yes.

10  Q.  And no application was made?

11  A.  No.

12  Q.  And that's because law enforcement did not in their

13  judgment believe they had probable cause to obtain a wire,

14  correct?

15  A.  Correct.

16  Q.  And not only can you apply for a wire, but you can apply

17  for a pen register, can't you?

18  A.  Yes.

19  Q.  And a pen register application is even made on lesser

20  grounds than a wiretap?

21  A.  Yes.

22  Q.  And all pen registers do is if I call it's like caller

23  ID, you track and trace a certain telephone number, you see

24  who is calling that number and you check the numbers that

25  are calling the number to see if there is any connection

1   between drug traffickers?

2   A.  Yes.

3   Q.  And the other way around is you work backwards and

4   obtain the numbers that the suspect phone is calling,

5   correct?

6   A.  In most cases, yes.

7   Q.  And nothing was done as far as Mr. Bass was concerned;

8   is that right?

9   A.  That's correct.

10  Q.  Now, you can't go into these areas and purchase drugs

11  because these guys know you, correct?

12  A.  That's correct.

13  Q.  And without putting a racial twist on this thing, these

14  are primarily black young men who are involved in this gang

15  activity in this particular part of Omaha?

16  A.  True.

17  Q.  If I were inclined to go down there and shop around for

18  crack, I would stick out like a sore thumb, wouldn't I?

19  A.  But you would be able to purchase crack if you wanted to

20  do that, yes.

21  Q.  If I wanted to, so you have white officers that could go

22  in that are unknown, don't you?

23  A.  I assume so, yes.

24  Q.  And black officers, other than yourself, that are

25  unknown?

1   A.  No.

2   Q.  Officer Lang does a pretty effective job of working

3   undercover, doesn't he?

4   A.  I'm sure he does.

5   Q.  And even Sergeant Langan, who we will hear from later in

6   this trial, in his younger years was a pretty good

7   undercover cop, wasn't he?

8   A.  Based on his reputation, I would assume so, yes.

9   Q.  But no effort was made to send in either an undercover

10  police officer or a confidential informant to try to buy

11  drugs from Jerome Bass?

12  A.  No, we did not have that type of access.

13  Q.  You didn't try it, did you?

14  A.  We know we could not have.

15  Q.  You didn't try?

16  A.  No, I did not.

17  Q.  Another pretty good investigative technique is a

18  surprise stop and search, isn't it?

19  A.  Surprise stop and search?  I'm not familiar with that.

20  Q.  Well, if you have got a suspect that you believe is

21  trafficking in drugs, and is likely to be transporting

22  drugs, and they don't know you're coming to stop and search

23  them, sometimes you can get evidence that someone is in

24  possession of drugs by just pulling them over and frisking

25  them, correct?

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    A.  Without probable cause for pulling them over that --

2    Q.  It's not probable cause; it's reasonable suspicion,

3    isn't it?

4    A.  I wouldn't do that.

5    Q.  You have done it with Mr. Bass, haven't you?

6    A.  No.

7    Q.  Absolutely you've never pulled Mr. Bass over and frisked

8    him?

9    A.  Not without probable cause.

10   Q.  Or reasonable suspicion?

11   A.  Not without probable cause for the traffic stop.

12   Q.  Traffic stop.  Is that your testimony?

13   A.  If that's what you are referring to, yes.

14   Q.  I am referring to pulling Mr. Bass over for any reason

15   that you think is legitimate and frisking him.  Have you

16   ever done that?

17   A.  I pulled Mr. Bass and his brother over on one occasion,

18   yes.

19   Q.  And frisked him?

20   A.  Yes.

21   Q.  Anything on him?

22   A.  No.

23   Q.  Did he know you were coming?

24   A.  I was behind him for a block or two and they did not

25   stop initially when I activated the emergency equipment?

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    Q.  Did they throw anything out of the car?

2    A.  No.

3    Q.  Did Mr. Bass have anything on him?

4    A.  No.

5    Q.  Lamar?

6    A.  No.

7    Q.  You have never pulled Mr. Bass over when he was with

8    somebody besides Lamar?

9    A.  Not that I recall.

10   Q.  So it could have happened?

11   A.  I could have, yes.

12   Q.  In any event, there has never been a search of

13   Mr. Bass's person or vehicle or property that has turned up

14   evidence of drug dealing; is that correct?

15   A.  That's correct.  From my standpoint, yes.

16   Q.  I'm talking about you; I'm not talking about anybody

17   else.  You are the case officer, aren't you?

18   A.  Yes, I am.

19   Q.  That means you are in charge of this case?

20   A.  Yes, it does.

21   Q.  And you not only obtained information on Mr. Bass

22   yourself, but all information obtained on Mr. Bass is

23   funneled to you?

24   A.  Yes.

25   Q.  Now, it has been filed in the court file in this case by

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    the prosecutor that there will be testimony about prices of

2    crack cocaine based on weight and looking at that --

3              MR. LEVY:  May I have a moment to mark an exhibit?

4              THE COURT:  Yes, you may.

5              MR. LEVY:   Your Honor, may I approach the witness?

6              THE COURT:  You may.

7    BY MR. LEVY:

8    Q.  In front of you is Exhibit 101, which is a filing by the

9    prosecution as to drug quantities and amounts of money

10   charged in connection with the sale of drugs.

11             Does that appear to be an accurate listing to you,

12   in your experience?

13   A.  Yeah, I would say that there's some variation maybe over

14   time.

15   Q.  But it's in a range, isn't it?

16   A.  For instance, it has quarter ounce, $250, $300.  That's

17   in the range.  However, half ounce is a little high, but

18   feasible.

19   Q.  You don't have any significant disagreement with

20   Sergeant Langan when he testifies to those amounts?

21   A.  Absolutely not.

22             MR. LEVY:  Offer Exhibit 101.

23              MS. DUGAN-HINRICHS:  No objection.

24             THE COURT:  Exhibit 101 is received.

25   BY MR. LEVY:

1    Q.  That exhibit indicates there are some big bucks involved

2    in crack dealing, doesn't it?

3    A.  Yes.

4    Q.  Especially when powder cocaine is relatively cheap and

5    the process for turning powder into crack is not terribly

6    expensive, just involves some labor and baking soda, so the

7    overhead isn't so high, is it?  The profit margin is pretty

8    good, isn't it?

9    A.  Yes.

10   Q.  A lot of money floating around, isn't there, in the

11   crack business?

12   A.  A lot of people make a lot of money, yes.

13   Q.  Did you do any financial investigation into Mr. Bass's

14   situation?

15   A.  No.

16   Q.  Did you ever subpoena any financial institutions in

17   Omaha to see if he had accounts?

18   A.  No.

19   Q.  Did Mr. Bass ever drive expensive cars that you saw?

20   A.  Yes.

21   Q.  Which one?

22   A.  He had a gold, fancy Monte Carlo, I believe it was.

23   Q.  I thought it was orange.

24   A.  Gold, orange, real bright color.

25   Q.  An old car?

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1   A.   It was a restored old car, yes.

2   Q.   1980s?

3   A.   Possibly, yes.

4   Q.   Did he wear jewels, jewelry, gold, that you saw?

5   A.   I don't recall, no.

6   Q.   He's a sharp-dressed man?

7   A.   That's an opinion.

8   Q.   He just dressed like a college kid, didn't he?

9   A.   I guess he dressed appropriate for his age, I guess.

10  Q.   In fact, you approached him out at Metro Community

11  College on Fort Street to question him, didn't you?

12  A.   I don't recall that, no.

13  Q.   Could have happened?

14  A.   Possibly.  I don't recall that incident.

15  Q.   Up to the time that you indicted Mr. Bass you relied

16  solely on the information from other drug dealers, didn't

17  you?

18  A.   I'm sorry?

19  Q.   To obtain the indictment you relied solely on the

20  information from other drug dealers?

21  A.   Like in all the other cases, yes.

22          MR. LEVY:  Move to strike as not responsive.

23          THE COURT:  Sustained.

24          MR. LEVY:  Please answer the question.  It will

25  save us time.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1              THE WITNESS:  Yes.

2              MR. LEVY:  May I confer with Ms. Dugan-Hinrichs?

3              THE COURT:  Yes, you may.

4    BY MR. LEVY:

5    Q.  You are aware, are you not, Officer Gassaway, that some

6    of these drug dealers who cooperate with you, who are in

7    jail, communicate with each other either by phone or mail or

8    third party?

9    A.  Yes, they can.

10   Q.  And they tell each other what they're talking to you

11   about?

12   A.  No.

13   Q.  In certain circumstances you have seen that these

14   cooperators have been talking to others about their cases,

15   haven't you?

16   A.  In certain circumstances.  They have been instructed not

17   to do so.

18   Q.  But they do it, don't they?

19   A.  Some do, yes.

20   Q.  The fact is, they are criminals, aren't they?

21   A.  Yes.

22   Q.  They don't have much respect for the law, do they?

23   A.  I assume not, no.

24   Q.  They don't have much respect for the police, do they?

25   A.  In some cases, no.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    Q.  So in some cases it doesn't matter whether you would

2    tell them to pursue a course of action, they do whatever

3    they want to do, isn't that correct?

4    A.  With consequences, yes.

5    Q.  And it's not always possible for you to determine

6    whether these cooperators are talking back and forth to each

7    other, is it?

8    A.  True.

9    Q.  Getting their stories straight, correct?  It's possible,

10   isn't it?

11   A.  It's possible.

12   Q.  It's also possible that certain cooperators would seek

13   revenge or retaliation against those people who have

14   informed against them?

15   A.  There have been instances or fights in the jail, yes.

16   Q.  There have been instances where cooperators will inform

17   on family members of those who have informed on them, isn't

18   that correct?

19   A.  By nature of association, yes.

20   Q.  What do you believe the gang membership to be of the

21   people who you know will be testifying in this case?

22   A.  I'm not sure.  Gang membership?  Number-wise?

23   Q.  No.  The gang.

24   A.  The hierarchy?

25   Q.  No.  The gang they belong to?

1    A.  I'm sorry.

2    Q.  Are they all 37th Street?

3    A.  Several are 37th Street.  One is a Jaynes Street Blood.

4    However, he's more closely aligned with 37th Street because

5    of relationships.

6             And a second one, another is a Crown Point Crip,

7    but because of relationship is also closely aligned with

8    37th Street, and a couple are 40th Avenue Crips.

9    Q.  It is a concern of law enforcement, that you try to

10   address, that an informant will inform upon a family member

11   of a person who has informed on him to extract revenge or

12   retaliation?

13   A.  You lost me on the first part of that question.

14   Q.  It is a concern of yours, you are concerned, you are

15   aware of the possibility that Jacara Baker is informing on

16   Jerome Bass because Lamar Bass informed on her?

17   A.  I don't think that's true, no.

18   Q.  I don't care whether you think it's true; I'm saying

19   that's a concern, isn't it?

20   A.  No, not my concern.

21   Q.  But you know that it has happened; that a family member

22   is sometimes informed on as a means of retaliation?

23   A.  I disagree with that.

24   Q.  Again, the statements that you've testified to, the jury

25   has nothing other than your word to rely on in determining

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    whether Mr. Bass said what you said he said, is that true?

2    A.   That's true, yes.

3    Q.   Even though you did have the technology to make a tape

4    recording?

5    A.   Not with me, but it's available, yes.

6    Q.   And a videotape recording?

7    A.   It was not -- videotape recording was not available at

8    the facility I conducted the interview.

9    Q.   But it was down at the station?

10   A.   Yes.

11   Q.   And certainly a partner was available at north side,

12   wasn't that true?

13   A.   No, not at that time.

14   Q.   There was nobody at north side?

15   A.   You said my partner.

16   Q.   A fellow officer?

17   A.   Yes, there was.

18   Q.   So you could have, to cover yourself, called in another

19   police officer to witness the statement?

20   A.   Yes.

21   Q.   But you chose not to?

22   A.   Yes.

23   Q.   You also could have retained your notes so that we could

24   have compared your handwritten notes with your testimony;

25   isn't that true?

1    A.  Yes, but -- yes.

2    Q.  You didn't do that?

3    A.  No, I did not.

4    Q.  Now, you claim that Mr. Bass told you that one of his

5    deliveries was to somebody named Sacks at a convenience

6    store.

7    A.  Yes.

8    Q.  And he was, Mr. Bass, was with his cousin?

9    A.  Yes.

10   Q.  And he gave you his cousin's name as Bobby Bass?

11   A.  I believe so, yes.

12   Q.  At least that's what you wrote in your note?

13   A.  Yes.

14   Q.  And you believe that your notes are accurate?

15   A.  I believe that's what he told me, yes.

16   Q.  And if he doesn't have a cousin named Bobby Bass then

17   would you wonder about the accuracy of your report?

18   A.  No.

19   Q.  If his cousin was Bobby Johnson?

20   A.  Perhaps.

21   Q.  Now in the conversation that you overheard with Marie

22   Harper and Mr. Bass, he didn't threaten Karlos, did he?

23   A.  No, not at all.

24   Q.  He didn't communicate to Marie a threat to pass on to

25   Karlos, did he?

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    A.  No.

2    Q.  He merely asked what is Karlos going to do?

3    A.  Yes.

4    Q.  Is he going to testify against me?

5    A.  Yes.

6    Q.  He didn't encourage Mrs. Harper to tell her son not to

7    testify against him, did he?

8    A.  No.

9    Q.  And he didn't say if Karlos testifies against me I'm

10   going to make sure somebody hurts him?

11   A.  No, he did not.

12   Q.  If I as his lawyer had called Ms. Harper as part of my

13   investigation and inquired whether Karlos was going to

14   testify, to do my job, would you have any criticism of me?

15        MS. DUGAN-HINRICHS:  Objection, relevance.

16        THE COURT:  Overruled.

17        THE WITNESS:  No.

18   BY MR. LEVY:

19   Q.  So Jerome didn't do anything more than I would have

20   done, correct?

21   A.  Not correct, no.

22   Q.  He didn't do anything other than ask Mrs. Harper what

23   Karlos was going to do?

24   A.  That's correct, in that context.

25   Q.  And he didn't ask Mrs. Harper what Karlos was going to

1   say, did he?

2   A.  No.

3   Q.  Just whether Karlos was going to be in court to testify,

4   correct?

5   A.  There's other things, but, yes, he did say that.

6   Q.  You know Karlos has testified before?

7   A.  Yes.

8           MR. LEVY:  May I have a moment, Your Honor?

9           THE COURT:  Yes, you may.

10  BY MR. LEVY:

11  Q.  You have referred to some individuals by the name of

12  Sacks and Mario.  Did you ever determine the true identity

13  of those?

14  A.  Mario, yes; Sacks, no.

15  Q.  You never found out who Sacks is?

16  A.  That's correct.

17  Q.  It's just a name?

18  A.  I know the street name, yes.

19          MR. LEVY:  I have no further questions.

20          THE COURT:  Redirect, Ms. Dugan-Hinrichs?

21          MS. DUGAN-HINRICHS:  Thank your, Your Honor.

22                    REDIRECT EXAMINATION

23  BY MS. DUGAN-HINRICHS:

24  Q.  Officer Gassaway, when you listened to the conversation

25  between Marie Harper and Jerome Bass regarding Karlos

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    testifying, do you recall Ms. Harper saying to Jerome that

2    she didn't know what Karlos was going to do, but she

3    encouraged Karlos to do what was best for him and tell the

4    truth?

5    A.  Yes.

6    Q.  What did Jerome respond when Mrs. Harper made that

7    statement?

8    A.  Without referring to my police report, solely because of

9    accuracy, if I could, I would rather do that.

10             MS. DUGAN-HINRICHS:  May I approach, Your Honor?

11             THE COURT:  Yes, you may.

12             THE WITNESS:  Jerome Bass responded by saying if

13   Karlos testifies he wouldn't beat his case.

14   BY MS. DUGAN-HINRICHS:

15   Q.  Did he say anything else after he made that statement?

16   A.  He said that he was not worried about anyone else

17   because they were all lying.

18   Q.  And it was after that that Ms. Harper became upset and

19   kind of started chastising Mr. Bass.  Is that a fair

20   representation?

21   A.  Yes.

22   Q.  Officer Gassaway, you were asked on cross-examination

23   about why you went back the second time to talk to

24   Jerome Bass on October 14th.

25             And I think your words were for two reasons.  You

1  wanted to be fair and make sure you were covered, correct?

2  A.  Yes.

3  Q.  Can you explain that further for me?

4  A.  Yes.  I have had a lot of trials in federal court and it

5  always seems to come down to procedural matters, that I

6  didn't do proper procedures, or I was flat out not telling

7  the truth.

8       So I wanted to ensure that he had a chance to read

9  his statement, make any changes to the statement, so when

10  it's presented in court it would show that I gave him a fair

11  opportunity to make a statement, number one, and I did so

12  without any biases or pressure exerted upon him.

13  Q.  And that's why you let him make the changes and

14  incorporated those changes into your final report?

15  A.  Absolutely, yes.

16  Q.  Mr. Levy asked you about that day that you saw Mr. Bass

17  on Sorensen Parkway.

18  A.  Yes.

19  Q.  I believe on direct you testified that you weren't even

20  on duty at the time that you saw him?

21  A.  That's correct.

22  Q.  Can you tell us how that came about?

23  A.  I was driving westbound on Sorensen and he passed me.  I

24  knew what kind of vehicle he was driving at the time.

25       And I saw the vehicle and I looked to see if it was

1    him, and in fact it was and I turned around on the vehicle

2    in my personal vehicle.

3           I had my radio with me and I radioed for a cruiser

4    to intercept him as he came eastbound.

5    Q.  Because you weren't even at work yet, or on duty yet,

6    you didn't have any of your recording equipment with you, is

7    that fair?

8    A.  That's correct.

9    Q.  Mr. Levy asked you about possibilities and probabilities

10   and I believe you testified about the minimization and that

11   you felt that he was minimizing his involvement.  Could you

12   explain that further for me, please?

13   A.  Yes.  Based on my experience in interviewing and

14   interrogations, people sometimes minimize their involvement

15   and seem to think that that gives you what you want to hear.

16          I didn't think that I could get him past the

17   minimization that he was doing, so that is why I stopped the

18   interview.

19          We could have went on probably for however long,

20   but I did not think that he was going to get past the

21   minimization and therefore it would have turned into -- it

22   would have seemed like I was pressuring him for a statement

23   at that point.  That's why I ended the interview when I did.

24   Q.  Rather than have it appear that you were pressuring him?

25   A.  Yes.

1   Q.   With regards to interrogation techniques versus

2   interview techniques, you were asked on cross about taking

3   the defendant down to central station where there were

4   recording capabilities.

5           Can you explain for me again why you didn't do that

6   in this situation?

7   A.   Yes.   Believe it or not, out of the whole department we

8   have two interview rooms that are set up at central station

9   for audio and video recording.

10          As stated earlier, the goal of an interrogation is

11  to obtain a confession.

12          There are certain things you set out to do to

13  maximize that possibility of obtaining a confession.

14          And I didn't want there to be a time gap.   I didn't

15  want to take the chance of transporting him to central

16  station, waiting for an interview room to open up and he may

17  have to sit there for three -- I won't estimate a time

18  period.

19          If someone had the interview room it could be

20  lengthy interview or it could be short.

21          So I thought my best chance of obtaining a

22  confession was to do an interview right then and there.

23  Q.   Strike when the iron is hot, so to speak?

24  A.   Yes.

25  Q.   Very close in time to when he's arrested and told about

1   his federal indictment, correct?

2   A.  Correct

3   Q.  Mr. Levy spoke to you about different investigative

4   techniques or tools that were not used in this case.

5           And I believe on direct you talked about you didn't

6   have an in when it came to a CI in this 37th Street group of

7   people.  Can you explain that for me, please?

8   A.  Yes.  I did have two CIs into that group; however, they

9   were in custody and/or found out to be working for the

10  police.

11          Therefore, it wasn't feasible to direct them to

12  make controlled purchases from Jerome Bass.

13          The word on the street was that my informants I had

14  were cooperating.

15          MR. LEVY:  Objection, Your Honor, to the word on

16  the street as hearsay, move to strike.

17          THE COURT:  I think we're talking about his

18  perception of his CIs and I think that he can express his

19  perception of why or why not his CIs had no credibility.

20          So I don't know that it's for the truth of what the

21  word on the street was, but his perception.

22          MR. LEVY:  As long as the jury understands this is

23  not for the truth.

24          THE COURT:  I'll overrule the objection.

25  BY MS. DUGAN-HINRICHS:

1  Q.  Continue, sir, about why you didn't utilize your CIs

2  with Mr. Jerome Bass.

3  A.  Basically they were useless, because they had been found

4  out to be cooperating and at some point they even provided

5  testimony in court which I identified them as an informant

6  that I had used, so we had no access to Mr. Bass.

7  Q.  That was before he was arrested, correct?

8  A.  That is correct.

9  Q.  With regard to the trash pulls that Mr. Levy asked you

10 about, can you explain why trash pulls weren't utilized in

11 this neighborhood as it related to the defendant, Mr. Bass?

12 A.  As related to Mr. Bass, it was a completely dry

13 conspiracy, or a conspiracy only.

14        That wasn't the avenue that we were going with the

15 investigation.

16        We knew that he sometimes stayed at his mother's

17 house, but it wasn't until I interviewed him did I find out

18 his other address, which was out west.

19        So conducting a trash pull at his mother's house

20 probably wouldn't have been fruitful.

21 Q.  What was his mother's address?

22 A.  3335 North 37th.

23 Q.  Mr. Levy asked you about utilizing surveillance as an

24 investigative technique on Mr. Jerome Bass.  Could you tell

25 us why that wasn't done in this case?

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1   A.  Again, the course of the investigation was being built

2   through historical, and again we didn't have any one close

3   to him that could provide us information that he was

4   actively at a location selling drugs.

5   Q.  And, Officer Gassaway, are you known to this group of

6   the 37th Street Gang in north Omaha?

7   A.  Very well known, yes.

8   Q.  If you went up and did surveillance on Mr. Bass's

9   mother's house, would somebody see and recognize you?

10  A.  Yes.

11  Q.  And therefore any activity that may have been taking

12  place would have been ceased?

13  A.  Yes.

14  Q.  Or they would have spread the word that the cops were

15  around, correct?

16          MR. LEVY:  Objection, Judge, to the leading nature

17  of the question.

18          THE COURT:  Sustained.

19  BY MS. DUGAN-HINRICHS:

20  Q.  Why didn't you conduct personal surveillance in north

21  Omaha?

22  A.  As I said earlier, I believe on direct, all of our

23  vehicles and most of us are well known.

24          Once we go into an area normally the activity

25  ceases and it stops.

1  Q.  Mr. Levy asked you about getting the details when you do

2  a proffer interview.

3          When you do a proffer interview on a person, do you

4  just get the general information at first from the person

5  who is proffering?

6  A.  Proffers take a long time and, yes, I like to get the

7  general information during the first proffer interview.

8          If someone says -- in most cases, if someone says

9  they gave three proffers, more than likely they actually had

10  six interviews.

11          We do it in two parts, because the information is

12  overwhelming.

13          So what I normally do in proffers, I get the names

14  of the individuals by gang sets if possible.

15          And then the next interview, or as much as we can

16  get done in the first interview, go back and fill in the

17  information about each person.

18          After about two hours of doing one of these proffer

19  interviews everyone is kind of fried and you just want to

20  come back the next day to complete it, and that's what we

21  normally do.

22  Q.  Does the information get more specific the more proffers

23  there are?

24  A.  No, not necessarily.

25  Q.  The day, sir, that you observed Mr. Bass on Sorensen

1    Parkway, October 14, 2004, he was not arrested because he

2    was driving his car, was he?

3    A.  No.

4    Q.  What was he arrested for?

5    A.  An outstanding felony warrant.

6    Q.  Because of his federal indictment, correct?

7    A.  Correct.

8    Q.  Do you recall when Terrell Jackson was indicted?  Do you

9    remember?

10   A.  No, I don't.

11   Q.  Do you know if Terrell Jackson was one of the people who

12   gave you information regarding Jerome Bass?

13   A.  Yes.

14   Q.  And if you remember, was he one of the first people that

15   talked on Mr. Bass?

16   A.  Quite possibly, yes.

17   Q.  I believe Mr. Levy asked you about some locations that

18   you had information the defendant had frequented, but you

19   didn't do surveillance to see if you could see him there.

20   Do you remember those questions?

21   A.  Yes.

22   Q.  Did you obtain those locations from proffers?

23   A.  We knew of them just by being on the street and doing

24   patrols and getting information, but they were confirmed on

25   proffers.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1   Q.  And would those have been crack houses?

2   A.  Yes.

3   Q.  And so you had proffers before the indictment, you had

4   proffers that indicated that Mr. Bass was seen at crack

5   houses?

6            MR. LEVY:  Objection, Your Honor, calling for

7   hearsay testimony.

8            THE COURT:  I'll sustain the objection.

9            MS. DUGAN-HINRICHS:  I will withdraw it, Judge.

10  BY MS. DUGAN-HINRICHS:

11  Q.  Mr. Levy asked you about search warrants and probable

12  cause.

13           With regard to Operation Alcatraz, from which this

14  case stems, there were search warrants done under that

15  operation, weren't there?

16  A.  Many, yes.

17  Q.  And can you explain why was not a search warrant used in

18  this case?

19  A.  A search warrant, if you are going to get a search

20  warrant issued or authorized, it has to be fresh probable

21  cause, within forty-eight hours you have to have probable

22  cause to go in and get an application for a search warrant.

23           We had no fresh information, meaning we didn't have

24  a CI buy out of a location within twenty-four hours.

25           We didn't have a trash cover within twenty-four

1    hours and again we weren't sure of the main location of

2    Mr. Bass's main residence.

3    Q.  Is that an example of when you said that you didn't have

4    access to Mr. Bass?

5    A.  Yes.

6    Q.  That's just another one of those ways that you didn't

7    have access?

8    A.  Right.

9    Q.  I believe you stated that there was one occasion that

10   you pulled over Lamar Bass and Mr. Jerome Bass was frisked?

11   A.  Yes.

12   Q.  Can you explain to me, sir, I think you touched on it in

13   direct, what a field observation card is?

14   A.  Yes.  When a person is contacted by the Omaha Police

15   Department, in all cases of an arrest, whether it's a

16   traffic citation, or a ticket in lieu of arrest, an officer

17   is required for fill out a field observation card, which

18   basically is a short card to document that contact with an

19   individual.

20   Q.  And what kind of information is included in a field

21   observation card?

22   A.  Name, date, address, location of the stop, vehicle,

23   other people in the vehicle, and just a very brief synopsis

24   of why you stopped this person, why you contacted this

25   person.

1    Q.  If you recall, did you complete any field observation

2    cards in relation to Jerome Bass?

3    A.  No.

4    Q.  And why not?

5    A.  I did not arrest him.

6    Q.  Mr. Levy asked you about the defendant's car in the

7    context of talking about a lot of money generated in the

8    crack business.

9         This orange/gold fancy Monte Carlo, in your

10   opinion, was that a custom paint job?

11   A.  Yes.

12   Q.  Why do you say that?

13   A.  I've never seen one like it and I have inquired about it

14   and I have been told it was a custom paint job.

15        MR. LEVY:  Move to strike what he has been told as

16   hearsay.

17        THE COURT:  Mr. Levy, you are letting the

18   information come out before you interpose your objection.

19        And so I just want you to be a little bit more

20   vigilant from this point forward.  But I'll sustain the

21   objection.

22   BY MS. DUGAN-HINRICHS:

23   Q.  Sir, you had the occasion to observe this fancy Monte

24   Carlo?

25   A.  Yes.

1    Q.  Did it have fancy rims?

2    A.  Yes.

3    Q.  And, sir, do you have any independent knowledge of how

4    expensive those fancy kind of rims are?

5    A.  Yes.

6    Q.  And in your opinion did Mr. Bass's orange Monte Carlo

7    have expensive rims on it?

8            MR. LEVY:  Objection, foundation.

9            THE COURT:  Just lay a little bit more foundation

10   on his knowledge with respect to rims.  I'll sustain the

11   objection.

12   BY MS. DUGAN-HINRICHS:

13   Q.  Sir, you said you were familiar with different prices of

14   fancy rims on cars, particularly those in north Omaha.  How

15   do you have that knowledge?

16   A.  I have a truck with fancy rims on it.

17   Q.  So have you had the occasion to go shopping and price

18   different kinds of expensive rims for automobiles?

19   A.  Yes.

20   Q.  And that's in your personal capacity, correct?

21   A.  Yes.

22   Q.  And, in your opinion, did this fancy gold/orange Monte

23   Carlo have fancy rims on it?

24   A.  Yes.

25   Q.  Any estimate on how much the rims may have cost?

1    A.  I would say in the range of $1500 each.

2    Q.  That's times four, correct?

3    A.  Yes.

4    Q.  Mr. Levy asked you about discussing or instructing a

5    cooperating witness not to talk about their testimony with

6    other people.  Do you remember that?

7    A.  Yes.

8    Q.  When are they specifically told not to discuss their

9    testimony with other people?

10   A.  At the initial proffer interview.

11   Q.  Are they told that at their trial prep?

12   A.  Yes.

13   Q.  That's closer in time to the trial?

14   A.  Yes, they are actually told that throughout the process

15   from the time they give their first proffer interview

16   throughout their cooperation.

17   Q.  Why do you tell people not to discuss their business

18   with other people in jail?

19   A.  To maintain the integrity of each case.

20   Q.  Are there times, sir, in proffers, particularly the

21   proffers related to this case, where people have not wanted

22   to talk on their own family members or give information or

23   evidence against their own family members?

24   A.  Yes.

25   Q.  And what do you do when you encounter that situation in

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    a proffer?

2    A.  We tell them in some cases that they can give a separate

3    proffer interview to be held different than the main proffer

4    interview that would be published and we would not disclose

5    that information, or simply that in some cases they don't

6    have to disclose that information initially but to think

7    about it and they may have to in the future.

8    Q.  Did any of that type of situation arise as it relates to

9    this case?

10   A.  Yes.

11   Q.  And tell me what happened.

12   A.  In the proffer interview with Lamar Bass it happened.

13   Q.  And can you describe that for me?

14   A.  He did not --

15        MR. LEVY:  I'm going to object.

16        THE COURT:  Sustained

17   BY MS. DUGAN-HINRICHS:

18   Q.  Is there an individual that Lamar did not want to talk

19   about?

20        MR. LEVY:  I guess it calls for a yes or no answer.

21   But I'm going to object anyway.

22        MS. DUGAN-HINRICHS:  Your Honor --

23        THE COURT:  I think it calls for a yes or no answer

24   as well, but it's still based on hearsay, and we've got the

25   confrontation issue, so I'm going to sustain the objection.

1    BY MS. DUGAN-HINRICHS:

2    Q.  Mr. Levy asked you when you were interviewing Mr. Bass

3    at the northeast precinct why didn't you call a fellow

4    officer in to listen to that interrogation.  Do you remember

5    that?

6    A.  Yes.

7    Q.  Why didn't you do that?

8    A.  It was 1500 hours and that's right in the middle of

9    shift change at the northeast precinct and officers were

10   going on duty and off duty and attending roll call.

11          So I didn't want to pull an officer out of roll

12   call, or I didn't have the authority to hold an officer over

13   for overtime to attend the interview.

14   Q.  And those officers that you are describing, would they

15   have been uniform officers?

16   A.  Yes, they were uniform patrol officers.

17   Q.  Were you in uniform at that time?

18   A.  No.

19   Q.  Mr. Levy asked you why you didn't retain your notes from

20   that interview.  Do you recall that?

21   A.  Yes.

22   Q.  Can you explain, what is your practice when it comes to

23   keeping or discarding notes in your interviews?

24   A.  There is no standard to retain your notes.  Normally we

25   take the notes, go back to the facility, dictate the report

1    from our notes and our typist types the report.

2           We read through the report to make sure everything

3    is accurate and then we publish the report and discard the

4    notes.

5    Q.  And you check it after it comes back from the typist for

6    accuracy, right?

7    A.  Yes.

8    Q.  And so you compare it with those notes before they are

9    discarded?

10          MR. LEVY:  Objection, leading.

11          THE COURT:  Sustained.

12   BY MS. DUGAN-HINRICHS:

13   Q.  Sir, in this case, did you do that with your report of

14   Jerome Bass's interview on October 13th and October 14th?

15   A.  Yes, I did.

16   Q.  And it was only after it was checked that you threw away

17   the notes?

18   A.  Yes.

19   Q.  And is that report an accurate reflection of that

20   interview?

21   A.  Yes.

22   Q.  Defense counsel asked you about the name of Bobby Bass.

23   Did the defendant give you that name?

24   A.  Yes.

25   Q.  You didn't just make it up?

1    A.  No.

2    Q.  I believe, sir, you testified that Operation Alcatraz --

3    let me ask you this.

4        How many defendants were indicted under Operation

5    Alcatraz?

6    A.  Between 135 and 150, somewhere around there.

7    Q.  And the defendant is just one of those, correct?

8    A.  That's correct.

9        MS. DUGAN-HINRICHS:  Could I have a second, Judge,

10   to review my notes?

11       THE COURT:  Yes, you may.

12   BY MS. DUGAN-HINRICHS:

13   Q.  Mr. Levy asked you about the people that Lamar Bass

14   talked on that are related to this case.  Do you remember

15   that question?

16   A.  Yes.

17   Q.  Do you know how many people Lamar Bass proffered on?

18   A.  He gave five proffers.  I think like forty-five maybe,

19   if I'm correct.

20       MS. DUGAN-HINRICHS:  I don't have any further

21   questions, Your Honor.

22       MR. LEVY:  Judge, may I be given leave to recross

23   solely limited to this rims issue?

24       THE COURT:  Yes, you may.

25                    RECROSS-EXAMINATION

1  BY MR. LEVY:

2  Q.  Officer Gassaway, you were subpoenaed by me, weren't

3  you?

4  A.  Yes.

5  Q.  And the subpoena required you to bring with you all

6  investigative reports relating to any contact with

7  Jerome Bass, didn't it?

8  A.  Yes.

9  Q.  And as far as you know the records department at OPD

10  provided me with that information, correct?

11  A.  Yes.

12  Q.  In front of you is Exhibit 102.  Is that an

13  investigative report of a vehicle stolen from Mr. Bass?

14  A.  Yes.

15  Q.  And that is the kind of report that is required to be

16  made and filed with the Omaha Police Department?

17  A.  Yes.

18  Q.  And it's prepared in the normal course of business of

19  the Omaha Police Department in the case of a crime against

20  person or property?

21  A.  Yes.

22          MR. LEVY:  I would offer Exhibit 102.

23          THE COURT:  Any objection, Ms. Dugan-Hinrichs?

24          MS. DUGAN-HINRICHS:   No, Judge.

25          THE COURT:  Exhibit 102 is received.

1    BY MR. LEVY:

2    Q.  Isn't it true that that is the report of a stolen

3    vehicle?

4    A.  Yes.

5    Q.  Mr. Jerome Bass is the victim?

6    A.  Yes.

7    Q.  The theft occurred on July 21, 2002?

8    A.  Yes.

9    Q.  And it involved a theft of a 1988 blue Oldsmobile

10   Cutlass two door?

11   A.  Yes.

12   Q.  And under other descriptive information is recited that,

13   and also within the narrative, that the vehicle had 22 inch

14   spoke wheels?

15   A.  Yes.

16   Q.  Fancy rims?

17   A.  Yes.

18   Q.  And that the value of the vehicle, inclusive of the rims

19   and the pipes and the Play Station, was four thousand

20   dollars?

21   A.  That's the officer's estimation, yes.

22            MR. LEVY:  That's all I have.

23            THE COURT:  If you want to follow up on this

24   limited issue, Ms. Dugan-Hinrichs?

25            MS. DUGAN-HINRICHS:  Yes, sir.  If I could have

1    one moment, please?

2              THE COURT:  Yes, you may.

3              MS. DUGAN-HINRICHS:  Your Honor, may I approach the

4    witness?

5              THE COURT:  You may.

6                   FURTHER REDIRECT EXAMINATION

7    BY MS. DUGAN-HINRICHS:

8    Q.  With regard to Mr. Bass's stolen rims from July 21,

9    2002, do you know if he got those rims back?

10   A.  Yes.

11   Q.  How do you know that?

12   A.  Via police reports, and based on the preparation, we

13   discussed it as well, and the police report was filed.

14   Q.  It states that he got those four chrome rims and the car

15   back?

16   A.  Yes.

17             MS. DUGAN-HINRICHS:  Nothing further.

18             THE COURT:  Officer, you may step down.  Ladies and

19   gentlemen, at this time we will take our morning recess and

20   we'll take ten minutes.

21                  (10:45 a.m. - Recess Taken)

22             (At 11:00 a.m. on September 20, 2005, with counsel

23   for the parties and the defendant present, the following

24   proceedings were had in the presence of the jury:)

25             THE COURT:  Ms. Dugan-Hinrichs, you may call your

1    next witness.

2              MS. DUGAN-HINRICHS:  Your Honor, the government

3    calls Terrell Jackson.

4              TERRELL JACKSON, PLAINTIFF'S WITNESS, SWORN

5                         DIRECT EXAMINATION

6    MS. DUGAN-HINRICHS:

7    Q.  Sir, state your name.

8    A.  Terrell T. Jackson.

9    Q.  How old are you?

10   A.  23.

11   Q.  How far did you go in school?

12   A.  Tenth grade.

13   Q.  Mr. Jackson, are you a person who is currently serving a

14   sentence for a federal drug trafficking crime?

15   A.  Yes, I am.

16   Q.  When were you sentenced?

17   A.  June 15, 2004.

18   Q.  What sentence did you receive?

19   A.  210 months.

20   Q.  Are you appearing here today under a cooperation plea

21   agreement with the government?

22   A.  Yes, I am.

23             MS. DUGAN-HINRICHS:  Your Honor, may I approach the

24   witness?

25             THE COURT:  You may

1    BY MS. DUGAN-HINRICHS:

2    Q.  Sir, take a moment and review that document for me.

3    I've marked this as Exhibit 3, sir.  Do you recognize that?

4    A.  Yes, I do.

5    Q.  What is it?

6    A.  My plea agreement.

7    Q.  Sir, do you have any secret or unwritten agreements or

8    is Exhibit 3 all there is?

9    A.  That's all there is.

10   Q.  Does Exhibit 3 appear to be an accurate copy of your

11   plea agreement?

12   A.  Yes, it does.

13   Q.  Can you look at the last page for me?  Does that bear

14   your signature?

15   A.  Yes, it does.

16   Q.  Does it contain the signature of your attorney?

17   A.  Yes, it does.

18   Q.  Who is your attorney?

19   A.  Karen Shanahan.

20          MS. DUGAN-HINRICHS:  Government offers Exhibit 3.

21          MR. LEVY:  No objection.

22          THE COURT:  Exhibit 3 is received.

23   BY MS. DUGAN-HINRICHS:

24   Q.  Mr. Jackson, can you explain to me in your own words

25   what it is that your agreement requires from you?

 1    A.  To cooperate with the government.

 2    Q.  And would that include testifying?

 3    A.  Yes, it does.

 4    Q.  Does it require that you're truthful?

 5    A.  Yes, it does.

 6    Q.  What are you hoping to get back in return?

 7    A.  Downward departure.

 8    Q.  Can you explain to me what a downward departure means to

 9    you?

10    A.  It has to do with for you cooperating, you ask your

11    lawyer to ask the prosecutor to file for it.

12          The prosecutor has to file for it.  Then the judge

13    decides whether you get it.

14    Q.  The judge makes the ultimate decision?

15    A.  Yes, he does.

16    Q.  And have you had your Rule 35 yet?

17    A.  No, I have not.

18    Q.  Has anyone promised that you'll receive a certain

19    sentence in exchange for your testimony?

20    A.  No, they have not.

21    Q.  And, sir, you understand that your plea agreement

22    requires that you testify truthfully, correct?

23    A.  Yes.

24    Q.  And that there are serious penalties if you testify

25    falsely, correct?

1    A.  True.

2    Q.  How many times have you testified before?

3    A.  Three.

4    Q.  And you've had an opportunity to give a proffer

5    statement, correct?

6    A.  Yes.

7    Q.  Do you know how many people that you talked about?

8    A.  I believe fifty-two.  It might be more.

9    Q.  At the time you were giving your proffer, were you hold

10   you had to talk about a certain number of people to get a

11   downward departure?

12   A.  No, I wasn't.

13   Q.  Were you told that you had to talk about specific people

14   to get a downward departure?

15   A.  No, I wasn't.

16   Q.  Other than the felony conspiracy charge that you are

17   serving time for, have you been convicted of any other

18   felonies?

19   A.  Yes, robbery.

20   Q.  When was that?

21   A.  I believe in December of 2004.  I got three five-to-ten

22   ran concurrent, but consecutive to my federal time.

23            THE COURT:  You get three five-to-tens?

24            THE WITNESS:  Yes.

25            THE COURT:  Three robberies?

1          THE WITNESS:  Yes.

2     BY MS. DUGAN-HINRICHS:

3     Q.  Consecutive with your federal, correct?

4     A.  Yes.

5     Q.  And just so the jury knows, what does consecutive mean?

6     A.  That means after I get done with my federal time I go do

7     my state time.

8     Q.  You will do three-to-ten total on the state?

9     A.  Three five-to-tens.

10    Q.  Were the five-to-tens run consecutive or concurrent?

11    A.  They was ran concurrent with each other.

12    Q.  Have you ever been convicted of giving false

13    information?

14    A.  Yes.  Twice.

15    Q.  Can you give me the details of those instances?

16    A.  I was pulled over and I had warrants and I used my

17    brother's name twice.

18    Q.  Were you a member of a gang?

19    A.  Yes, I was.

20    Q.  Which gang?

21    A.  37th Street.

22    Q.  Is that a Crip or a Blood gang?

23    A.  Crip.

24    Q.  Do you have a street name?

25    A.  No, I do not.

1    Q.  How long were you in the gang?

2    A.  I don't know.  I would say ten years.

3    Q.  Sir --

4    A.  I can't account for when I was arrested, so like ten

5    years.

6    Q.  Total?  Okay.  Why were you in the 37th Street Gang?

7    A.  At first, you know what I'm saying, my cousin was from

8    there so it was like a family thing.

9         Then I started making money and everything, so it

10   ended up like drugs in the end, you know, just to get money.

11   Q.  Let me back up.  You said that your cousin was in the

12   gang?

13   A.  All of them.  Most all of them.

14   Q.  Who were your cousins?

15   A.  Jermaine Brown, Royce Brown, Mario Watson, Maurice

16   Watson, William Watson, Marcel Watson.

17   Q.  They were all members of 37th Street?

18   A.  Yes.  Columbus Brown.

19   Q.  Of those cousins, sir, have any of them been federally

20   indicted?

21   A.  Yes.

22   Q.  How many?

23   A.  Four of us.  One of them beat it.

24   Q.  Four of seven?

25   A.  Yes.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    Q.  Then I believe you said that you started making money.

2    How did you make money being a member of 37th Street?

3    A.  I sold drugs; sell crack.

4    Q.  How much crack did you sell total?

5    A.  I don't know.  Nobody knows, honest.

6    Q.  How come you don't know?

7    A.  I mean, you go through so much dope every day.  There is

8    no way you could know.

9           If a person told you how much dope they sold

10    throughout their whole life they're lying.

11    Q.  Because it's too much to calculate?  Is that what you're

12    saying?

13    A.  Yes.

14    Q.  Did the 37th Street operate in a particular area of

15    town?

16    A.  Yes, off of Ames and Grand.

17    Q.  And on 37th?

18    A.  It ran from like 37th all the way up to 46th and Grand.

19    Q.  Other than those people, sir, that you named were your

20    relatives, who else were members of the 37th Street Gang?

21    A.  Name all of them?

22    Q.  As many as you can.

23    A.  Christopher Grant, Marcus Hudson, Lamar Bass, JeVaughn

24    Erwin, Terrence Nelson, M.E. Buckworth (phonetic spelling),

25    Bernard Long, Bobby Long, Darnel Long, Jimmy Swain, Johnny

1    Smith.

2          That's it.  I don't remember how many.  I know

3    there are probably more.  There's more, but I just don't

4    know the rest of the names.

5    Q.  Did being in the gang help you deal drugs?

6    A.  No.

7    Q.  Did you sell --

8    A.  At first you probably thought it did, you probably

9    thought that you had to be familiar to sell drugs.

10          Honestly, you know what I'm saying, when you are

11   out there selling drugs it was every man for himself, you

12   know, it was like cut throat, nobody was going to help you

13   sell drugs, they would compete, it was like competition.

14   Q.  Like a business?

15   A.  Yes.

16   Q.  And when you say compete, everybody was competing for

17   customers?

18   A.  Customers, at the same time money, you know, try to see

19   who got more money, who got what, you know.

20   Q.  And can you estimate for me how much money you made

21   selling drugs?

22   A.  I made a lot of money, shook off a lot of money, though,

23   you know, so at the same time I mean I really can't, because

24   you make a lot of money, but everything that you made, you

25   know, you can't count that as made because you spend all

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    that, you know what I'm saying?

2              You might make fifteen hundred, you put a thousand

3    back into the street, so then you only have five hundred to

4    show for it.

5    Q.  When you say put a thousand back into the street --

6    A.  That means you went back and bought some more drugs.

7    Q.  So that you can continue your business?

8    A.  Exactly.

9    Q.  With the money that you made that was profit, what did

10   you spend that money on?

11   A.  Cars, clothes, paying rent, you know, just living a fast

12   life.

13   Q.  Did you sell drugs to other gang members?

14   A.  Yes.

15   Q.  Did you sell drugs to people who weren't in your gang

16   but were in other gangs?

17   A.  Yes.

18   Q.  And did you buy from the 37th Street Gang members?

19   A.  Yes, I did.

20   Q.  Did you buy from people who were in gangs other than

21   37th Street?

22   A.  Yes, I did.

23   Q.  Sir, I'm going to name some people and ask you, if you

24   know, to tell me what their street name is and what gang

25   they are affiliated with, if you know.  Lamar Bass?

1    A.  He's 37th Street.

2    Q.  What is his nickname?

3    A.  Fish or Gump.

4    Q.  Fish or Gun?

5    A.  Gump, like Forrest Gump.

6    Q.  JeVaughn Erwin?

7    A.  Pockets.

8    Q.  What gang is he from?

9    A.  37th Street.

10   Q.  How about Jerome Daniels?

11   A.  JD.

12   Q.  What gang?

13   A.  40th Ave.

14   Q.  Damian Jackson?

15   A.  House Cat.

16   Q.  What gang is he with?

17   A.  37th Street/Spencer.

18   Q.  What does that mean?

19   A.  He was from 37th Street at first and then he just fell

20   off and he went to Spencer.  He started in Spencer projects.

21   They started making their own neighborhood.

22   Q.  Started creating their own gang?

23   A.  Yes.

24   Q.  Karlos Harper?

25   A.  Shoe String, he's a former Jaynes Street, he was like

1    from Jaynes Street, from whenever he and his father stayed

2    over there and he got into it with him after his uncle Cory

3    Bass got killed and he started hanging around 37th Street.

4              He never was from 37th Street, but that's who he

5    spent most of his time around, 37th Street.

6    Q.  He was not a member, but he hung around 37th?

7    A.  Yes.

8    Q.  Deandre Baker?

9    A.  He's from Crown Point.

10   Q.  Do you know his nickname?

11   A.  BG.

12   Q.  Royce Brown?

13   A.  He's from 37th Street.

14   Q.  He's your cousin, isn't he?  Antone Green?

15   A.  He's from 40th Ave.

16   Q.  Do you know what his nickname is?

17   A.  Tome.

18   Q.  How about Jacara Baker?

19   A.  37th Street.

20   Q.  What is her nickname?

21   A.  Blue.  She's originally from Crown Point, though.

22   Q.  Is she related to Deandre Baker?

23   A.  That's his sister.

24   Q.  He's with Crown Point?

25   A.  Exactly.  She's the reason why he's from Crown Point.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    Q.  Why do you say that?

2    A.  Because he was from Crown Point at first.

3    Q.  Did she get him in?

4    A.  Yes.

5    Q.  How about Marshall Box?

6    A.  He was from 40th Ave and named Little Mouse.

7    Q.  Jerry Coleman?

8    A.  He's from 40th Ave.  Dusty-Lo.

9    Q.  Sir, and the defendant, Jerome Bass, what is his

10   nickname?

11   A.  Rommie.

12   Q.  And is he in a gang?

13   A.  Kind of.

14   Q.  Why do you say that?

15   A.  Because he mostly went to school, you know, and then in

16   the end he started hanging around 37th Street a lot.

17   Q.  So was he a member or an associate?

18   A.  If anything, he was initiated -- he was initiated

19   through his brother.

20          He never got beat in.  He just was through his

21   brother, so you could say he was a member through his

22   brother, but he was more like an associate, you know, he

23   went to school, graduated, you know.

24   Q.  You used the word, he wasn't beat in.  Can you tell me

25   what that means?

1    A.   That's initiation.

2    Q.   What does that include?

3    A.   Initiation means that you need to get beat in or you go

4    shoot somebody or something, you know, you go put in work,

5    you got your, whoever the rival is, the enemy is, you go

6    shoot at them, that can be an initiation to get in, or you

7    can get jumped in by several members of a gang.

8    Q.   What does jumped in mean?

9    A.   That's initiation.

10   Q.   Does everybody go beat you up or something?

11   A.   You fight back.  It might be odds, you might get four

12   little guys, you might get them, or they might get you.

13   Q.   If that doesn't happen, then the shootings occur?

14   A.   If you don't want to get beat in.

15   Q.   You can choose?

16   A.   Sometimes, no.  Sometimes you don't never know what is

17   going to happen.

18   Q.   But if one of those two things happen, that's part of

19   the initiation?

20   A.   Right.

21   Q.   And, to your knowledge, was Rommie initiated in either

22   of those two ways?

23   A.   No.

24   Q.   You said he was brought in through his brother?

25   A.   Yes.

1    Q.  If you were brought in by a family member to the gang,

2    do you bypass that initiation?

3    A.  Like his brother had respect, his brother had clout, you

4    know what I'm saying, his brother was home, he was like a

5    person from the neighborhood that had a lot of money, you

6    know what I'm saying, you know, he had dope.

7              Everybody wanted to get dope from Lamar, you know,

8    his name say it all, Lamar Bass, it's like just because

9    Lamar is Lamar, Lamar from the neighborhood, he was an older

10   dude from the neighborhood, he had been from the

11   neighborhood like 7, 8, 9, 10  years, so his little brother,

12   you know, just came in, just came, because that was his

13   little brother, you know.

14             That's how things usually go.  Like your uncle,

15   he'll turn you on to a gang and then you'll get put in the

16   gang.

17             Just like Pockets from the gang, Little Pockets

18   started claiming 37th Street because his brother was

19   Pockets.

20   Q.  Let me slow you down.  Little Pockets is who?

21   A.  That's JeVaughn Erwin's little brother.

22   Q.  And who is Lamar's little brother?

23   A.  Jerome Bass.

24   Q.  So because their brothers are in, they get to be part of

25   the gang?

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1   A.  That would be like if somebody said yeah, I want him to

2   be from the neighborhood, that would make his word like real

3   good, okay, he can be from the hood because his brother is

4   from the neighborhood, his brother ain't got a past as being

5   a pussy or snitch or something like that, things that can

6   stop you from being from the neighborhood, but if his

7   brother is from the neighborhood, he's older, been from the

8   neighborhood  7, 8, 9, 10 years, he has a pass, he can come

9   though.

10  Q.  It's kind of like a good reputation?

11  A.  Yes.

12  Q.  Is that a good way to say it?

13  A.  Let's say it like this.  My cousin Six Pack, William

14  Watson, he was an OG from the neighborhood, he was one of

15  the older dudes.

16  Q.  What is OG?

17  A.  That means he is high in rank, he got respect, he calls

18  the shots.

19          His little brother, Marcel Watson, he's from our

20  neighborhood, but he never got jumped in, initiated, but

21  everybody says he is from the neighborhood, but he got to be

22  from the neighborhood because his brother was high in rank.

23          So everybody respected his brother, they let him be

24  from the neighborhood, they gave him the name Little Six.

25  Q.  And I think you said the name Six Pack?

1    A.   Yes.

2    Q.   What is Six Pack's real name?

3    A.   William Watson.

4    Q.   Sir, at any time when you were in this gang did you ever

5    have a job?

6    A.   Yes, I did.

7    Q.   What was your job?

8    A.   I worked at Sun Dawgs when I was 14 to 15.  That's park

9    recreation with the kids.

10            I worked for APAC after I left there around 15 or

11   to 16.

12            And I worked at West like seven, eight, nine, ten,

13   sporadic occasions.

14            Right before I got locked up I was doing

15   construction work, it's like this place on 24th and Lake,

16   Blue Lion, where you go down there and apply for a job.

17   It's kind of like all in a day or something.

18   Q.   Like a temporary?

19   A.   Like a temporary place.  I was doing construction work.

20   Then I started at Oriental Trading doing telemarketing.

21   Q.   At which place telemarketing?

22   A.   Oriental Trading, West and APAC.

23   Q.   And in addition to those jobs you sold crack cocaine?

24   A.   I would work.  I always sold crack.  When I would work I

25   would try to stop selling crack, because after I seen my

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    cousin Six Pack, William Watson, get indicted and all the

2    older homeys in the neighborhood, I see them all get

3    indicted, I'm like man I got to do something else.

4           So I would go back and get another job.  But then I

5    see my paycheck, every two weeks I'm making like four

6    hundred dollars, and I can go to the neighborhood and make a

7    thousand dollars in one night, make it fast, you know, I

8    didn't have to be out eight, nine, ten hours.

9           I can go three, four fours, make a thousand dollars

10   real fast.

11          I would be like why should I work this job when I

12   can make this money?

13          So I would call in sick, make excuses, you know,

14   and then I quit, get fired or quit.

15   Q.  And that's why there were so many jobs that you said,

16   correct?

17   A.  That's why I kept going back and forth to West.  West

18   was a job, like if you worked for APAC, you got fired or

19   quit, you had to wait another year before you go back and

20   get hired.

21          West you can quit and thirty days later you can go

22   back out there and get hired again.

23   Q.  We have heard the term gang-banging.

24   A.  Yes.

25   Q.  Can you tell us what that means?

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1  A.  Gang-banging started from Cali, you know, Omaha didn't

2  have gang-banging.

3        It started from Cali, they came up here in about

4  '89 and they turned Omaha on to gang-banging.

5        They came to the projects, Hill Top and Vietnam

6  projects.

7        And it was just, that's why it was just Santana

8  Block and Hill Top and Vietnam.   There was no 37th Street,

9  40th Ave.   They was only neighborhoods to like '92, '93.

10  Q.  What happened after that?

11  A.  What happened was, the Cali dudes, they were coming up

12  here selling the dope and they turned Omaha on to

13  gang-banging, so like in three or four years everybody was

14  fighting each other, you know, killing each other, but there

15  was no major killing, just fighting, killing each other, and

16  they was like wow and they got to looking around and these

17  dudes were making all the money.

18        So then they started robbing and that's when

19  everybody started selling dope, because at first everybody

20  just smoked dope, they used to smoke Primos, which is crack

21  mixed in with the weed.

22        Everybody was saying hold on, they are selling the

23  dope, they are making money in our neighborhood and we are

24  out here fighting, they were using, so that is when

25  everybody started robbing the Cali dudes and they started

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1   selling dope.

2   Q.  Did the violence continue?

3   A.  Not really, you know what I'm saying, the dude, he was

4   like cool with some killings, but not like it is now these

5   days, like how it is, you have twenty, twenty-three murders

6   right now.

7            It wasn't like it is right now, because there ain't

8   no respect.

9            There was respect out there.  If I shot at one of

10  your home boys, I would know that in retaliation you all was

11  going to come back.

12           Now it's like one hood out there taking over, doing

13  everything, every hood has its shining at one point in time,

14  so therefore the gang-banging is worse now.

15           There was more respect back then.  It wasn't just

16  anybody can be from a neighborhood, but now they just let

17  anybody be from a neighborhood.

18  Q.  And you said that Mr. Bass was associated with the gang

19  and he didn't have to do that initiation that we talked

20  about.  I'm talking about Rommie Bass.

21  A.  Right.

22  Q.  Did he ever participate in any of those banging

23  activities?

24  A.  No.  It was just some dudes who were jealous of him, you

25  know, he had a nice little green Cutlass, he had big rims,

1    22 inch, you know, 2000, 2002, and they robbed him, you know

2    what I'm saying, at gun point range.

3            And he went back to -- he decided to do it the

4    right way, get his rims back.

5            He didn't go back with a pistol and try to fight

6    them.  He went back and got his rims back.

7            So they got mad at him.  He pulled into Amoco.  He

8    fought one of them, he beat him up, and then they jumped him

9    and broke his jaw.

10           My cousin Royce was with him that day, Royce Brown,

11   he wasn't into all that, going out there fighting and

12   shooting, but that was over something he had.  They was

13   jealous of what he had and they took it.

14           So, therefore, he got his stuff back.  They got mad

15   and broke his jaw and then it ended up being some beef over

16   there.

17           The Crown Point dudes robbed him, but then we ended

18   up getting into it, we had enemies with the 40th Ave because

19   they is the ones that jumped him.

20           Later on they ended up getting mad at him, JeVaughn

21   Erwin, Pockets, and his brother Lamar.

22   Q.  They were mad at who?

23   A.  They was mad at all three of them.  So the whole 40th

24   Ave got into it and they started coming into the

25   neighborhood and looking for them and that's when the whole

1    neighborhood got into it.

2          That's the only -- I can say that's the only beef

3    or the only war that started over him, over his rims,

4    though, something that was legally his.

5    Q.  Over Rommie's rims?

6    A.  Yes.

7    Q.  And just so I understand what you're trying to tell us,

8    Rommie was robbed of those rims at gun point?

9    A.  Right.

10   Q.  Do you know who did it?

11   A.  I hear who did it.  I wasn't there.   So for me to sit

12   here and say, I wasn't there, no, I wasn't there, but he

13   told me out of his own mouth that Deandre Baker and another

14   dude, last name Moore, robbed him.

15   Q.  And Jerome told you that?

16   A.  Yes.

17   Q.  And after that happened you said he got his rims back,

18   correct?

19   A.  Yes.

20   Q.  How did he get them back?

21   A.  That way, I don't know how he got them back, honestly.

22   I don't know.  He got them back.  The police might have went

23   over there.   I think they called the police.

24   Q.  Then you said he got beat up?

25   A.  Yes.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    Q.  Why did he get beat up?

2    A.  He pulled into Amoco on Ames where everybody be,  he

3    pulling into Amoco and he was pulling through and one of

4    them got to talking crazy to him.

5            So he got out of the car and fought him one-on-one,

6    beat him up, and they didn't like that.  They was real deep,

7    twenty, thirty deep, they jumped him.

8    Q.  Who beat whom up?

9    A.  The 40th Ave dudes jumped him.   Too Tall is the dude he

10   fought.

11   Q.  What gang is Too Tall with?

12   A.  Crown Point.

13   Q.  So there was a confrontation at Amoco, correct?

14   A.  Right.

15   Q.  And Rommie gets in a fight with Too Tall?

16   A.  Right.

17   Q.  From a rival gang?

18   A.  Yes.

19   Q.  And who gets hurt as a result of that fight?

20   A.  Too Tall.

21   Q.  Did anything happen to Rommie?

22   A.  After he beat him up, the 40th Aves jumped him.

23   Q.  What happened to Rommie?

24   A.  He got his jaw broke.

25   Q.  Then you said something about Lamar Bass and Pockets and

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    I didn't understand that part.  What happened after Rommie's

2    jaw got broke?

3    A.  That's Lamar's little brother.  He has to retaliate for

4    his brother.  He wrecked the car.  Him and Pockets got into

5    a wreck.

6    Q.  Were they trying to retaliate?

7    A.  Yes.

8    Q.  How were they going to do that?

9    A.  They was going to shoot at them.

10   Q.  So, Lamar Bass and JeVaughn Erwin had going to shoot at

11   whom?

12   A.  Deandre Baker and his friends.

13   Q.  The Crown Point guys?

14   A.  Yes.

15   Q.  Because Rommie's jaw got broke?

16   A.  Yes.

17   Q.  That didn't happen, correct?

18   A.  Because they got in a car wreck.

19   Q.  Were they like on their way there?

20   A.  They seen them and if they didn't get in a wreck it

21   would have happened.

22        They seen him and he started to make an illegal

23   turn and that's why he got into the car wreck.

24   Q.  I want to stop you for a second, Terrell, and talk about

25   specifically you and Rommie Bass, okay?  How long have you

1    known Jerome Bass?

2    A.  I met him in 2000.

3    Q.  And how did you meet him?

4    A.  I meet him through his brother Lamar.

5    Q.  And where did Jerome Bass live when you knew him?

6    A.  He stayed right up the street from my old crack house,

7    3902 North 37th, he stayed up the street.

8    Q.  Mr. Jackson, I've handed you exhibits in this case and

9    there is a little sticker with the number down in the bottom

10   right corner.  Could you look at the one that has the number

11   11 on it?

12   A.  Yes.

13   Q.  Do you recognize Exhibit 11?

14   A.  Yes.  That's his house.

15   Q.  Whose house?

16   A.  Jerome's.

17   Q.  How do you know that?

18   A.  I have been there before.

19   Q.  And does that photograph look the same as it did on the

20   times that you were there?

21   A.  There might have been some cars there, other cars there,

22   but, yes.

23           MS. DUGAN-HINRICHS:  Government offers Exhibit 11.

24           MR. LEVY:  I have no objection.  Could we have the

25   address again of that property?

1            MS. DUGAN-HINRICHS:  Do you know what that address

2   was?

3            THE WITNESS:  No, I do not.

4            THE COURT:  Exhibit 11 is received.

5   BY MS. DUGAN-HINRICHS:

6   Q.  Could you look at the one that has the twelve, Exhibit

7   12?  Do you recognize that house?

8   A.  Yes.

9   Q.  And do you know what the address is?

10  A.  3902 Spaulding.

11  Q.  Who lived there?

12  A.  Me and Marcus Hudson.

13  Q.  And does the picture in Exhibit 12, does it look the

14  same as it did when you and Marcus Hudson lived there?

15  A.  Yes.  It got painted.

16  Q.  Pardon me?

17  A.  It got painted.

18  Q.  Other than the new paint job does it look the same?

19  A.  Yes.

20           MS. DUGAN-HINRICHS:  Government offers Exhibit 12.

21           MR. LEVY:  No objection.

22           THE COURT:  Exhibit 12 is received.

23  BY MS. DUGAN-HINRICHS:

24  Q.  Can you look at Exhibit 13?  Do you recognize that

25  house?

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    A.  Yes.

2    Q.  Whose house is that?

3    A.  That's my aunt Sheri's house.

4    Q.  Have you seen that house before?

5    A.  I used to live there before I stayed at 3902 Spaulding.

6    Q.  What is the address of that house?

7    A.  4524 North 38th.

8    Q.  Does Exhibit 13 look like it did when you remember going

9    over there and living there?

10   A.  Yes.

11           MS. DUGAN-HINRICHS:  Government offers Exhibit 13.

12           MR. LEVY:  No objection.

13           THE COURT:  Exhibit 13 is received.

14           MS. DUGAN-HINRICHS:  Permission to publish, Your

15   Honor?

16           THE COURT:  Permission granted.

17   BY MS. DUGAN-HINRICHS:

18   Q.  This is the house that is marked as Exhibit 11.  Who

19   lived in this house?

20   A.  Rommie did.

21   Q.  This is the one marked Exhibit 12.  Whose house is that?

22   A.  That was me and Marcus Hudson's house.

23   Q.  Do you know anyone else that lived in that house?

24   A.  Before me and Marcus Hudson lived there Karlos Harper

25   and Lamar Bass stayed there.

1    Q.  And what year or time frame did you and Marcus Hudson

2    live there?

3    A.  April of 2002.

4    Q.  When did Karlos Harper and Lamar Bass live there?

5    A.  They got there like around February 2002.

6    Q.  This is marked as Exhibit 13.  Whose house is this

7    again?

8    A.  Sheri Brown's.

9    Q.  This is where you lived?

10   A.  Yes.

11   Q.  Mr. Jackson, the individual that you know as Rommie

12   Bass, or Jerome Bass, is he present in court today?

13   A.  Yes, he is.

14   Q.  Could you please describe where he is seated and what

15   he's wearing?

16   A.  Over there with his lawyer, red tie on, gray shirt.

17          MS. DUGAN-HINRICHS:  May the record reflect the

18   witness has identified the defendant?

19          THE COURT:  It shall.

20   BY MS. DUGAN-HINRICHS:

21   Q.  Sir, you said you met Mr. Bass around 2002, correct?

22   A.  No, I said 2000.

23   Q.  I misspoke.  What kind of car did he drive when you knew

24   him?

25   A.  He had a Jeep.

1   Q.  Was that the first car you saw him in?

2   A.  Yes.

3   Q.  Did he have any cars after that?

4   A.  He had a Cutlass.

5   Q.  Anything special about that car?

6   A.  That's the one he got robbed, he had the rims on it.

7   Q.  Do you know what size rims?

8   A.  22s.

9   Q.  Are you familiar with what those rims cost if you were

10  going to buy them in the store?

11  A.  If you bought them in the store at that time, 2002,

12  probably pay like five thousand dollars, but he didn't buy

13  them in the store.

14  Q.  How do you know that?

15  A.  He got them from Lumber, Robert Johnson.

16  Q.  He got them from Lumber?

17  A.  Lamar got them from Lumber.

18  Q.  So the rims that were on the car Lamar gave Jerome?

19  A.  Exactly.

20  Q.  Did you ever know him to drive any other cars?

21  A.  Right before I came to jail, August 2003, he had a candy

22  orange Monte Carlo SS.

23      MR. LEVY:  I'm sorry, I didn't hear the testimony

24  before he described the Monte Carlo.  Before he went to jail

25  he was driving --

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1              THE WITNESS:  Before I went to jail.

2              MR. LEVY:  He was driving a what?

3              THE WITNESS:  Candy orange Monte Carlo SS.

4    BY MS. DUGAN-HINRICHS:

5    Q.  Candy orange, is that the color?

6    A.  Yes.  That's the color of the car.  He had on some 20

7    inch rims.

8    Q.  Do you know if that was a custom paint job?

9    A.  No.  That was candy.

10   Q.  What does that mean?

11   A.  That means he paid some money for it.

12   Q.  That's what you mean when you say candy orange?

13   A.  Right, that's what it's called.

14   Q.  With regards to the rims that were on that candy orange

15   Monte Carlo, was there anything special about those rims?

16   A.  They weren't spokes.  They was the new age, they call it

17   space age now, they was some buttons.

18   Q.  Are those expensive rims?

19   A.  Yes.

20   Q.  Any do you know how much they cost?

21   A.  Brand new, like $3500.

22   Q.  Per wheel?

23   A.  No, just a complete set.

24   Q.  Do you know where he got those?

25   A.  No, I do not.

1   Q.  Sir, from 2002 when Lamar introduced you to Rommie, did

2   you have the occasion to be around --

3   A.  2000.

4   Q.  2000.  I keep saying the wrong day.  I apologize.

5   A.  I'm not exactly sure on 2000, because I met him when his

6   brother went to prison, and I believe Lamar went to prison

7   in like '99.

8   Q.  So 1999 or 2000 is when you met him?  Now, you had the

9   occasion to be around both Jerome Bass and Lamar Bass from

10  being within the same gang or hanging around the same gang,

11  correct?

12  A.  Right.

13  Q.  Did you have the opportunity to observe their

14  relationship?

15  A.  Right.

16  Q.  Can you describe that relationship as you saw it between

17  Lamar and Rommie?

18  A.  They was brothers.

19  Q.  Why is that important or what did that mean to you?

20  A.  It was like me and my brother is.  They was real close.

21  There's a lot of love here.

22  Q.  Lamar is older, correct?

23  A.  Exactly.

24  Q.  I believe you talked about how he was very well

25  respected.

1          Do you know, other than loving him, do you know how

2    Rommie felt about him?  Did he ever tell you?

3    A.  No, he never ever came out and said I love my brother,

4    you know, but you can tell this, you know, because they love

5    each other.

6    Q.  How can you tell?

7    A.  Lamar, you know, he looked out for his little brother.

8    Like he gave him the rims for the 22s, gave him the 22s for

9    his car; always talked good about him, Lamar would say stuff

10   about my brother graduating and everything.

11         Lamar didn't want him in that type of lifestyle;

12   didn't want him in the lifestyle he was living.

13   Q.  So did he buy him those things so that he wouldn't take

14   part in that lifestyle?

15   A.  I can't really say that.  I wasn't living in their

16   household, but he was going to school.

17         He graduated, so therefore I don't think it was a

18   problem for him to be around that lifestyle, because it

19   wasn't like he was there like us.

20         We was there every day for 24-7.  He wasn't there

21   like that at first.  He wasn't up there every day.

22   Q.  At some point did that change?

23   A.  Later on like in 2002/2003 he started coming around

24   more.  After the robbery he started coming around more,

25   after he got robbed.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    Q.  And when you say he started coming around, coming around

2    where?

3    A.  He came to the house on 3902 Spaulding.  He would be up

4    in the neighborhood in front of my Aunt Sheri's house with

5    Christopher Grant.  He would be with Marcus Hudson, you

6    know, Bumpy.

7    Q.  What did you see him doing when he was with those

8    people?

9    A.  He would be kicking with them.  I never seen him smoke

10   weed.  I didn't see him drinking.  He would be kicking it,

11   you know.

12   Q.  Is that like hanging around?

13   A.  Hanging around.  He had Pockets' car one day, him and

14   Pockets would trade cars, you know.

15   Q.  And that's kicking it, hanging around?

16   A.  That's what friends do, they trade cars, like you can

17   use my car today, or like I would ride in your car today,

18   you know.

19   Q.  When you were talking, Mr. Jackson, you said at first

20   he wasn't doing anything and then all of a sudden he started

21   hanging around.

22        At the point at which you saw him hanging around,

23   did you ever have the occasion to observe Jerome Bass with

24   crack?

25   A.  Not until 2002.

1    Q.  And can you tell me in 2002 --

2    A.  He was around crack.  The first time I ever seen him

3    around crack was in 2001.

4            That's when I was getting Lamar out of the joint,

5    Lamar got out like around 2001.

6            Karlos had this house on 36th and Ames, it's right

7    across the street from North, there's a fire station off of

8    Ames, they got some duplexes in back of there, Karlos' mom

9    was staying there and Rommie got that green Cutlass and he

10   was coming over there.

11           That was the neighborhood spot, because 37th Street

12   was hot, Gassaway was pulling up in an all black Taurus,

13   jump out boy car.

14   Q.  Wait.  Slow down.  Gassaway was doing what?

15   A.  He was pulling up in a black Taurus.  It's called a jump

16   out boy car.

17   Q.  His car is a what?

18   A.  Jump out boy.  They jump out.  They jump out and they're

19   getting ready to chase you, you know, they don't wear cop

20   clothes, he had jeans and T shirt and he was ready to chase

21   us.

22           So we started getting crack houses, you know,

23   selling dope in the house.

24   Q.  Instead of on the street?

25   A.  Yes.

1    Q.  Before then were you regularly selling crack on the

2    street?

3    A.  We always had crack houses, but a lot of us would be on

4    the street, because when you are on the street you see more

5    people, you know, driving through and you might catch them

6    before they get to the destination they were going.

7    Q.  So it was easier to attract customers when you were

8    standing out on the street.  Is that what you are saying?

9    A.  Right.

10   Q.  Then in 2002 that changed?

11   A.  2001.

12   Q.  In 2001 you guys started using crack houses more?

13   A.  Yes.  I started doing it because I had caught a dope

14   case and I knew I was going to jail on the sentence but I

15   kept out on the appeal, the appeal bond.

16          What I was doing, I was continuing my court dates.

17   I was buying time on the streets so I was trying to make

18   some money before I go to jail, because I knew I was going

19   to jail.

20          I went over to the house off of 36th and Ames,

21   Karlos was over there selling dope, and that's when Lamar

22   got out.

23          He was over there and Karlos was over for a time

24   and Rommie would come over there.

25          There would be a lot of people over there.  There

1   would be twenty, twenty-five people over there all the time.

2   Q.  Was there crack out in the open at this place?

3   A.  Yes.

4   Q.  So that if anybody walked in they would see it there?

5   A.  Yes.

6   Q.  How much crack was out in the open?

7   A.  I would say the average day it was always like five to

8   ten people were there.  That's the beginning of the day.

9        Around night time there might be twenty, fifteen,

10  twenty people up in there.

11       There was a lot of dope in there.  I can say on the

12  average day like nine ounces in there at one time, not just

13  -- not every dude had nine ounces, just all the dope that's

14  in there, me have my dope, he has his dope, nine ounces, and

15  no telling how much dope was hidden outside.

16  Q.  Let's talk about that, because I want to understand from

17  you how this process worked.

18       If you were all hanging out at this house, was

19  there like a scale there that you would weigh stuff on?

20  A.  There was a scale.

21  Q.  And for example who would you sell to?

22  A.  People that smoked.

23  Q.  Customers?

24  A.  Yes.  That was really my main thing.  I wanted to sell

25  to the person that smoked because you make more money that

1    way.

2    Q.  How come?

3    A.  Because if I go buy an ounce, say you got the dope, say

4    you got 36 ounces of dope, say you got a bird, right?

5    Q.  A bird is what?

6    A.  36 ounces of dope.

7    Q.  Is that a kilogram?

8    A.  That's where I'm trying to get.  Say you got a bird, 36

9    ounces of dope.

10          You are selling ounces for thousand.  I buy an

11   ounce from you for a thousand, there's 28 grams, that means

12   $2800 dollars worth of dope in there.

13          I can sell it to people who smoke it and probably

14   make about $2000, $2200, you know.

15          If I be stingy with it I might make the whole

16   $2800.

17          If I'm selling ounces, how you sell me for a

18   thousand, I feel like I'm beating myself.

19   Q.  So you could almost double your money if you broke it

20   into smaller pieces and sold it to customers?

21   A.  Sell to customers, nine out of ten times you always

22   double your money.

23   Q.  You said there was about nine ounces at this house on

24   37th, just as an average?

25   A.  Average.

1    Q.  You said something about that doesn't include what is

2    hidden outside.

3    A.  Yes.

4    Q.  Explain that for me.

5    A.  If you are in the house and selling drugs, say you have

6    an ounce on you, say I come over to your house with an

7    ounce, your house is a drug house.

8          Ain't no reason I should have the whole ounce on

9    me.  For one, some people swallow dope.

10         The most I ever saw a person swallow myself was

11   a quarter.

12         That's when the cops come in on a raid, you get rid

13   of dope.

14         Some people put it in their behind.  I don't agree

15   with all that, you know, try to hide it from the police.

16         Some people, a person probably can put an ounce in

17   their behind, but that's a lot.

18         If you just come in there with a quarter on you, if

19   they see you selling, you have probably three quarters

20   hidden outside, so when you run out you go outside to

21   wherever you hid it and go grab another one instead of

22   having to drive off or go somewhere else, catch a car, or

23   call somebody to come and sell you some.  It saves you

24   trouble.

25   Q.  Saves you trouble, but it also saves you, if the police

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    come you get caught with less?

2    A.   Right, or none at all.

3    Q.   Because you are selling it while you have on it you?

4    A.   When they come, like I said, you can swallow it or hide

5    it.

6    Q.   Now, the house at 3902 North 37th, I think it's

7    Exhibit 12, you said you saw Rommie at this house, correct?

8    A.   Yes.

9    Q.   Did you ever see him in possession of crack cocaine at

10   that house?

11   A.   No.  He never came in the house.  He would be outside.

12   When people -- when his brother stayed there, Karlos, Karlos

13   got robbed in there.

14          So Lamar stopped coming over there and stopped

15   selling dope over there.

16          I was on work release.  Remember, I told you, 2001,

17   February 2002 I had got sentenced to 90 days in jail for

18   violation of probation.

19          I knew I was going to jail for that dope case I

20   caught.

21          So I went to jail.  I was on work release, so I

22   wasn't over there, because I wasn't supposed to be around.

23          So when I got out on April 21, 2002, it was me and

24   Marcus Hudson's house and everybody from the neighborhood

25   they would come over there, but they would be outside.

1          Some people came in, but he wasn't one that came

2     in.  He would be outside.

3          He might be in his car, sitting in his car, he's

4     like what you doing?  What you all about to do today, or

5     something like that.

6          And then he would just sit back and chitchat, BS

7     for a little bit, and then he would pull off.

8     Q.  Did you ever have the occasion to do illegal business

9     with Jerome Bass?

10    A.  Not at that time, no.

11    Q.  At some time later?

12    A.  Yes.

13    Q.  And when was that?

14    A.  In December of 2002.

15    Q.  Can you tell me what happened in December of 2002 with

16    regards to you and Jerome Bass?

17    A.  He called my phone.  He said he wanted to get some dope.

18    I told him to meet me at Big Jim's Rib Haven.

19         He met me there and I asked him what he wanted to

20    get.  He said he wanted an ounce.

21         I told him to meet me at the old house at 3902

22    Spaulding.

23         I called Marcus Hudson, Bumpy, on the phone,

24    because I had, you know, September 16, 2002, Gassaway, I had

25    caught another dope case, so I was running from that area

1   and I wasn't around him like that.

2          So I called Marcus Hudson, that's Bumpy, and I

3   said, "Rommie sell dope?"

4          And he said yeah.  He said he would be at the house

5   on 40th, they had a crack house on like 40th and Fowler,

6   between Fowler and Grand.

7          So I said all right.  So I went in front of -- I

8   already had the drugs on me, I went in front of 37th and

9   Spaulding, I had a scale, I put it on the scale and I sold

10  it to him for nine hundred dollars.

11  Q.  Why did you call Bumpy, or Marcus Hudson, before you

12  were willing to sell Jerome Bass dope?

13  A.  Because I never seen him sell dope before and also they

14  said his brother was indicted.

15         They was saying everybody was indicted.  I knew I

16  was getting indicted.

17         They said he was indicted, his brother was

18  indicted, Pockets was indicted.

19         Last time I seen his brother was October 15, 2002.

20  So in my eyes, I don't know, maybe his brother could have

21  been in jail.

22  Q.  Were you checking on him by calling Bumpy?

23  A.  Yes.

24  Q.  Why would Bumpy know?

25  A.  Like I said, Bumpy was still in the neighborhood.  He

1    was still cool, running from the police he was not.

2          He didn't feel at the time he was hot.  He was in

3    the neighborhood, and that's where they was at, but I wasn't

4    slinging dope in the neighborhood.

5          I was slinging dope downtown.  I had my home spot.

6    I was doing my own thing.  I was branching off from there,

7    basically.

8    Q.  And getting out of that neighborhood, correct?  Is that

9    what you're saying?

10   A.  Exactly.  If you look at my arrest sheet, out of 142

11   entries, 90 of them came out of there, that neighborhood.

12   Q.  So at some point you figured time to move?

13   A.  Exactly.

14   Q.  After that first occasion in, you said that was around

15   September 16, 2002?

16         MR. LEVY:  Objection, form.  I don't know what

17   she's what this is or that is.

18         MS. DUGAN-HINRICHS:  I can rephrase it.

19   BY MS. DUGAN-HINRICHS:

20   Q.  You testified about a one ounce crack transaction for

21   nine hundred dollars where you sold to Jerome?

22   A.  Exactly.

23   Q.  Do you know when that occurred?

24   A.  I don't know the exact date, but it was in December of

25   2002.  It was before New Years.

1   Q.  That's all I was looking for.  Did you have the occasion

2   to have any other crack activities with Jerome Bass?

3   A.  Like two weeks later.  I was riding with Marcus Hudson

4   and we stopped over at the house at 40th and Fowler.

5   Q.  Who stopped over?

6   A.  Me and Marcus Hudson.  And I wasn't going to go in there

7   because, like I said, I wasn't selling drugs over there.

8           When I went in the house, Rommie, he was selling

9   some dope to somebody, a schmo, in Audry's house.

10  Q.  You used the word schmo.  What is that?

11  A.  A person that uses drugs, and I didn't recognize the

12  person, but he was in the kitchen area in Audry's house.

13          And when I came in I just sat on the couch and he

14  said he was trying to get on.

15          And I had like four and a half, five ounces left,

16  and I wanted to get it off.

17          It wasn't no bad dope, but it really wasn't what he

18  wanted, you know what I'm saying, so he wanted like three or

19  four ounces.

20          I had three ounces right around the corner, like in

21  the back of my Aunt Sheri's yard and went over there and got

22  it and I sold it to him for $2100.

23  Q.  You said this was at Audry's house on 40th and Fowler?

24  A.  Yes.

25  Q.  But that you had hidden it at your aunt's house?

1   A.  Yes.  Like it wasn't at her house.  It was in the alley

2   in the back of her house.

3   Q.  I think you testified that after October 16, 2002, you

4   didn't see Lamar?

5   A.  No, I did not.

6   Q.  Why is that date important?

7   A.  Because October 16th, 2002, is the day I did a

8   controlled buy on Lamar.

9   Q.  Let's talk about that.  You did a controlled buy from

10  Lamar?

11  A.  Yes.

12  Q.  Of how much?

13  A.  Seven grams.

14  Q.  And were you a CI?

15  A.  Yes, I was.

16  Q.  Who was the officer supervising you?

17  A.  Gassaway.

18  Q.  And how much did pay for that crack?  Do you remember?

19  A.  $250.

20  Q.  And it was after that time that you didn't see Lamar

21  anymore, correct?

22  A.  No, I didn't.  The last day I seen him, that's the day I

23  bought it.

24  Q.  Did you hide from him after that?

25  A.  No.  He didn't know at that time that I did a controlled

1   buy on him.

2   Q.  He didn't know it yet?

3   A.  No.

4   Q.  Do you know when he was federally indicted?

5   A.  I believe he got picked up in December.

6   Q.  Was your controlled buy part of that indictment or do

7   you know?

8   A.  I believe it was.

9   Q.  After December of 2002, were there any times after that

10  that you saw Jerome Bass with crack cocaine?

11  A.  I didn't sell him no more dope.  I went out of town to

12  Kansas City and I came back.

13         I went to Kansas City for like two months and I

14  came back and then like in the summer of 2003, it had to be

15  like before the 4th of July, I was with Pockets, he had came

16  back, he was in his Jeep Grand Cherokee and he was telling

17  me that he owed his brother some money, like he didn't want

18  to give him the money, he couldn't pay him, so he was like

19  I'm going to give him this dope.

20  Q.  Let me stop there.  I think this is important and I want

21  to make sure I understand.

22         MR. LEVY:  Objection to the prosecutor

23  characterizing the nature of the testimony as being

24  important.

25         MS. DUGAN-HINRICHS:  I apologize, Your Honor.  I

 1    withdraw it.

 2              THE COURT:  You may proceed.

 3    BY MS. DUGAN-HINRICHS:

 4    Q.  Sir, you sold to Jerome December of 2004, correct?

 5    A.  2002.

 6    Q.  I'm sorry.  December 2002.  Now you are talking about a

 7    time where you saw JeVaughn Erwin?

 8    A.  Yes.

 9    Q.  When was that?

10    A.  Summer of 2003.

11    Q.  You said around the 4th of July?

12    A.  As a matter of fact, it was in June.  I got picked up by

13    Gassaway like a week after.

14    Q.  Now, where did you see JeVaughn Erwin?

15    A.  I seen him -- I was at my grandpa's house at 2905

16    Laurel, in the back of the liquor store.

17    Q.  Why did you see JeVaughn Erwin at that place?

18    A.  I was going to the store and I didn't know he was in

19    town.  I heard he was on the run.

20              I seen him.  He pulled up.  He was driving, about

21    to go in the store.

22              He stopped.  I hopped in the car with him.  He was

23    talking, he was asking me about Lamar.

24              He was telling me that Lamar told him that I set

25    him up.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1            And then he was telling, he was just telling me

2     like man, he told me don't tell on him.

3            He was asking me not to set him up.  He had his son

4     with him, too.

5            Like he told me to look at his son, don't take me

6     from my son or something, and he said I want you to make

7     this run.

8            Basically what he was trying to do was like buy my

9     friendship, but I wasn't working with Gassaway no more, but

10    he didn't know that.

11           So he went over somewhere around Jaynes Street, I

12    believe it's 35th and Jaynes, his cousin's house.

13           And he went and got this plastic bag, like a

14    Baker's grocery sack, but it was a plastic bag, and he had

15    some dope in it.

16           He was like man, he said he don't know if he should

17    give Rommie the dope, but he said he ain't going to give

18    Lamar no money.

19           He pulled up to the house at 40th and Fowler and he

20    went in and that's when he gave Rommie the dope.

21    Q.  Was Rommie already at the house at 40th and Fowler?

22    A.  Yes, he was.  Him and his car was there.

23    Q.  How much dope was in that grocery bag?

24    A.  Like six ounces.

25    Q.  And you saw JeVaughn give that six ounces of crack to

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    Jerome?

2    A.  Exactly.

3    Q.  After that occurred, you said that was June, during the

4    summer of 2003, after that date was there ever a time that

5    you saw Jerome Bass with crack cocaine?

6    A.  No, there was not.

7    Q.  Did you ever have any conversations with your fellow

8    gang members about people fronting crack cocaine to

9    Jerome Bass?

10   A.  When I came down here April 19, 2004, I was coming to

11   plead out.  I believe that's the day I pled out, I pled

12   guilty, April 19th.

13          JeVaughn Erwin was supposed to plead out and

14   Deandre Baker was here too and Pockets was trying to tell

15   me --

16          MR. LEVY:  Judge, I object to what Pockets was

17   telling him in 2004.

18          THE COURT:  Sustained.  It's noon.  I think it's

19   time we take our noon recess.

20          I have a hearing at 1:00 o'clock.  So, ladies and

21   gentlemen, we'll readjourn at 1:30.

22                  (12:05 p.m. - Recess Taken)

23          (At 1:30 p.m. on September 20, 2005, with counsel

24   for the parties and the defendant present, the following

25   proceedings were in the presence of the jury:)

1           THE COURT:  Ms. Dugan-Hinrichs, you may continue

2     your examination of the witness.

3                DIRECT EXAMINATION (CONT'D)

4     BY MS. DUGAN-HINRICHS:

5     Q.  Mr. Jackson, before we took our lunch break we were

6     talking about instances in which you saw the defendant,

7     Jerome Bass, in possession of crack cocaine.  Do you

8     remember that?

9     A.  Yes.

10    Q.  And just so that we're clear, we've already talked about

11    the instances when you sold to him.

12           When was the first time after you sold to him that

13    you saw Jerome Bass in possession of crack cocaine?

14    A.  The first time after I sold to him?

15    Q.  Yes.

16    A.  That's the only time I ever seen him in possession, is

17    when I sold to him, and then the second time I sold to him.

18    Q.  There was a time you were at Audry's house?

19    A.  Yes.

20    Q.  And who did you go there with?

21    A.  First time I went with Marcus Hudson.

22    Q.  Did you go there with JeVaughn?

23    A.  Yes, the second time.

24    Q.  Do you know when that was?

25    A.  In the summer of 2003.

1  Q.  That's the instance that I want to talk about, because I

2  want to make sure that we're clear.  You ran into JeVaughn

3  Erwin where that day?

4  A.  At my grandfather's house.

5  Q.  And then you got in the car with him, correct?

6  A.  Yes.

7  Q.  What happened after that?

8  A.  We went for a ride and he was telling me that he owed

9  Lamar some money and then he went over to his cousin's house

10  off of like 35th and Jaynes and that's when he got the

11  crack.

12  Q.  Do you know where he got it from that house at 35th and

13  Jaynes?

14  A.  I know he went in the house, but I don't know where he

15  got it from in the house.  I know it was in the house.

16  Q.  Did you wait in the car?

17  A.  Yeah.  I sat in the truck.

18  Q.  After you picked it up, then what did you two do?

19  A.  We got to driving around for a minute and he stopped

20  over at Audry's house.

21  Q.  Why?

22  A.  Because that's where Rommie was at.

23  Q.  And what happened next?

24  A.  That's when he was giving him the drugs.

25  Q.  And how much?

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1   A.  Six ounces.

2   Q.  And I think you said it was in one of those grocery

3   bags, plastic grocery bags?

4   A.  Yes.

5   Q.  Do you see him hand it to Jerome Bass?

6   A.  Yeah.  I went in the house with him.

7   Q.  Was there any conversation that you observed between

8   JeVaughn Erwin and Jerome Bass about that crack?

9   A.  No.  He was just like here you go, this is what I owe

10  your brother.

11  Q.  JeVaughn said that?

12  A.  Yes.

13  Q.  And did Jerome Bass say anything after that statement

14  was made?

15  A.  Not really.

16  Q.  After that instance in the summer of 2003, was there

17  another instance in which you saw Jerome Bass in possession

18  of crack cocaine?

19  A.  No, I did not.

20  Q.  What is fronting?  Have you heard that term before, when

21  somebody fronts somebody else dope?

22  A.  Yes.

23  Q.  What does that mean?

24  A.  That means somebody gave it to you on credit.

25  Q.  You don't have to pay for it right away?

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    A.   Right.

2    Q.   Were you aware of any time when anybody ever fronted

3    crack to Jerome Bass?

4    A.   No, not besides when Mr. Erwin gave it to him.  That's

5    the only time I ever seen anybody give him some dope.

6    Q.   When JeVaughn made the comment, this is for your

7    brother, do you know what that meant?

8    A.   He owed his brother some money, so apparently he was

9    paying his debt to him.  His brother wasn't out there, so he

10   paid it to his little brother.

11   Q.   This would have been after Lamar Bass was arrested,

12   correct?

13   A.   Exactly.

14   Q.   I think you talked about how you would hide crack

15   cocaine in different places so you wouldn't get caught with

16   all of it at once.  Do you remember that?

17   A.   Yes.

18   Q.   Was that a common practice amongst this group of you?

19   A.   We all did it.

20   Q.   Do you know why?

21   A.   Basically everybody did it for the same reason I did it.

22   Q.   So they wouldn't get caught with all of it?

23   A.   Exactly.

24   Q.   Where did you guys learn it from?

25   A.   Each other.

1    Q.  So it was a common practice?

2    A.  Right.

3    Q.  Did you ever know anybody to bury dope like in a

4    backyard or in the dirt?

5    A.  That's part of hiding it, yes.

6    Q.  Sometimes it would be buried and sometimes it would be

7    just hidden like in a bush?

8    A.  No.  Like you might walk down the alley and you've got

9    like a bag of Doritos, you might must put a quarter in

10   there, you might stow it.

11          A person sees a bag of Doritos, they ain't going to

12   go through no bag of Doritos to see what is in it.

13   Q.  So then later, after you sold the amount you had on your

14   person, you would go back and get that bag of Doritos,

15   right?

16   A.  Right.

17   Q.  Mr. Jackson, how many times did you sit down and do a

18   proffer interview in this case or in any case?

19   A.  I did a total of two proffer interviews.

20   Q.  And who was present?

21   A.  Gassaway; my lawyer, Karen Shanahan; Maria Moran; and I

22   believe Noonan was present at one of them.

23   Q.  Was that at two different times or was it all at the

24   same time?

25   A.  Two different times.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1   Q.  Did it happen in the same day or two different days?

2   A.  Two different days.

3   Q.  You talked about, you mentioned Officer Gassaway a

4   couple of times before we broke for lunch.  How long have

5   you known Officer Gassaway?

6   A.  Since like 1999.

7   Q.  How did you meet him?

8   A.  I was standing on 38th and Grand and they were doing a

9   no-knock warrant or something.

10          They was doing something, they was in the area, in

11  that black Taurus I was telling you about.

12          And one of my friends, Lawrence Russell, he tried

13  to go up to sell somebody some drugs, but they had an

14  undercover cop up there and he figured it was an undercover

15  cop and he ran from them.

16          So me and my cousin Royce was standing outside, we

17  seen him, we was watching him.

18          I seen Lawrence Russell run and I seen Gassaway

19  tried to jump in the air like he did and he fell.

20          So I took the initiative at that time to try to run

21  myself.

22          We was walking down the alley, we was trying to

23  escape from where the police was.

24          He came out of nowhere and then I had like threw

25  some dope, but I was only a juvenile, so I went to jail.

1    Q.  That was how you met him?

2    A.  Yes.

3    Q.  Have you had contact with Officer Gassaway over the

4    years since that first time?

5    A.  Yes.

6    Q.  Did you work for him ever?

7    A.  Yes, September 14, 2002.  I worked with him from

8    September to October.

9    Q.  In what capacity?

10   A.  Controlled buy, wired.

11   Q.  So you were a CI, correct?

12   A.  Exactly.

13   Q.  Do you know how many controlled buys you made for him?

14   A.  I would say like seven.

15   Q.  When were you arrested on your federal indictment?

16   A.  August 26, 2003.

17   Q.  Between October of 2002 and August of 2003, did you work

18   as a CI for him during that time frame?

19   A.  No, I did not.

20   Q.  How come?

21   A.  Well, people was putting me over, telling me that he had

22   told them that I was working for him.

23   Q.  People were putting you over?

24   A.  People had -- I guess he pulled somebody over that I

25   hang around with, he had come to me, "Where your home boy

1   Pockets at?"

2          Or, "Tell who can you get it from," and I would

3   tell him.

4          But at the same time I didn't want him, like

5   JeVaughn Erwin, Marcus Hudson, Bump, they was one of my real

6   close friends, I was like, "No, I wouldn't want to do that."

7          So they had pulled me over, like we had seen

8   Gassaway, "He said that you work for him,".

9          I go like, "Yeah,

10         So that made me not want to, you know what I'm

11  saying, not work for him no more because I felt he was

12  endangering my life out there, you know what I'm saying?

13         So what I did was I just stopped working for him,

14  you know, but he tried to get me to work for him again in

15  June of 2003 and I was going to do it, but I couldn't go in

16  the area he wanted me to go in, because I really wasn't

17  going over there buying dope from the 40th Ave dudes like

18  that, you know, go buy dope from them.

19         The people he wanted, I couldn't get them, because

20  JeVaughn was on the run and I didn't want to.  It wasn't I

21  couldn't get them; I didn't want to.

22  Q.  Can you describe your relationship with Officer

23  Gassaway?

24  A.  I mean, when I was working with him he was a straight up

25  guy, you know, he never lied to me about nothing, you know,

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    he was straight up.

2    Q.  And --

3    A.  He used to call me and tell me, you know, you can do

4    this or you are going to get indicted.

5              I used to laugh at it, though.  I thought it was a

6    joke until I seen Lamar indicted, and then I seen -- I got

7    Leon Carter indicted, and Kevin Jones, and after that that's

8    when I knew it was real.

9    Q.  During any time of your relationship with Officer

10   Gassaway, did he ever lie to you?

11   A.  No.

12   Q.  Did he ever make you any promises that he didn't follow

13   through on?

14   A.  No.

15   Q.  So, he was straight with you.  Is that fair?

16   A.  Right.

17   Q.  Lamar Bass talked on you in his proffer, correct?

18   A.  Right.

19   Q.  And do you know how much weight Lamar put on you?

20   A.  I believe four and a half, five ounces.

21   Q.  Who put the most weight on you?

22   A.  Julius Harris.

23   Q.  Is Julius Harris a 37th Street guy?

24   A.  No.

25   Q.  Did you ever talk with anybody about your testimony at

1    this trial today?

2    A.  No, I did not.

3    Q.  Why not?

4    A.  It wasn't important.  To be honest with you, I really

5    didn't know he was going to trial until Wednesday of last

6    week.  That's when my lawyer told me.

7            I was never even -- it wasn't really a big subject.

8    I never talk about anybody I was going to trial with, and

9    nine times out of ten I wasn't around the people I was going

10   to trial with.  I never even knew that many people told on

11   me.

12   Q.  How many other times have you testified?

13   A.  This is my fourth time.  So I testified three other

14   times.

15   Q.  At any of those other tree trials, did you tell the

16   truth?

17   A.  Yes, I did.

18           MR. LEVY:  Judge, I'm going to object and move to

19   strike the testimony about whether the witness is telling

20   the truth or not.  That's for the jury to decide.

21           THE COURT:  Overruled.  He can answer.

22           THE WITNESS:  Yes, I did.

23   BY MS. DUGAN-HINRICHS:

24   Q.  Why?

25   A.  That's what I'm here to do, is to tell the truth.

1    Q.   Why?

2    A.   Because, for one, I filed for a cooperation agreement,

3    so if I filed for a cooperation agreement I have to tell the

4    truth or else I can be charged with perjury.

5            It says in the agreement, as long as you tell the

6    truth, what you say cannot be held against you, but once you

7    lie it can be held against you.

8    Q.   What would happen if you lied?

9    A.   For one I would get charged with perjury.

10   Q.   These people that we've talked about during your

11   testimony, the defendant, Jerome Bass, JeVaughn Erwin, these

12   people were your friends, weren't they?

13   A.   Me and Lamar was cool.  We was real close.  Pockets and

14   me was real close.

15           Lamar, we was friends, like we were from the same

16   neighborhood, but he wasn't somebody that you would see me

17   with every day that I ride with.

18           He wasn't, not really, you know what I'm saying, me

19   and him, me and him was different, we was on a different

20   type of level, you know what I'm saying.

21           I was in the streets.  He was about all the money.

22   I was in the streets, in the club, all of that, I was

23   everything, a hundred percent street.  He wasn't a hundred

24   percent street.

25   Q.   When you are talking about he, who are you talking

1   about?

2   A.  Lamar Bass.  But me and JeVaughn Erwin --

3   Q.  Is it hard for you to testify here today?

4   A.  I mean, yeah, that's his little brother, you know, I

5   really don't know him like that, you know what I'm saying,

6   to say that me and him was friends either like that.

7           He was cool.  I ain't never had any problems with

8   him.

9           If I had a choice, no, I won't testify against him,

10  but I proffered on him and I'm here today to tell what I

11  said, the truth.

12          MS. DUGAN-HINRICHS:  Your Honor, may I have a

13  moment to confer?

14          THE COURT:  Yes, you may.

15          MS. DUGAN-HINRICHS:  I have nothing further.

16          THE COURT:  You may cross-examine, Mr. Levy.

17                      CROSS-EXAMINATION

18  BY MR. LEVY:

19  Q.  Mr. Jackson, do you remember the date that Jerome Bass

20  was beat up?

21  A.  No, I do not.  I know it was the summer of 2002.

22  Q.  It was what?

23  A.  I know it was the summer of 2002.

24          THE COURT:  The date who was beaten?

25          MR. LEVY:  Jerome Bass.  I am going to offer

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    Exhibit 103, Your Honor.

2              I think Ms. Dugan-Hinrichs is going to waive

3    foundation.

4              103 is an emergency room record from St. Joe's

5    Hospital dated September 1, 2002, regarding treatment

6    provided to Jerome Bass for a broken jaw as a result of an

7    assault.

8              THE COURT:  Is there any objection?

9              MS. DUGAN-HINRICHS:  No, sir.

10             THE COURT:  103 is received.

11   BY MR. LEVY:

12   Q.  Mr. Jackson, Exhibit 103 is in front of you.  That's the

13   hospital report of Jerome Bass's hospitalization for his

14   broken jaw.

15             So, September 1st, is that consistent with your

16   recollection about when that assault happened?

17   A.  Yes.

18   Q.  As far as your prior record is concerned, you have three

19   felony convictions for robberies?

20   A.  Yes.

21   Q.  Correct?

22   A.  I said that earlier, yes.

23   Q.  Who did you rob?

24   A.  I don't know their names.  I robbed people.

25   Q.  Strangers?

1    A.  Yes.

2    Q.  Did you use a gun?

3    A.  Yes, I did.

4    Q.  What kind of gun?

5    A.  Used a different gun on each circumstance.

6    Q.  Where did those robberies take place?  Where did the

7    first one take place?

8    A.  I really don't remember them, to be honest with you.  I

9    know it took place out west.

10   Q.  West Omaha?

11   A.  Yes.

12   Q.  Were you with somebody?  Did somebody help you rob?

13   A.  No, I did them all by myself.

14   Q.  Was this a day time or night time robbery?

15   A.  Night.

16   Q.  When did it happen?

17   A.  Summer of 2003.  As a matter of fact, two weeks prior

18   before I got locked up.

19   Q.  When did you get locked up?

20   A.  August 26, 2003.

21   Q.  So, during the month of August of 2003 you committed one

22   robbery in west Omaha?

23   A.  Three.

24   Q.  Three?

25   A.  All three of them.

1   Q.  Same day?

2   A.  No.  Same week.

3   Q.  Same week.  Two weeks prior to August 26, 2003, you

4   stuck up three people?

5   A.  Yes.

6   Q.  Men or women?

7   A.  Men.

8   Q.  All of them?

9   A.  Yes.

10  Q.  White or black?

11  A.  White.

12  Q.  You threatened all of them with a gun?

13  A.  Yes.

14  Q.  Day time or night time?

15          MS. DUGAN-HINRICHS:  Objection, asked and answered.

16          THE COURT:  Sustained.

17  BY MR. LEVY:

18  Q.  Were all three of them day time or were all three of

19  them night time?

20          MS. DUGAN-HINRICHS:  Objection, asked and answered.

21          THE COURT:  I'm going to overrule the objection.

22          THE WITNESS:  All of them was at night.

23  BY MR. LEVY:

24  Q.  Were they all in the same neighborhood of west Omaha?

25  A.  No, they was not.

1   Q.  Were did they happen?

2   A.  Center.

3   Q.  West Center Road?

4   A.  Yes.

5   Q.  At a shopping center?

6   A.  No.

7   Q.  Where?

8   A.  ATM.

9   Q.  You saw somebody using an ATM and you went up and stuck

10  a gun in their face and said give your money?

11  A.  I was riding in my car and somebody would call me on the

12  phone that they seen this person at the ATM and then I would

13  go rob them.

14  Q.  At the ATM?

15  A.  No.  I followed them.  They might go to Taco Bell.  They

16  might go somewhere else.

17  Q.  The fact is that you stuck a gun at them and threatened

18  them with their life if they didn't give you the money?

19  A.  I never threatened no one.

20  Q.  You didn't?

21  A.  No, never.

22  Q.  What would you say about sticking a gun in somebody's

23  face?  Is that a threat or not?

24  A.  But you just said I threatened their life.  I told them

25  give me your money.  I didn't say I was going to kill

1    nobody.  I said give me the money.  I never said I will kill

2    you.

3    Q.  You just stuck the gun in their face, or pointed the gun

4    at them, and said give me the money?

5    A.  Exactly.

6    Q.  You don't think that's a threat?

7    A.  That's a statement.

8    Q.  It certainly is, isn't it?  Sticking a gun at somebody

9    is a statement, isn't it?

10          It's a statement if I don't get your money I'm

11   going to shoot you, isn't it?

12   A.  No.

13          MS. DUGAN-HINRICHS:  Objection, calls for

14   speculation.

15          THE COURT:  Overruled.

16   BY MR. LEVY:

17   Q.  What do you think it is?

18   A.  I never ever had nobody say no, so therefore I can't sit

19   here and tell you that I would have shot them and I can't

20   tell you I wouldn't have shot them.

21   Q.  What kind of gun was it?  Was it a handgun?

22   A.  I told you in each situation it was a different robbery.

23   Two was a handgun and one was a semiautomatic.

24   Q.  The handgun, was it a nine millimeter?

25   A.  A .380.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    Q.  Revolver?

2    A.  No.  They was all automatics.

3    Q.  And then the third one was?

4    A.  A Glock nine.

5    Q.  A Glock nine millimeter.  Then you gave false

6    information to the police, right?

7    A.  Yes.

8    Q.  On two occasions?

9    A.  Yes, I did.

10   Q.  You lied to the police, didn't you?

11   A.  Yes, I did.

12   Q.  You gave a false name?

13   A.  Yes, I did.

14   Q.  And you lied to the police because you didn't want to go

15   to jail?

16   A.  Exactly.

17   Q.  Is that right?

18   A.  Exactly.

19   Q.  And you lied to the police because you didn't want to go

20   to jail on a misdemeanor warrant?

21   A.  Exactly.

22   Q.  That could have got you six months in jail, correct?

23   A.  Exactly.

24   Q.  What kind of misdemeanor warrants were they?

25   A.  It was always driving.

1    Q.  Driving offenses?

2    A.  Driving under suspension.

3    Q.  Serious enough for you to stay out of jail on a

4    misdemeanor warrant that would have got you six months in

5    jail, it was serious enough to lie to the police about your

6    name?

7    A.  Yes, it was.

8    Q.  And because of your testimony today, and your testimony

9    three other times, you are hoping for a cut in your

10   sentence, aren't you?

11   A.  Yes, I am.

12   Q.  210 months is your sentence, isn't it?

13   A.  Exactly.

14   Q.  15, 16 years?

15   A.  17 and a half.

16   Q.  17 and a half years.  You are how old?

17   A.  23.

18   Q.  You do your time, you will be forty, won't you?

19   A.  Close to it.

20   Q.  Are you happy to be in prison?

21   A.  No.

22   Q.  Do you want to go home?

23   A.  We all want to go home.

24   Q.  You want to go home, don't you?

25   A.  Everybody wants to go home.

1    Q.  You want to go home, don't you?

2    A.  Yes.

3    Q.  There's a stolen vehicle report in evidence as Exhibit

4    102, and that relates to the theft of Mr. Bass's car that

5    you talked about?

6    A.  Yes.

7    Q.  That shows that Jerome's car was stolen July 21, 2002,

8    and it shows that one of the parties involved in stealing

9    Jerome's car in July of 2002 was James Moore.  Do you know

10   that to be the fact?

11   A.  That's what I overheard.

12   Q.  And it also shows that another individual was involved

13   who held a gun to Jerome Bass to steal his car, and his name

14   was BG.  You heard he was involved, too.  Who is BG?

15   A.  Deandre Baker.

16   Q.  And Deandre came up in the van with you from CCA to

17   testify in this case?

18   A.  No.

19   Q.  Who did he come with?

20   A.  I have been here thirteen months.

21   Q.  Deandre is here, isn't he?

22   A.  Yes, he should be.

23   Q.  To testify, isn't he?

24   A.  Yes.

25   Q.  So you believe that the guy that stuck a gun in Jerome's

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1   face to steal his car is also going to come and testify

2   against Jerome, don't you?

3           MS. DUGAN-HINRICHS:  Objection, relevance, Your

4   Honor.

5           THE COURT:  Sustained.

6   BY MR. LEVY:

7   Q.  Jerome was not jumped in the gang, was he?

8   A.  No, he was not.

9   Q.  Jerome wasn't beat in the gang, was he?

10  A.  No, he was not.

11  Q.  And in order to be a gang member that's how you are

12  initiated, isn't it?

13  A.  Like I said earlier, you either get initiated by being

14  jumped in the gang, or you go shoot somebody.

15  Q.  Being a gang member doesn't really get you hooked up

16  with selling crack, does it?

17  A.  No, you ain't got to be in a gang to sell crack.

18  Q.  You don't have to be in a gang to sell crack, and you

19  can be in a gang and sell crack.

20          The fact that you are a gang member doesn't

21  necessarily mean you are a crack dealer, does it?

22  A.  No.  A lot of people in the gang sell crack because

23  their neighborhood might be a drug area, and that's

24  somebody's turf, that's somebody's gang area, so they go

25  join the gang to sell crack there, but you don't have to be

1    in the gang to sell crack.

2    Q.  In September of 2002 Jerome was jumped at a convenience

3    store and his jaw was broke?

4    A.  Right.

5    Q.  Who was involved in that?

6    A.  I wasn't there, but I overheard that Jerome Daniels, Too

7    Tall, and a couple of his friends jumped him.

8    Q.  Who is Too Tall?

9    A.  He's from Crown Point.  He's one of BG's friends.

10   Q.  What is his name?

11   A.  I don't know.

12   Q.  Who else was involved besides Daniels and Too Tall?

13   A.  I don't know.  I wasn't there.

14   Q.  I know you weren't there, but you were asked about this

15   incident by the prosecutor, so I'm going to follow up on it.

16   A.  I will tell you the same thing I told her.

17   Q.  What did you hear?

18   A.  Jerome Daniels, Too Tall, and his friends.

19   Q.  And the reason that the fight happened is that people

20   were jealous of what Jerome had?

21   A.  Exactly.

22   Q.  And Jerome was kind of a straight arrow kid, wasn't he,

23   went to school, right?

24   A.  Yes, he was.  At one point in time, yes, he was.

25   Q.  Graduated from school?

1    A.   Yes.

2    Q.   Kept his nose clean?

3    A.   Yes.

4    Q.   Stayed away from the life his brother was living?

5    A.   Yes.

6    Q.   Stayed away from the life that you were living?

7    A.   Yes.

8    Q.   And Jerome was driving this candy orange Monte Carlo

9    when?

10   A.   2003.

11   Q.   When in 2003?

12   A.   Summer of 2003.   Right before I got picked up.

13   Q.   I have never seen an orange car.  You don't see many of

14   them, do you?

15   A.   Yeah, you might see them if you come on the north side,

16   north Omaha.

17   Q.   Kind of a distinctive color, isn't it?

18   A.   Just the color, you see it, you know what it is.

19   Q.   It's not a color of a car that --

20   A.   Average person, no.

21   Q.   -- that would not draw attention, is it?

22   A.   It would draw attention.

23   Q.   Like the jumpsuit you are wearing?

24   A.   Yes.

25   Q.   Orange jump suit.  So here is this straight arrow kid

1    who is going to school and keeping his nose clean and

2    staying out of the life, and all of a sudden he flips and

3    starts buying crack cocaine.  Is that what you are telling

4    this jury?

5    A.  That's what I said.

6    Q.  I know it's what you said.  Let's talk about the time

7    that you say he bought crack cocaine from you.

8         The first time you met at Jim's Rib Haven on Ames

9    Avenue, correct?

10   A.  Yes.

11   Q.  About 43rd and Ames?

12   A.  38th and Ames.

13   Q.  Good ribs, right?

14   A.  No.

15   Q.  Not good?

16   A.  No.

17   Q.  Did you meet inside?

18   A.  No.

19   Q.  Where did you meet?

20   A.  Parking lot.

21   Q.  The date that happened?

22   A.  I don't remember the exact date.

23   Q.  Yes, you do.  You said that you got involved in illegal

24   business with Jerome in December of 2002.  That's when

25   Ms. Dugan-Hinrichs asked you.

1    A.  That's not the exact date.

2    Q.  So the exact month is December, before New Years, right?

3    Correct?  Yes or no?

4    A.  Yes.

5    Q.  And you sold in December of 2002 before New Years an

6    ounce of crack cocaine to Jerome Bass, correct?

7    A.  Yes.

8    Q.  And two weeks later you sold three ounces to Jerome

9    Bass?

10   A.  Yes.

11   Q.  So was that after New Years?

12   A.  No.

13   Q.  It was still in December?

14   A.  Yes.

15   Q.  And then you saw JeVaughn Erwin give Jerome Bass a bag

16   with six ounces of crack in it?

17   A.  Yes.

18   Q.  And that was in the summer of 2003?

19   A.  Exactly.

20   Q.  You had given that crack to JeVaughn?

21   A.  No, I did not.

22   Q.  Who did?

23   A.  I told you he went in the house on 35th and Jaynes, the

24   guy that owned it, who gave it to him.

25   Q.  You were there and saw it?

1    A.  I seen him give him the dope.  I didn't see who he got

2    it from.

3    Q.  You were riding with JeVaughn?

4    A.  Yes.

5    Q.  Went up to the house, JeVaughn got out of the car, went

6    in the house, came back to the car, had a bag with him?

7    A.  Exactly.

8    Q.  And how was it that you saw what was in the bag?

9    A.  He showed me.

10   Q.  And then you drove to Audry's house?

11   A.  Yes, we did.

12   Q.  And then you gave that bag to Rommie?

13   A.  I didn't give him nothing.

14   Q.  I'm sorry.  JeVaughn gave the bag to Rommie?

15   A.  Yes, he did.

16   Q.  In your presence?

17   A.  Yes.

18   Q.  As you were watching?

19   A.  Yes.

20   Q.  And those three transactions were the only transactions

21   involving crack cocaine that you had with Rommie or saw

22   Rommie involved with, correct?

23   A.  That's the only three instances that I saw him involved

24   in.

25   Q.  I'm just asking about you.

1    A.  The third one wasn't my transaction.  It was two with me

2    and the third I saw him in.

3    Q.  And that's it?

4    A.  That's it.

5    Q.  Now, one of your many testimonies was in the case

6    involving JeVaughn Erwin, correct?

7    A.  That was my first one, yes.

8    Q.  I am going to ask you if you remember, you were under

9    oath then, weren't you?

10    A.  Yes, I was.

11    Q.  Was that in front of Judge Strom?

12    A.  Judge Strom, yes.

13    Q.  There wasn't a jury in that case, was there?

14    A.  Bench trial.

15    Q.  Was it just the judge or the jury?

16    A.  Bench trial, no jury.

17    Q.  You were still under oath, swore to tell the truth,

18    correct?

19    A.  Yes.

20    Q.  And Maria Moran was the prosecutor, wasn't she?

21    A.  Yes, she was.

22    Q.  Do you remember Maria asking you this question, "Did you

23    continue to sell crack cocaine until you got arrested in

24    August of 2003?"

25          And your answer, "No, I stopped in November of

1    2002?"

2           Do you remember that?  Do you remember testifying

3    to that, Mr. Jackson?

4    A.  I don't remember what I said back then, but, yes, I

5    probably said it.  Yes.  If it's in black and white I said

6    it.

7    Q.  "Why was it you stopped then," Maria Moran asked you.

8    Do you remember that?

9           "Because of an officer named Gassaway.  He was

10   harassing me a lot, but there was nowhere for me to make

11   money, he was always harassing me, pulling me over, chasing

12   me, so I just stopped selling drugs."  Do you remember that

13   answer?

14   A.  Yes.

15   Q.  So you told under oath Judge Strom that you stopped in

16   November of 2002 and you are telling this jury that you were

17   still selling to Jerome in December of 2002.  Now which is

18   the truth?

19   A.  What I just said is the truth.

20   Q.  So it was a lie when you testified to Judge Strom that

21   you stopped in November?

22   A.  No, it wasn't.

23   Q.  Explain to me how if it's true that you stopped in

24   November it's also true that you were selling in December?

25   A.  I thought she meant, when she asked me the question, she

 1   was talking about me and JeVaughn.

 2           I don't remember her asking me about me selling

 3   dope, period, me selling dope, period, altogether we stopped

 4   selling dope, because I was selling dope the whole time that

 5   I was out there.  I never ever stopped selling drugs.

 6   Q.  "After you met him, were you selling crack cocaine

 7   yourself?"

 8           "Yes, I was."

 9           "Did you continue to sell up until you got arrested

10   in August of 2003?"

11           "No.  I stopped in November of 2002."

12           Now, did you give those answers to those questions

13   before Judge Strom under oath or didn't you?

14   A.  You got it in black and white so, yes, apparently I did.

15   Q.  I have it in black and white.  Do you want to see it?

16   A.  I don't need to see it.  You're reading it.  You

17   wouldn't be standing there saying a lie, so apparently I

18   said that.

19   Q.  You worked with Officer Gassaway, didn't you?

20   A.  Yes, I did.

21   Q.  He recruited you to be an undercover operative for him,

22   didn't he?

23   A.  CI, yes.

24   Q.  Did he pay you?

25   A.  No.

1   Q.  You did it for the good of your community?

2   A.  No.

3   Q.  You did it for the good of Terrell Jackson, didn't you?

4   A.  Yes.

5   Q.  And besides setting up Lamar Bass, who else did you set

6   up?

7   A.  Kevin Jones, Karlos Harper, Deon Carter, and I made

8   controlled buys on Reginald Bell and Steve Phipps.

9   Q.  You didn't set up Jerome Bass, did you?

10  A.  No, I did not.

11  Q.  Did you choose the parties who you set up or did Officer

12  Gassaway choose them for you?

13  A.  I did.

14  Q.  And these were your buddies?

15  A.  The people I set up?  Were they my buddies?

16  Q.  They were your buddies, weren't they?

17  A.  No.

18  Q.  They were your homeys?

19  A.  No.

20  Q.  They were your fellow gang-bangers, weren't they?

21  A.  No.

22  Q.  Lamar was?

23  A.  I told you earlier, I told Ms. Dugan-Hinrichs, no, he

24  wasn't my buddy.

25  Q.  You were in the same 37th Street Gang, weren't you?

1    A.  That don't mean anything.

2    Q.  Doesn't mean anything, does it?

3    A.  It doesn't.  You can be working for the same job, but

4    that don't mean we are friends.

5    Q.  So being in a gang doesn't mean anything as far as the

6    dope business is concerned, does it?

7    A.  No, it doesn't.

8    Q.  It doesn't, does it?

9    A.  No.

10   Q.  It's not like the Hell's Angels when they run the meth

11   trade, is it?

12   A.  No.

13   Q.  And you stopped doing controlled buys because people

14   were coming up to you and telling you that Gassaway was

15   talking on you?

16   A.  Yes.  That's what they said.

17   Q.  You were worried that maybe somebody would pull a gun on

18   you?

19   A.  No, not really.  If I was worried I wouldn't have been

20   out there no more.

21   Q.  Now, you were indicted on August 20, 2003, correct?

22   A.  August 26th, yes.

23   Q.  August 26th?

24   A.  Yes.

25   Q.  And you have been in custody since then, from that date

1   until now, correct?

2   A.  Still in custody, yes.

3   Q.  You've never been released on pretrial release?

4   A.  No.

5   Q.  You've never been put on bail?

6   A.  No.

7   Q.  You have been in custody all the time?

8   A.  There is no bail with the feds; just pretrial.

9   Q.  Where have you been kept?

10  A.  I was in Cass County.  Then I went to Lexington; went

11  back to Cass County; Douglas County; Holton, Kansas;

12  Pottawattamie County; back to Holton, Kansas; Oklahoma City,

13  the transfer center, Terra Haute, Indiana, USP, CCA, and

14  I've been in Douglas County since then.

15  Q.  On any of those occasions have you been in jail with

16  Deandre Baker?

17  A.  I was in jail with Deandre Baker in Holton, Kansas, the

18  first time.  Before I got sentenced June 15, 2004.

19  Q.  Jacara Baker is his sister?

20  A.  Yes.

21  Q.  Have you been in jail at any time with Antone Green?

22  A.  Yes.  He was there in June of 2004.

23  Q.  How about Royce Brown?

24  A.  No, I've never been in jail with him.

25  Q.  Deandre Baker?

**PDF created with FinePrint pdfFactory trial version** http://www.fineprint.com

1    A.  I said yes.  Yes.

2    Q.  And Lamar?

3    A.  No.

4    Q.  You've not been in jail with Lamar?

5    A.  No.

6    Q.  They keep you separate?

7    A.  I don't think we have to be kept separate.  He

8    cooperated; I cooperated.

9    Q.  Marshall Box, you have been in jail with him?

10   A.  No, never been in the mod with him.

11   Q.  Jerry Coleman?

12   A.  Yes.

13   Q.  Damian Jackson?

14   A.  No.

15   Q.  And while you are in jail you have phone privileges,

16   don't you?

17   A.  Telephone privileges, yes.

18   Q.  You can three-way, can't you?

19   A.  No.

20   Q.  Mr. Jackson, when you are in Douglas County you can

21   three-way, can't you?  You are not supposed to, but you do

22   it?

23   A.  No, man, they hang up.  They have this new system, as

24   soon as you click over, even if your lawyer clicks over, it

25   automatically hangs up.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    Q.  You can write letters?

2    A.  You can write letters.

3    Q.  You were always represented by a fine attorney, weren't

4    you, Karen Shanahan?

5    A.  Yes.  She's a nice lady.

6    Q.  She represented you to the best of her ability, didn't

7    she?

8    A.  Yeah.  I would say she did what she could do.

9    Q.  She went over all the evidence against you?

10   A.  Yes, she did.

11   Q.  And in fact she showed you the proffers that people had

12   made on you?

13   A.  Yes.

14   Q.  And she discussed with you what the evidence was that

15   the prosecutor would present if you went to trial, correct?

16   A.  Yes, she did.

17   Q.  And she told you what your options were?

18   A.  Yes, she did.

19   Q.  And she told you that if you went to trial and got

20   convicted you would get a much longer sentence than if you

21   copped a plea and cooperated?

22   A.  I was going to trial and then she -- but I always asked

23   her, you know, if you don't think I can win let me know.

24        When I first got picked up, they only have four

25   people on my indictment.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1          So she said I had a good chance, because she said

2     that's the fewest you ever see on an indictment.

3          When I got to Douglas County in January of 2003 I

4     had like seven or eight people, everybody started hopping on

5     my case.

6     Q.   Everybody started to proffer on you?

7     A.   Yes, and she said that don't look too good.

8     Q.   One of those people that proffered on you was Lamar?

9     A.   No.   He proffered on me at first.   He was the reason I

10    got picked up.

11    Q.   He was the reason what?

12    A.   He was one of the reasons I got picked up.

13    Q.   Lamar proffered on you early and he was one of the

14    reasons that you got indicted?

15    A.   Exactly.

16    Q.   Lamar is Jerome's brother?

17    A.   Exactly.

18    Q.   And one of the main reasons you are sitting there in

19    that orange jumpsuit for seventeen and a half years is

20    because Lamar ratted you out?

21    A.   Yes.

22    Q.   And he's Jerome's brother?

23    A.   Yes.

24    Q.   I don't suppose you have any hard feelings toward Lamar,

25    do you?

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    A.  I would lie if I tell you I didn't.

2    Q.  You do, don't you?

3    A.  Yes, I do.

4         MR. LEVY:  I don't have any further questions of

5    Mr. Jackson.

6         THE COURT:  Ms. Dugan-Hinrichs?

7         MS. DUGAN-HINRICHS:  Thank you, Your Honor.

8                   REDIRECT EXAMINATION

9    BY MS. DUGAN-HINRICHS:

10   Q.  Mr. Jackson, Mr. Levy asked you about these three

11   robberies in great detail, correct?

12   A.  Yes.

13   Q.  When you got caught, did you admit that you had done

14   those?

15   A.  Yes, I did.  I took responsibility.  They wanted to

16   prosecute my little cousin, and I told them no.  I said he

17   didn't have nothing to do with it.

18   Q.  Just you?

19   A.  Yes.

20   Q.  Your false information that you've got, you testified

21   that you had given a different name, correct?

22   A.  Yes.

23   Q.  And why did you do that again?

24   A.  I had warrants.

25   Q.  And did the police figure out who you really were?

1    A.   The first time -- well, yes, the first time was when I

2    met Gassaway in 1999.

3             I didn't know that he seen me when I threw the

4    dope, so I used my brother's name.

5             My brother, he went to high school, graduated from

6    Brian, he played college basketball, so I knew he was

7    legitimate.

8             So Gassaway put me in handcuffs and then he went

9    over and got the dope.

10            And when he took me downtown I figured that he was

11   going to charge me with my dope, so that's when I said my

12   name is Terrell Jackson.   I told him I lied to him.

13   Q.   So you admitted that before Gassaway figured it out?

14   A.   He never -- he would never even know if I didn't tell

15   him until I got processed and running my fingerprints.

16            And when I figured I was going to get in more

17   trouble with the drugs as an adult, I told him, I said my

18   name is Terrell Jackson.   I'm only 16.

19   Q.   Now, when Mr. Levy asked you about the incident where

20   Mr. Bass's jaw got broken, do you remember that?

21   A.   Yes.

22   Q.   That was all stuff that you had heard on the street,

23   correct?

24   A.   Yes.

25   Q.   Because you weren't there, right?

1    A.  I was never on that occasion, when he got robbed, when

2    he got jumped, when his brother wrecked the car, none of it.

3    Q.  But you heard about it through the neighborhood,

4    correct?

5    A.  Correct.  I talked to Lamar and he told me about it.  I

6    talked to him after he got robbed for his car.

7    Q.  You talked to Jerome about it?

8    A.  Yes.

9    Q.  What did he tell you about it?

10   A.  He was mad.

11   Q.  Did he tell you who did it?

12   A.  Yeah, he told me who did it.

13   Q.  Who did he tell you did it?

14   A.  Deandre Baker and James Moore did it.

15   Q.  Is James Moore a Crown Point?

16   A.  Yes.

17   Q.  You were asked about, Mr. Jackson, that you knew at some

18   point that Rommie was a straight arrow and that he graduated

19   from school.  Do you remember talking about that?

20   A.  Yes.  I remember when he said that, yes.

21   Q.  And you answered the question at that point in time?

22   A.  Yes.

23   Q.  Did it change?

24   A.  Yes, it did.

25   Q.  Do you know what caused it to change?

1  A.  I'm not him.  I'm not in his brain; so, therefore, I

2  don't know what he was thinking at the time.

3          He's not the only person I seen do the same thing.

4  My friend Jimmy Swain, he got indicted.

5          He went to North High, played basketball, went to

6  college.

7          He got kicked out of college for trying to sell

8  weed in college.

9          He was 23, 24 years old when he first joined 37th

10 Street, too, so it's nothing that I never seen before.

11         I used to look at him the same way, why did you go

12 to school and college and graduate and then join the gang?

13         I don't know why he did it.  Maybe he was idolizing

14 what his brother was doing.  He might have like that.

15         I don't know.  I can't put words in his

16 mouth because I'm not him.

17 Q.  At some point you saw a change happen?

18 A.  Yes.  He started coming around more.  I know everybody

19 that comes to the neighborhood, because I'm there, I'm in

20 the hood every day.  He's coming around more.

21 Q.  When did that start happening?

22 A.  After he got robbed.

23 Q.  In July of 2002?

24 A.  I believe.  If that's the day he got robbed, yes.

25 Q.  Since you're in the neighborhood every day, and you have

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1   a chance to observe the goings on of all the people that we

2   have been talking about, after Jimmie Swain and Kevin Jones

3   and individuals like that got indicted, before they were

4   indicted, did they move more crack cocaine than anyone else?

5   A.  They moved a lot of dope.  They got fronted a lot of

6   dope, too.

7           They tried to play the big man role.  They moved

8   more dope than us.

9           They was selling dope like ounces-wise and

10  quarters.  They was trying to move it fast.

11          They was trying to dump it real fast, so they was

12  going through a lot of dope a day.

13          When you got a person like me who just sits on the

14  curb all day, you see them on the corner smoking, they was

15  moving more dope than we was.

16  Q.  And as those people got indicted and arrested, did other

17  people of this group that we have been talking about move up

18  and fill that void and start moving --

19  A.  People that -- some people, new people came around and

20  they started making more money.

21          They was accepted more and they didn't have to

22  worry about nobody running them away saying you can't be

23  around here no more.  So, yeah, it opened up doors for more

24  people.

25  Q.  So the people who were the low level curb dealers, they

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    could move up into that role once those people were indicted

2    and arrested?

3              MR. LEVY:  I object to the leading form of the

4    question.

5              THE COURT:  Overruled.

6              THE WITNESS:  Some people; some people didn't.

7    Some people stayed just how they was.

8              Like I said, if you was a street person, and ain't

9    no way you tell me that you wouldn't rather be on the

10   street, you're trying to get money, you go out there and get

11   it yourself, you're trying to sell dope to everybody, that's

12   where everybody sees your business, that's another form of

13   getting robbed.

14             You have access to get robbed because you are

15   selling everybody dope.

16             Yeah, some people moved up.  Some people that was

17   lower moved up and started getting on more, because they was

18   gone, so there was more money coming in.  The money that was

19   going through those dudes came to everybody else.

20   Q.  Was Lamar one of those people?

21   A.  He was always getting money, regardless, couldn't nobody

22   stop what he was doing, because it's like he had a personal

23   bonding with whoever he messed with, you know what I'm

24   saying, he was a people person, he knew how to treat people,

25   you know what I mean?

1           If they came with $20 he would give them more than

2     what they came for.

3           They all could be out right now, and we all get out

4     right now, and he would still be the same person.

5           He didn't change what he was doing.  He stayed the

6     same, you know what I'm saying?

7     Q.  He was a good businessman?

8     A.  He always has been, yes.

9     Q.  After Lamar was arrested, who moved up and filled that

10    void?

11    A.  Didn't nobody move up.  After Lamar got arrested it was

12    scary over there.  The neighborhood was already full of

13    cliques.  Everybody got cliqued out.  Me,  Bumpy--

14    Q.  Slow down.  You said cliqued out.  What does that mean?

15    A.  Groups, like three, us three might hang around, you

16    three might hang around, wasn't nobody trusting nobody no

17    more.  Everybody was scared, because everybody was getting

18    indicted.

19    Q.  Did you ever discuss the details of your proffer about

20    Jerome Bass with Jerry Coleman at any time when you were in

21    custody with him?

22    A.  No.  I ain't never discussed none of my proffers with

23    none of them.  I really ain't cool with too many of them.

24    Q.  Deandre Baker?

25    A.  No.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    Q.  Antone?

2    A.  No.

3    Q.  When you first got indicted, I think you testified that

4    it was based on four or five people, correct?

5    A.  Right.

6    Q.  And who was it based on?

7    A.  Julius Harris, Deandre Robinson, and Kevin Jones, and

8    Lamar Bass.

9    Q.  Who was the third one?  Deandre Robinson?

10   A.  Julius Harris, Deandre Robinson, Kevin Jones.

11   Q.  You said by the time it got to trial more people had

12   proffered on you?

13   A.  Yes.

14   Q.  Of the original four people, who put the most weight on

15   you?

16   A.  Julius Harris.

17   Q.  Do you know how much?

18   A.  42 ounces.

19   Q.  How much did Lamar put on you?

20   A.  Five ounces.  Four and a half, five ounces.

21   Q.  How about Deandre Robinson?

22   A.  I believe he put six and a half, seven ounces on me.

23   Q.  Kevin Jones?

24   A.  Four and a half, five ounces on me.

25   Q.  Julius was by far the most?

1    A.  Yes.

2    Q.  Was Julius your main supplier?

3    A.  I never bought dope from him in my life.  He witnessed

4    his uncle Cut Throat sell me some dope.

5            So he told a lie and said it was him, but he was

6    just there.  He never sold me any dope.

7            He was out on pretrial release.  When I got out of

8    jail he was on supervised release.  He was indicted already,

9    so I wouldn't mess with him because he was indicted.

10   Q.  But he saw it?

11   A.  He was there.  He didn't sell me nothing.

12   Q.  You talked about the fact that you have hard feelings

13   about Lamar.  Why?

14   A.  I ain't got no hard feelings like I want to kill him or

15   something.  I really don't.

16           I mean like if we was in jail together, we was in

17   the same mod, I wouldn't speak to him.

18           I wouldn't mess with him.  If he told on me, why

19   would I mess with him, you know what I mean?

20   Q.  Do you feel that same way about Kevin Jones?

21   A.  Yes.

22   Q.  Deandre Robinson?

23   A.  Yes.

24   Q.  And Julius Harris?

25   A.  Yes.

1    Q.  Any other people that proffered on you?

2    A.  Afterwards, yes.

3    Q.  These hard feelings that you have, is that because they

4    told on you?

5    A.  Yes.

6    Q.  Did Lamar lie on you?

7    A.  No.

8    Q.  But it was just because he told?

9    A.  If anything, you know what I'm saying, he could have

10   lied on me.  Of all of them that told on me, he could have

11   hurt me the worst.  No, he didn't lie on me.

12          MS. DUGAN-HINRICHS:  Nothing further, Your Honor.

13          THE COURT:  I think, ladies and gentlemen, for the

14   sake of my court reporter, we are going to take about ten

15   minutes before the next witness.  We are in recess.

16                  (2:45 p.m. - Recess Taken)

17          (At 3:00 p.m. on September 20, 2005, with counsel

18   for the parties and the defendant present, the following

19   proceedings were had in the presence of the jury:)

20          THE COURT:  Ms. Dugan-Hinrichs, you may call your

21   next witness.

22          MS. DUGAN-HINRICHS:  The government calls Jacara

23   Baker.

24          JACARA BAKER, PLAINTIFF'S WITNESS, SWORN

25                  DIRECT EXAMINATION

1    BY MS. DUGAN-HINRICHS:

2    Q.  Ma'am, could you please state your name again?

3    A.  Jacara Baker.

4    Q.  And how old are you?

5    A.  I'm 24 years old.

6    Q.  How far did you go in school?

7    A.  About the tenth grade.

8    Q.  And, Ms. Baker, are you a person who is currently

9    serving a sentence for a federal drug trafficking crime?

10   A.  Yes, ma'am, I am.

11   Q.  When were you sentenced?

12   A.  November 23, 2004.

13   Q.  What sentence did you receive?

14   A.  168 months.

15   Q.  Are you appearing here today under a cooperation plea

16   agreement with the government?

17   A.  Yes, I am.

18            MS. DUGAN-HINRICHS:  Your Honor, may I approach the

19   witness?

20            THE COURT:  You may.

21   BY MS. DUGAN-HINRICHS:

22   Q.  Ms. Baker, I've handed you Exhibit 7.  Do you recognize

23   that document?

24   A.  Yes, I do.  It's my plea agreement.

25   Q.  Do you have any secret or unwritten agreements other

1    than Exhibit 7?

2    A.  No, ma'am.

3    Q.  Does that appear to be an accurate copy of your plea

4    agreement?

5    A.  Yes, it is.

6    Q.  Could you look at the last page for me?  Does that page

7    bear your signature?

8    A.  Yes, it does.

9    Q.  And your attorney's signature?

10   A.  Yes, it does.

11   Q.  Who is your attorney?

12   A.  The attorney that is signed on there now is not my

13   attorney anymore.  My attorney now is Michael Gooch.

14   Q.  Who was your attorney at the time you entered your plea

15   agreement?

16   A.  Glenn Shapiro.

17          MS. DUGAN-HINRICHS:  The government offers

18   Exhibit 7.

19          MR. LEVY:  No objection.

20          THE COURT:  Exhibit 7 is received.

21   BY MS. DUGAN-HINRICHS:

22   Q.  Ms. Baker, what is your understanding of what that plea

23   agreement requires from you?

24   A.  Just my full cooperation.

25   Q.  And does that include your testimony?

1    A.   Yes.

2    Q.   And what are you hoping for in return for your

3    testimony?

4    A.   I'm hoping I get a Rule 35 at some point in time.

5    Q.   What is a Rule 35?

6    A.   Like a downward departure.

7    Q.   What does that mean to you?

8    A.   Time cut off my sentence.

9    Q.   Has anyone promised that you will receive a certain

10   sentence in exchange for your testimony?

11   A.   No, ma'am.

12   Q.   Do you understand that that agreement requires you to

13   testify truthfully?

14   A.   Yes, I do.

15   Q.   And do you understand that there are serious penalties

16   for testifying falsely?

17   A.   Yes, I do.

18   Q.   Have you testified before, ma'am?

19   A.   Yes, I have.

20   Q.   How many times?

21   A.   Two times.

22   Q.   How many persons do you estimate that you proffered on

23   when you talked to the police officers?

24   A.   I would say about thirty people.

25   Q.   Were you told that you had to talk on a certain number

1    of people to get a departure?

2    A.  No.

3    Q.  Were you told that you had to talk on particular people?

4    A.  No.

5    Q.  Other than the felony conspiracy charge that you are

6    serving time for, have you been convicted of other felonies?

7    A.  Yes, I have.

8    Q.  And when was that?

9    A.  August 6, 2001, I was convicted of possession with

10   intent to distribute charge.

11   Q.  What drug was that?

12   A.  Crack cocaine.

13   Q.  Did you serve jail?

14   A.  Yes, I did.  I got probation, but I violated, so I ended

15   up serving jail time.

16   Q.  How much time did you serve?

17   A.  Six months.

18   Q.  Any other felonies?

19   A.  No, ma'am.

20   Q.  Have you ever been convicted of giving false

21   information?

22   A.  Yes, I have.

23   Q.  How many times?

24   A.  Probably about five or six.

25   Q.  And --

1   A.  I'm not totally accurate on that, but I know somewhere

2   around there.

3   Q.  More than one time?

4   A.  Yes.

5   Q.  Do you know the details surrounding those?

6   A.  Yes.

7   Q.  Can you describe it for me?

8   A.  I got pulled over, I had warrants, so I used somebody

9   else's name or something like that.

10  Q.  Every time you got pulled over did you give them a

11  different name?

12  A.  If I didn't have a warrant I'll use my name.

13  Q.  You are aware of when there was a warrant out for you?

14  A.  Uh-huh.

15  Q.  Are you a member of a gang or were you?

16  A.  Yes, I was.

17  Q.  What gang?

18  A.  37th Street Crips.

19  Q.  Do you have a street name?

20  A.  Yes, I do.

21  Q.  What is it?

22  A.  Blue.

23  Q.  How long were you in the gang?

24  A.  Since like '97.

25  Q.  And why were you in the gang?

1    A.   Probably was just the thing to do.

2    Q.   What were the activities of your gang?

3    A.   Partying, drinking, smoking weed, selling drugs,

4    stealing cars, anything, everything negative.

5    Q.   Have you heard the term gang-banging?

6    A.   Yes.

7    Q.   What does that mean?

8    A.   Fighting, gang fights, shootings, selling drugs.

9    Q.   Did you participate in those activities as well?

10   A.   Yes, I did.

11   Q.   Did you operate in a specific area of town?

12   A.   Yes, I did.

13   Q.   What area are we talking about?

14   A.   Between 37th and 38th and Grand.

15   Q.   Who else was in your gang?

16   A.   Do you want me to name all the names?

17   Q.   If you could.

18   A.   All the names?

19   Q.   As best as you can.

20   A.   Lamar Bass, JeVaughn Erwin, Chris Grant, William

21   Hawkins, William Watson, Mario Watson, Marcus Hudson, Jeremy

22   Walker, Jimmie Swain, Columbus Brown, Royce Brown, Jermaine

23   Brown, Bernard Long, Ronnie Long, Darnel Long.  I am sure

24   there were more, but that's off the top of my head.

25   Q.   And did being in a gang help you to deal drugs?

1    A.  Pretty much, yes.

2    Q.  How?

3    A.  Because I wasn't dealing drugs before I started in the

4    gang.  I mean, it was a thing to do, so that's what we did.

5    Q.  Did you get your drugs from other gang members?

6    A.  Yes, I did.

7    Q.  Did you sell drugs to other gang members?

8    A.  Yes, I did.

9    Q.  With regards to people who were outside your gang, did

10   you buy and sell drugs with people from other gangs?

11   A.  Yes, I did.

12   Q.  Which ones?

13   A.  Other Crips, some Bloods, that's about it.

14   Q.  40th Ave?

15   A.  Yes.

16   Q.  Crown Point?

17   A.  Yes.

18   Q.  Jaynes Street?

19   A.  A couple.

20   Q.  Spencer Projects?

21   A.  Yes.

22   Q.  Did you have more than one supplier?

23   A.  Yes.

24   Q.  Why?

25   A.  Because if one person wasn't doing something at that

1   point in time I would go to somebody else.  I wouldn't wait

2   around for one person.

3   Q.  So you always had a constant supply?

4   A.  Yes.

5   Q.  Did you have a job?

6   A.  No.

7   Q.  How did you have enough money to live?

8   A.  Drug money.

9   Q.  Did you make a lot of money selling drugs?

10  A.  Yes.

11  Q.  Can you estimate for me how much?

12  A.  In all, ever, ever?

13  Q.  Yes.

14  A.  More than a quarter million.

15  Q.  And does that begin when you started in that gang?

16  A.  Yes.

17  Q.  What did you spend it on?

18  A.  Clothes, my family, pay my mom's bills with it, ended up

19  having a child.  I supported her with drug money.  Myself.

20  My siblings, just whatever, whatever I needed.

21  Q.  Do you know a person by the name of Jerome Bass?

22  A.  Yes, I do.

23  Q.  Does he have a street name?

24  A.  Rommie.

25  Q.  How do you know him?

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    A.   From around the neighborhood.  He's Lamar Bass's little

2    brother.

3    Q.   Is the person you know as Rommie, is he present in

4    court?

5    A.   Yes.

6    Q.   Could you please describe where he is seated and what

7    he's wearing?

8    A.   Seated to the left of me.  He's wearing a gray shirt

9    with red suspenders and red tie.

10            MS. DUGAN-HINRICHS:  May the record reflect the

11   witness has identified the defendant?

12            THE COURT:  It shall.

13            MS. DUGAN-HINRICHS:  Thank you.

14   BY MS. DUGAN-HINRICHS:

15   Q.   How long have you known Rommie Bass?

16   A.   Since about 1997.

17   Q.   How did you meet him?

18   A.   From coming around in our neighborhood with his brother.

19   Q.   Did he live in the neighborhood?

20   A.   Not far from it.

21   Q.   When you are talking about the neighborhood, are you

22   talking about a specific house or location?

23   A.   Just our territory.

24   Q.   Do you know where he lived?

25   A.   Yes, I do.

1   Q.  Do you know what kind of car he drove?

2   A.  Yes, I do.

3   Q.  Where did he live?

4   A.  Off of 37th and Spaulding -- or 37th and Bedford.

5   Q.  What kind of car did he drive when you knew him?

6   A.  Since I've known him he had like a green color or light

7   green Cutlass, whatever, I think it was a Cutlass, and then

8   an orange Monte Carlo, if I ain't mistaken.

9   Q.  Any other cars you remember him driving?

10  A.  Yes.  He used to drive his brother's car, a red El

11  Camino; purplish/blue Malibu.

12  Q.  You knew those cars to be Lamar's?

13  A.  Yes.

14  Q.  This orange Monte Carlo, could you describe it for me?

15  A.  Orange, like a glossy orange, chrome rims, 22s, 20s.

16  Q.  When you say 22s or 20s, what does that mean?

17  A.  Rims.  The size of the tires.

18  Q.  The size of the rims?

19  A.  Yes.  That's how it was when I left the streets.  If

20  he's added or taken off from it since then, I wouldn't know

21  nothing about that.

22  Q.  When were you arrested?

23  A.  August 26, 2003.  About two years ago.

24  Q.  So you remember that car from right before your arrest?

25  A.  Yes.

1    Q.  Do you know Damian Jackson?

2    A.  Yes, I do.

3    Q.  What street gang is he associated with?

4    A.  He said he associated with 37th Street, but he hangs out

5    in Spencer.  So I really don't know, but he claims he's

6    around from where I am from, so you could say he's from

7    around there.

8    Q.  How about Deandre Baker?

9    A.  That's my brother.

10   Q.  What gang is he associated with?

11   A.  Crown Point.

12   Q.  Does he have a nickname?

13   A.  BG.

14   Q.  How about Karlos Harper?

15   A.  He was a Blood, but he hangs around in our neighborhood

16   a lot, but he's not from our neighborhood, though.

17   Q.  Terrell Jackson?

18   A.  Terrell is from my neighborhood.

19   Q.  When you are using the phrase from my neighborhood, does

20   that mean 37th Street?

21   A.  Yes.

22   Q.  How about Royce Brown?

23   A.  Royce is my neighborhood.

24   Q.  Antone Green?

25   A.  He is from 40th Ave.

1    Q.  Jerry Coleman?

2    A.  He's from 40th Ave.

3    Q.  I know you said that you saw Jerome around the

4    neighborhood.  Was he a member of the 37th Street Gang?

5    A.  Not actively.  Not active.  He didn't do all the

6    activities that we did as far as shooting and gang-banging

7    and all that because he was like scared to do all that.

8    Q.  Did he do the activities other than that what you

9    mentioned?

10   A.  He did sell drugs around there, that's it.  No fighting,

11   none of that.

12   Q.  To be a member of your gang, did you have to do the

13   gang-banging?

14   A.  Yeah.

15   Q.  Then how come he was permitted to sell drugs without

16   doing the gang-banging?

17   A.  He was a homey's little brother.  They respected him.

18   Q.  They respected Jerome?

19   A.  Yes.

20   Q.  Because he was Lamar's little brother?

21   A.  Yes.

22   Q.  Did you ever have the occasion to conduct illegal

23   business with Rommie Bass?

24   A.  Yes, I have.

25   Q.  Do you remember the first time?

1    A.  I want to say in '98, but he wasn't of legal age at that

2    time, I don't think, so legally '99, I would say.

3            MR. LEVY:  Judge, at this point I'm going to object

4    to this line of testimony on relevance grounds.

5            THE COURT:  Sustained.  It's outside the scope of

6    the conspiracy dates.  So it's not relevant at this

7    juncture.

8            If there is evidence of other acts I would like to

9    hear them, if at all, after we hear evidence inside the

10   scope of the indicted conspiracy.

11   BY MS. DUGAN-HINRICHS:

12   Q.  Ma'am, I would like to refer you to the year 2001,

13   January 1, 2001, and talk about events that occurred after

14   that date, okay?

15   A.  Okay.

16   Q.  Did you ever have the occasion to conduct illegal

17   business with Rommie after that time?

18   A.  Yes, I had.

19   Q.  And do you remember when?

20   A.  Right off exact dates or nothing like that, no, I don't.

21   I know a lot in the summer of 2001, towards the end of the

22   year.

23   Q.  Of 2001?

24   A.  Yes.

25   Q.  Let's talk about the summer of 2001 first.  Where did

1    you and Jerome conduct your illegal business?

2    A.  In front of Sheri Brown's house.  In front of Royce's

3    house.  At the house on 37th and Spaulding -- in 2001 he

4    wasn't on Spaulding.  He was there 2002.

5             But in front of his house or in front of Royce

6    Brown's house.  Right off of 38th and Meredith.

7    Q.  Two specific locations, Royce's house, in front of

8    Royce's house or in front of Jerome's house?

9    A.  Yes.

10   Q.  And in the summer of 2002 how many times -- let me ask

11   you this.  Did you buy crack from him or did you sell crack

12   to him?

13             MR. LEVY:  I'm sorry --

14             THE COURT:  I will sustain that objection.  I'm not

15   sure we are talking about 2001 or 2002.  The dates have just

16   changed.

17             So if you could clarify with the witness what dates

18   she's talking about, I think that would be helpful.

19   BY MS. DUGAN-HINRICHS:

20   Q.  In the summer of 2001, did you buy or sell crack cocaine

21   with Jerome Bass?

22   A.  Yes, I did.

23   Q.  Where?

24   A.  In front of Royce Brown's house on 38th and Meredith and

25   on 37th and Bedford at his house.

1    Q.  How many times?

2    A.  Just roughly I'm going to say eight times, between both

3    of them places in 2001, the summer.

4    Q.  Is there anything significant about it being summer or

5    do you just remember it was summer?

6    A.  I remember it was summer, it was real hot outside.

7    Q.  Now, of these eight transactions that took place, who

8    sold what to whom?

9    A.  He always sold to me.

10   Q.  In what amounts?

11   A.  Ounces.

12   Q.  How many ounces?

13   A.  Just between that time?

14   Q.  Yes.

15   A.  I'm going to say seven, roughly.

16   Q.  You mean seven total?

17   A.  Yes, in that time, in 2001, the summer.

18   Q.  If there were seven total ounces and it happened about

19   eight times, then it was less than an ounce each time?

20   A.  I think one time it was, or twice maybe, it was a half

21   ounce, which equals to an ounce.

22   Q.  How much did he charge you for a half ounce?

23   A.  $500.

24   Q.  And how much did he charge you for one ounce?

25   A.  $950 to a thousand.  It all depends.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    Q.  Depends on what?

2    A.  Whatever kind of mood he was in, or how he wanted to

3    sell it at that time.  If he needed extra money.

4    Q.  So would you pay the additional cost?

5    A.  Yes, I would pay it.

6    Q.  After the summer of 2001 at Royce Brown's or at Jerome

7    Bass's house, when was the next time that you bought or sold

8    crack from Jerome Bass?

9    A.  Towards the end of the year, like -- let me see -- fall,

10   like November I want to say, between November and December.

11   Q.  Of what year?

12   A.  2001.

13   Q.  And how can you remember that's when it was?

14   A.  Because I remember it was toward the end of the year,

15   like towards Christmas time, or around Christmas, going

16   towards Christmas, a little bit after Thanksgiving, I

17   remember the holidays.

18   Q.  How many transactions took place between you and Rommie

19   at the end of 2001?

20   A.  I'm going to say two.

21   Q.  Do you remember them specifically?

22   A.  You mean like how much or whatever?  Yes, it was ounces

23   both times.

24   Q.  How many the first time?

25   A.  One.

1   Q.  For how much?

2   A.  For between either nine hundred or a thousand.  I can't

3   remember.  It always bounced around with him.

4   Q.  And the second time?

5   A.  It was an ounce.

6   Q.  Same price range?

7   A.  Yes.

8   Q.  Now, the time from Thanksgiving to the end of the year

9   is just a little bit over a month, five weeks, is that fair?

10  A.  Uh-huh.

11  Q.  How long would it take you to get rid of two ounces in

12  that five-week period of time?

13  A.  It all depends on how I was selling it, but not that

14  long, though.  A couple weeks.

15  Q.  Okay.

16  A.  Week and a half.

17  Q.  And who were you selling to?

18  A.  Smokers, or if somebody -- like somebody young or

19  whatever wanted to buy an eight-ball, or a dub or something,

20  I would sell them that.

21  Q.  What is an eight-ball?

22  A.  It's 3.5 grams, half of a quarter, a quarter ounce.

23  Q.  What is a dub?

24  A.  It's like double -- like if somebody brings me a hundred

25  dollars and they want two hundred dollars worth of drugs,

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    and that was a double up.  They double their money.

2    Q.  After the end of the year in 2001, when was the next

3    time that you and Rommie Bass bought or sold crack to one

4    another?

5    A.  Exact dates and all that, I'm not really on point on

6    that, but I know it was after -- I had a kid in 2002,

7    February, I know it was after then, I know that.  Maybe it

8    was in late spring.

9    Q.  And do you recall, what was the quantity of that

10   transaction?

11   A.  Any time I bought from him it would have been more than

12   a half ounce.  A half ounce or more, or more than an ounce,

13   so I'm -- there's been so many times I dealt with him I

14   really can't tell you exactly that, but I know it was more

15   than an ounce; no less than a half.

16   Q.  And how many transactions took place in late spring of

17   2002?

18   A.  At that time we was dealing with each other a lot

19   because we was at the house on 37th and Spaulding where

20   Marcus Hudson and his brother ran the house on the corner.

21        And he lived right up the street, so if I ever

22   called Lamar, Lamar would send Rommie.

23        If Lamar couldn't bring it right then he would send

24   Rommie.

25        Rommie would walk down or ride a bike, whatever,

1    from his house, however he wanted to get there.

2    Q.  Now, in these transactions that you've described, would

3    you call and order the crack from Lamar and Rommie would

4    show up?

5    A.  Yes.  He would tell me he would send Rommie.

6    Q.  So everything that you've talked about thus far since

7    2001 you would order it from Lamar?

8    A.  Pretty much, yes.

9    Q.  And then Rommie would be the one that would deliver it

10   to you?

11   A.  Yes.

12   Q.  And then --

13   A.  Or we would be at the same spot and I would want some

14   from Lamar, and Lamar would be like I ain't got it with me.

15   Let me call Rommie, and he would call Rommie and Rommie

16   would bring it.

17   Q.  Did you always give the money to Rommie?

18   A.  A lot of times.  Sometimes I give it to Lamar.  A lot of

19   times I gave it to Rommie.

20   Q.  When you would get the crack from Rommie, was it ever

21   wrapped up in anything?

22   A.  Just in plastic.

23   Q.  Like a plastic bag?

24   A.  Yes.

25   Q.  Was it ever wrapped in clothes?

1    A.  No.

2    Q.  Was it a clear plastic bag?

3    A.  Yes.

4    Q.  So you could see what it was?

5    A.  Yes.

6    Q.  How big is an ounce, Ms. Baker, physically?  Is there a

7    common object you can describe for me that would be about

8    the same size?

9    A.  About the size of this cup.  A little bit bigger.

10   Q.  While at the house on Spaulding, did you see Jerome Bass

11   there often?

12   A.  Yes.

13   Q.  Is that kind of where you guys all hung out?

14   A.  Yes.

15   Q.  What would you see him do?

16   A.  Sell drugs with the rest of us.  Sell drugs.  Sit

17   around.

18        He wasn't smoking marijuana.  A lot of us would be.

19   We would shoot dice.  He don't shoot dice.

20   Q.  When you say he would sell drugs with the rest of you,

21   can you describe that for us?

22   A.  I mean it was a crack house.  Smokers come and get what

23   they want.

24        Other people come.  If they want to buy weight,

25   they would come there, because they knew we was there.

1    Q.  So other than the times that you specifically bought

2    from Rommie at that house, can you tell me how many times

3    you saw him sell to a customer at that house?

4    A.  Not very rare at all.

5    Q.  Let me ask it this way.  Did he sell a lot?

6              MR. LEVY:  Object to the form.

7              THE COURT:  Sustained.

8    BY MS. DUGAN-HINRICHS:

9    Q.  When you said that it wasn't very rare, can you explain

10   that better for me?

11   A.  He really wasn't no person that would sell pieces.  He

12   would sell his brother's weight.  He didn't sell pieces

13   like that.

14   Q.  When you say pieces, is that what you are talking about

15   in terms of customers?

16   A.  Yes.

17   Q.  The smokers who would come to the house?

18   A.  Yes.

19   Q.  How much do you estimate, total, you bought from Rommie

20   at the 37th and Spaulding house in late spring of 2002?

21   A.  Total, I'm going to say nine ounces.

22   Q.  Were there any other times that you bought drugs from

23   Jerome Bass after late spring of 2002?

24   A.  Not very many times because there was an altercation

25   with him, or whatever, and my brother supposedly.

1    Q.  Let's talk about that.  Did you have anything to do with

2    that altercation?

3    A.  No, I didn't.

4    Q.  What do you know about it?

5    A.  Supposedly they said that my brother stole Rommie's car,

6    and him and somebody else supposedly had stole his car.

7    That's what I know about it.

8    Q.  Which brother are you referring to?

9    A.  Deandre.

10   Q.  Did you ever talk to Deandre about that?

11   A.  Yes, I talked to him about it.  He said he didn't do it.

12   Q.  Now, do you know when that happened?

13   A.  August, July, August, of that summer, 2002, somewhere

14   around there.  I ain't too specific on dates like that, but

15   I know somewhere around there, between July and August.

16   Q.  Of 2002?

17   A.  Uh-huh.

18   Q.  And following that altercation did anything else happen

19   to Mr. Bass that you are aware of, to Jerome Bass?

20   A.  No, not that I've seen or I'm aware of, no.  I know

21   there was a car accident, or whatever, where his brother

22   ended up in the hospital for trying to chase my brother in

23   another car, shoot at them, and they ended up getting in a

24   wreck or something like that.

25   Q.  Do you know when that happened?

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    A.  No, I don't.

2    Q.  You said that because of this altercation the crack

3    dealing ended, correct?

4    A.  Yes.

5    Q.  Why?

6    A.  I mean, if he thought my brother stole something from

7    him he couldn't trust me.

8    Q.  And so it was at that point that you stopped dealing

9    with Jerome Bass?

10   A.  Yes.

11          MS. DUGAN-HINRICHS:  May I have a moment, Judge?

12          THE COURT:  Yes, you may.

13   BY MS. DUGAN-HINRICHS:

14   Q.  Ma'am, have you ever discussed your testimony at this

15   trial with anybody?

16   A.  No, I have not.

17   Q.  When you would purchase an ounce, half ounce to ounce

18   quantities, what would you do with it?

19   A.  I would sell it to smokers, or like I said, if somebody

20   was around that wanted to buy a little dub, or whatever, an

21   eight-ball, I would sell that.

22   Q.  Did you always keep that half ounce on you at all times?

23   A.  Pretty much, yes.

24   Q.  Did everybody else do that, too?

25   A.  Pretty much, yes.

1   Q.  Did you ever know any of your fellow gang members to

2   bury their crack cocaine?

3   A.  Yes, I did.

4   Q.  Can you tell me about that?

5   A.  Lamar Bass used to always bury his.  If it wasn't around

6   his house, it would be around the neighborhood.

7        A lot of the males, since they don't really have

8   nowhere to keep them on their person, they would bury or

9   stash it somewhere around, wad it up in a piece of paper,

10  throw it somewhere where they know where they can go to it.

11  I kept mine on me.

12  Q.  You kept it on your person?

13  A.  Uh-huh.

14  Q.  Up until this confrontation you had the occasion to be

15  around both Jerome and Lamar a lot, correct?

16  A.  Yes.

17  Q.  Can you describe for me the relationship between them as

18  you observed it?

19  A.  It was real tight.

20  Q.  Was Lamar around when Rommie was delivering the crack

21  cocaine?

22  A.  Sometimes and sometimes not.  Most of the time no,

23  though.

24  Q.  Is that why you would get it from Rommie?

25  A.  Yes.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    Q.  In your experience with Rommie Bass, did he know the

2    quantities and prices to charge?

3    A.  Yes, he did.

4    Q.  Were you ever aware of Mr. Bass receiving any benefits

5    for helping Lamar sell the crack cocaine?

6    A.  I'm pretty sure, yeah.

7    Q.  Did you ever talk to him about any of that?

8    A.  No.

9          MS. DUGAN-HINRICHS:  Your Honor, may I have a

10   moment to confer?

11         THE COURT:  Yes, you may.

12         MS. DUGAN-HINRICHS:  Thank you, ma'am.  Your Honor,

13   I don't have any further questions.

14         THE COURT:  Mr. Levy, cross-examination?

15                   CROSS-EXAMINATION

16   BY MR. LEVY:

17   Q.  Ms. Baker, Rommie Bass was selling you ounces and half

18   ounces in 2001.  Is that your testimony?

19   A.  Yes.

20   Q.  And you sold those quantities during 2001?

21   A.  Yes.

22   Q.  Is that your testimony to this jury today?

23   A.  Yes.

24   Q.  You're telling the jury that you sold drugs, you sold

25   crack cocaine, in 2001?

1    A.  Yes.

2    Q.  Do you remember testifying in the case of Christopher

3    Grant?

4    A.  Yes.

5    Q.  Mr. Martinez of the United States Attorney's office was

6    asking you questions?

7    A.  Who was that?  The prosecutor, Mr. Martinez?

8    Q.  Yes.

9    A.  Yes.

10   Q.  Do you remember Mr. Martinez asking you, "When you say

11   hanging out, what did that include?"

12          And your answer is, "Drinking, smoking, selling

13   drugs, whatever."  Do you remember saying that?

14   A.  Yes.

15   Q.  You were under oath, weren't you?

16   A.  Yes.

17   Q.  Swore to tell the truth like you did today?

18   A.  Yes.

19   Q.  Jury in the jury box like there is today?

20   A.  Yes.

21   Q.  And then Mr. Martinez asked you, "When you say selling

22   drugs, what drugs are you talking about?"

23          And your answer was, "Crack cocaine; weed."

24   A.  Yes.

25   Q.  Is that what you testified to under oath?

1    A.  Yes.

2    Q.  In the Christopher Grant case?

3    A.  Yes, I did.

4    Q.  And then Mr. Martinez asked you, "And how long did that

5    continue?"

6            And your answer was, "All the way up until 2000,

7    and then it continued in 2002 up until 2003."

8            Was that your testimony in the Christopher Grant

9    case?

10   A.  I don't remember everything I said.

11   Q.  You don't?

12   A.  But whatever I told was the truth.

13           MR. LEVY:  May I approach and show her a

14   transcript?

15           THE COURT:  Yes, you may.

16           MR. LEVY:  Read that.

17           THE COURT:  Just to yourself, ma'am.

18           THE WITNESS:  If this is in the Chris Grant case, I

19   was talking about him, but it ain't a year from '97 that I

20   can't remember not selling drugs.

21           So if you are trying to say I did not sell drugs in

22   2001, you got something misconstrued.

23   BY MR. LEVY:

24   Q.  I am not saying anything.  I'm just asking you if you

25   testified to that in the Christopher Grant case?

1    A.  Okay, if it's written right there, yes, I did.  If it's

2    in the Chris Grant case I was talking about me and him, his

3    dealings.

4             I wasn't talking about me and Rommie's dealings.  I

5    was talking about me and him.

6    Q.  It didn't say that, did it?

7    A.  No.

8    Q.  It just said you sold up until 2000 and then you

9    continued at 2002 until 2003, correct?

10   A.  Yes.

11   Q.  That's all I said.

12   A.  Okay.  I caught a drug case in 2001.  So you can't say I

13   wasn't selling drugs then.  I caught my drug case March 21,

14   2001.

15            MR. LEVY:  Move to strike that as not responsive.

16            THE COURT:  Sustained.  The answer is stricken.

17   BY MR. LEVY:

18   Q.  Where is your baby?

19   A.  My mom got her.

20   Q.  How old is your baby?

21            MS. DUGAN-HINRICHS:  Objection, relevance.

22            THE COURT:  Overruled.

23   BY MR. LEVY:

24   Q.  How old is your baby?

25   A.  Three years old.

1  Q.  You want to get out of jail, don't you, to see your baby

2  and raise your baby?

3  A.  Yes, I do.

4  Q.  You don't want your baby to be a teenager when you get

5  out of prison, do you?

6  A.  No, I don't.  I see her quite often, though, in jail,

7  that's in jail, too, so, it's not like I don't see her.

8  Q.  That's not where you want your baby to see her mom, is

9  it?

10  A.  No, it ain't.

11  Q.  You lied to the police on five or six occasions so you

12  wouldn't go to jail for misdemeanor traffic stuff, isn't

13  that right?

14  A.  Pretty much, yeah.

15  Q.  And --

16  A.  I was younger then.

17  Q.  You lied about your name to avoid going to jail on

18  misdemeanors?

19  A.  Yes, I did.

20  Q.  And you lied to the police five or six times by giving a

21  false name?

22  A.  Yes, I did.

23  Q.  Because you didn't want to go to jail?

24  A.  Yes, I did.

25  Q.  This is a little more serious than a traffic

1   misdemeanor, isn't it?

2   A.  Yeah, but I have been locked up long enough I'm used to

3   it, so it ain't nothing to me.

4   Q.  Doesn't mean anything to you?

5   A.  No.

6   Q.  168 months, just a piece of cake?

7   A.  As long as I tell the truth, and do what I'm supposed to

8   do, I know I will get out, you know what I mean?

9   Q.  The truth as you know it?

10  A.  The truth, period.

11  Q.  Isn't it true that the locations where you had these

12  transactions with Jerome Bass included the duck pond at

13  Fontanelle?

14  A.  Yes.

15  Q.  And the Walgreens on Ames and Fontanelle?

16  A.  Yes.  I dealt with him there before, too.

17  Q.  Where?

18  A.  Both of them places.

19  Q.  Where at the Walgreens?  In the parking lot or inside

20  the store?

21  A.  The parking lot.  Actually he had me follow around the

22  corner.  We met there and he had me follow him around the

23  corner.

24  Q.  That business was open, so you didn't want to do it in

25  the parking lot?

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1   A.  Right.

2   Q.  That would have been in 2001, according to you?

3   A.  2001 or 2002.  2002.  I can't remember.  I ain't exactly

4   on dates, sir, none of that.

5          I smoked a lot of weed and my memory is not all the

6   way on point, but a lot of stuff I do remember and it's up

7   to date.

8   Q.  I am trying to pin you down on the Walgreens at

9   Fontenelle Boulevard and Ames Avenue.

10  A.  Okay.

11  Q.  That's where you had your dealings with Rommie Bass in

12  you say 2001 and up until the auto theft in 2002; is that

13  right?

14  A.  Only one time we dealt there.  We didn't even deal

15  there.

16          I called him.  He told me to meet him there.  When

17  we got there it was broad daylight.  He said follow me

18  around the corner.

19  Q.  I want to make sure we are talking about the same

20  Walgreens.  The one on 43rd and Ames?

21  A.  Right by Fontenelle Park, yes.

22  Q.  The one that opened in October of 2002?

23  A.  I don't know when it opened.  I don't know when it

24  opened.  I didn't ask them when it opened.

25  Q.  Of course, if it opened in October of 2002 it would be

1    very difficult for you to have a transaction with Rommie

2    Bass at the parking lot of the Walgreens earlier, wouldn't

3    it?

4    A.  If it wasn't open then something else was there, but

5    that's where the dealing was at then.

6          That's where he told me to meet him at.  I followed

7    him around the corner from there.  Whatever you want to say.

8    Q.  That's what you said in your proffer, isn't it?

9    A.  That's what I said.  I remember saying that.

10   Q.  Walgreens, Fontenelle Boulevard and Ames Avenue,

11   correct?

12   A.  Yes, that's correct.

13   Q.  Now, when were you arrested in this case?

14   A.  August 26, 2003.

15   Q.  You know that Lamar proffered on you, don't you?

16   A.  Yes.  I didn't know at the time I got arrested, but I

17   know now.

18   Q.  You knew it by the time you entered your plea, didn't

19   you?

20   A.  Yes, I did.

21   Q.  Because your lawyer told you?

22   A.  Yes, he did.

23   Q.  And that didn't make you very happy, did it?

24   A.  Everybody that proffered on me didn't make me happy, not

25   just Lamar.

1    Q.  I'm talking about Lamar.  I don't care about anybody

2    else.

3    A.  Nobody that proffered on me I was happy with.

4    Q.  You had hard feelings toward them, didn't you?

5    A.  I knew how the game goes, so actually there wasn't no

6    hard feelings.

7    Q.  When you were arrested on this charge, you were actually

8    released on pretrial, weren't you?

9    A.  Yes, I was.

10   Q.  You made a promise to the court under oath that you

11   would act and conduct yourself in a certain way, didn't you?

12   A.  Yes, I did.

13   Q.  You broke the promise?

14   A.  I messed up, just like everybody else.

15   Q.  I don't care about everybody else.  You answer the

16   question about you.

17        You broke that promise that you made to the court

18   to behave and act as a responsible law-abiding citizen,

19   didn't you?

20   A.  Yes, I did.

21   Q.  What did you do?

22   A.  When I got out?

23   Q.  What did you do to cause your pretrial to be revoked and

24   get thrown in jail?  What did you do?

25   A.  I still sold drugs when I got out.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1   Q.  So you still sold drugs when you got out of jail on this

2   charge when you promised Judge Thalken or Judge Gossett that

3   you wouldn't do it, correct?

4   A.  That's correct.

5   Q.  You did that under oath and you lied, didn't you?

6   A.  People make mistakes.  I wasn't lying under oath, or

7   whatever you're trying to say I did, but people make

8   mistakes, just like I said.

9           That's the only way I know how to survive, so that

10  is what I did.  I couldn't get no job.

11  Q.  By what?  Lying?

12  A.  No.

13  Q.  You lied to the police five or six times to stay out of

14  a jail on a misdemeanor.  You lied to --

15  A.  How do you know it was a misdemeanor that I lied to the

16  police on?

17  Q.  You lied to one of the judges of this court, didn't you?

18  You didn't keep a promise, did you?

19  A.  No.  People make mistakes every day.  You make them,

20  too.  You lied before.

21  Q.  Ms. Baker, I'm not on trial.  I'm not sitting up there

22  in orange.

23  A.  It don't matter.

24  Q.  My baby doesn't have --

25          MS. DUGAN-HINRICHS:  Your Honor, I object.

1          MR. LEVY:  I withdraw that.  I'm sorry.  I should

2     know better.  I apologize to the court and the jury.

3          THE WITNESS:  I --

4          THE COURT:  Ma'am, you can only talk when you are

5     asked the question.

6     BY MR. LEVY:

7     Q.  Now, after you were put in jail for violating your

8     pretrial release, where were you kept?  What institution?

9     A.  Douglas County Corrections.

10    Q.  Was that up until the time you pled?

11    A.  Yes.

12    Q.  And then when you were sentenced they sent you somewhere

13    else?

14    A.  Yes.

15    Q.  Where?

16    A.  After I pled I got sent to Jackson County in Holton,

17    Kansas.

18          I came back to get sentenced.  After I got

19    sentenced I was sent to CCA, where I went to Oklahoma, and I

20    went to prison from there in Carswell, Texas.

21    Q.  Have you talked to your brother Deandre since you have

22    been in jail?

23    A.  Yes, I have.  We write.  We got correspondence.

24    Q.  You write to each other?

25    A.  Yes.

 1    Q.  Do you talk to him on the phone?

 2    A.  No.  How am I going to talk to him on the phone if I'm

 3    in jail and he's in jail?

 4    Q.  Where there's a will there's a way.

 5    A.  No.

 6              MR. LEVY:  May I have a moment to review my notes?

 7              THE COURT:  Yes, you may.

 8    BY MR. LEVY:

 9    Q.  You know if the prosecutor doesn't make the motion for

10    downward departure you're stuck at 168 months, aren't you?

11    A.  Yes, I'm aware of that.

12    Q.  So it may be up to the judge to cut your sentence, but

13    the judge's hands are tied until the prosecutor makes that

14    motion, isn't that correct?

15    A.  Yes, that's correct.

16    Q.  So it's in your best interest to please the prosecutor,

17    isn't it?

18    A.  I'm telling the truth.  I don't know about pleasing the

19    prosecutor or whatever you want to call it.

20    Q.  That wasn't my question.  It's in your best interest to

21    please the prosecutor, isn't it?

22    A.  It's in my interest to tell the truth.  That's all I

23    came here for today.

24              She's not even my prosecutor.  So, no, I'm not

25    trying to please no prosecutor or please nobody else.

1              MR. LEVY:  That's all.

2              THE COURT:  Redirect?

3              MS. DUGAN-HINRICHS:  Just a few questions, sir.

4                        REDIRECT EXAMINATION

5    BY MS. DUGAN-HINRICHS:

6    Q.  Ms. Baker, the defense attorney asked you about your

7    testimony in the case of Christopher Grant.  Do you remember

8    that?

9    A.  Yes.

10   Q.  When he was referring to sales of crack cocaine in 2001,

11   that dealt with only Christopher Grant, correct?

12   A.  Yes, I was only talking about Christopher Grant in that

13   trial that I testified at.

14              I was not talking about me, Christopher Grant,

15   Lamar Bass, Rommie Bass.  No one else.  Me and his dealings

16   only.

17   Q.  During the year 2001 you were selling crack to a lot of

18   different people, correct?

19   A.  Yes.

20   Q.  Including the defendant?

21   A.  Yes -- no.  The defendant Rommie Bass?

22   Q.  Yes.

23   A.  I never sold crack to him.  He always sold it to me.

24   Q.  I mixed that up.  I'm sorry.  What is your current

25   Bureau of Prisons assignment?

1    A.   Where I am placed at?

2    Q.   Yes.

3    A.   Fort Worth, Texas.   Carswell.

4    Q.   And is there a program down there that you are

5    attempting to get into?

6    A.   Yes.

7    Q.   And if you get into that program, how long is that?

8    A.   It's a total of, I believe I want to say nine months,

9    but if you do like everything you are supposed to do you can

10   get out earlier than that.   Between six and nine months.

11   Q.   And you are planning on participating in that, correct?

12   A.   Yes.   If I'm back on time I can participate in that.

13   Q.   When you got out on pretrial release, and the defense

14   attorney asked you about swearing to the judge that you were

15   going to follow the rules, do you remember that?

16   A.   Yes.

17   Q.   When you held up your hand and you swore the time that

18   you did that, did you intend to go out and sell crack?

19   A.   No, it wasn't my motive, but --

20   Q.   It just happened?

21   A.   It does happen.

22   Q.   I think your words were that was the only way you knew

23   how to survive?

24   A.   Yes.   I never had a job legally or nothing like that.   I

25   have been doing this since I was sixteen, fifteen years old,

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    since '97.  It's basically all I know.

2             My family, my mom and dad was drug heads, and I

3    never had nothing I wanted.

4             So I wanted to get on my own, so that is what I did

5    for a living all these years.

6             That's all I know, but, no, I didn't have no

7    intentions of going out there and selling drugs.

8             I wanted to get a job.  I got turned down for like

9    three jobs.

10            How can you get a job?  People don't want to be

11   giving felons jobs, so that is what I turned to.  That's

12   what I did.

13   Q.  This program that you want to enter at Fort Worth, is

14   that going to help teach you some skills to get a job when

15   you get out?

16   A.  Yes, it is.

17   Q.  You have written correspondence with your brother?

18   A.  Yes, I do.

19   Q.  Did you ever talk to him about this case or your

20   testimony in this case?

21   A.  No.

22            MS. DUGAN-HINRICHS:  I have no further questions.

23   Thank you.

24            THE COURT:  Anything further, Mr. Levy?

25            MR. LEVY:  No.

 1                THE COURT:  Ma'am, you may step down.  You may call

 2     your next witness.

 3                MS. DUGAN-HINRICHS:  The government would call

 4     Deandre Baker.

 5                DEANDRE BAKER, PLAINTIFF'S WITNESS, SWORN

 6                          DIRECT EXAMINATION

 7     BY MS. DUGAN-HINRICHS:

 8     Q.   Sir, could you please state your name one more time for

 9     the record?

10     A.   Deandre Baker.

11     Q.   How old are you?

12     A.   22.

13     Q.   How far did you go in school?

14     A.   Tenth grade.

15     Q.   And, Mr. Baker, are you currently a person who is

16     serving a sentence for a federal drug trafficking crime?

17     A.   No, I ain't.

18     Q.   You are not?

19     A.   You are asking me -- yes, I am.

20     Q.   Let me ask you this.  What are you in jail for?

21     A.   Conspiracy to sell crack cocaine.

22     Q.   Is that a federal charge or a state charge?

23     A.   Federal.

24     Q.   When were you sentenced?

25     A.   July of last year.

1    Q.  2004?

2    A.  Yes, ma'am.

3    Q.  What sentence did you receive?

4    A.  121 months.

5    Q.  Are you appearing here today under a cooperation plea

6    agreement with the government?

7    A.  Yes, ma'am.

8           MS. DUGAN-HINRICHS:  Your Honor, may I approach the

9    witness?

10          THE COURT:  You may

11   BY MS. DUGAN-HINRICHS:

12   Q.  Sir, I've handed you what I've marked as Exhibit 4.  Do

13   you know what that is?

14   A.  Yes.

15   Q.  What is it?

16   A.  My plea agreement.

17   Q.  And do you have any secret or unwritten agreements with

18   the government or is Exhibit 4 all there is?

19   A.  This is all there is.

20   Q.  And does that appear to be an accurate copy of your plea

21   agreement?

22   A.  Yes, ma'am.

23   Q.  Would you look at the last page for me, please?  Does

24   that bear your signature?

25   A.  Yes, ma'am.

1    Q.  Your attorney's signature, too?

2    A.  Yes.

3    Q.  Who is your attorney?

4    A.  John Velasquez.

5            MS. DUGAN-HINRICHS:  The government offers

6    Exhibit 4, Your Honor.

7            MR. LEVY:  No objection, Judge.

8            THE COURT:  Exhibit 4 is received.

9    BY MS. DUGAN-HINRICHS:

10   Q.  Mr. Baker, what is your understanding that that

11   agreement requires of you?

12   A.  I plead guilty, you know what I'm saying, to the count

13   of conspiracy, and I pled guilty to cooperate with the

14   government and tell the truth and hold nothing back.

15   Q.  And that includes testifying, right?

16   A.  Yes, ma'am.

17   Q.  And what do you hope to get in exchange for your

18   testimony?

19   A.  I ain't promised nothing, but I hope to get a downward

20   departure.

21   Q.  What is a downward departure to you?

22   A.  My sentence gets reduced.

23   Q.  Have you had your Rule 35 yet?

24   A.  No, I have not.

25   Q.  Has anyone promised you that you will receive a certain

1    sentence in exchange for your testimony?

2    A.  No, I have not.

3    Q.  And you understand that that agreement requires you to

4    tell the truth, right?

5    A.  Yes, ma'am.

6    Q.  You understand there are serious penalties for

7    testifying falsely?

8    A.  Yes, ma'am.

9    Q.  Have you testified before?

10   A.  No, I have not.

11   Q.  Sir, do you know how many people, when you gave your

12   proffer interview to the police, how many people you talked

13   on?

14            MR. LEVY:  That's objected to on relevance grounds.

15            THE COURT:  Overruled.  I think he can answer that.

16   I think it's generally relevant.

17   BY MS. DUGAN-HINRICHS:

18   Q.  Sir, how many people did you talk on?

19   A.  Probably about twenty.

20   Q.  Were you told how many people you had to talk on to get

21   a departure?

22   A.  No, I didn't.

23   Q.  Were you told specifically the people that they wanted

24   you to talk on?

25   A.  No, they didn't.

1    Q.  Other than this charge you are serving time on, have you

2    been convicted for other felonies?

3    A.  Yes, I have.

4    Q.  How many?

5    A.  One, but it got dismissed.

6    Q.  Any other felonies?

7    A.  No.

8    Q.  Have you ever been convicted of giving false

9    information?

10   A.  No, I haven't.

11   Q.  Are you a member of a gang?

12   A.  Yes, I am.

13   Q.  Which one?

14   A.  Crown Point.

15   Q.  Do you have a street name?

16   A.  Yes.  They call me BG.  Baby Gangster.

17   Q.  How long have you been in that gang?

18   A.  Since I was like thirteen years old.

19   Q.  What activities does your gang take part in?

20   A.  Just holding down the hood, you know what I am saying.

21   Q.  Can you explain that for me?

22   A.  Representing where you grew up at and representing, you

23   know

24    what I'm saying, where you grew up at, you know, what you

25   is.  I'm a Crip.

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

1    Q.  Do you operate in a certain area of town?

2    A.  Yes, I do.

3    Q.  What area is that?

4    A.  North Omaha.

5    Q.  Does being in a gang help you sell drugs?

6    A.  No, it don't.

7    Q.  Do you buy and sell drugs from other members of your

8    gang?

9    A.  Yes.

10   Q.  Do you buy and sell drugs from members of other gangs?

11   A.  Yes.

12   Q.  And when were you arrested for this charge?

13   A.  January 23, 2004.

14   Q.  Sir, do you know a person by the name of Jerome Bass?

15   A.  Yes, I do.

16   Q.  Do you know if he has a nickname?

17   A.  They call him Rommie.

18   Q.  Is that person that you know as Jerome Bass present in

19   court today?

20   A.  Yes, ma'am.

21   Q.  Could you please describe where he is seated and what

22   he's wearing?

23   A.  He's right there.

24   Q.  Could you describe what he's wearing for me?

25            MR. LEVY:  Judge, I'll acknowledge he has

1    identified the defendant.

2              THE COURT:  The record will reflect that he has

3    identified the defendant.

4              MS. DUGAN-HINRICHS:  Thank you, sir.

5    BY MS. DUGAN-HINRICHS:

6    Q.  Sir, how do you know Jerome Bass?

7    A.  I know him from around 37th Street.

8    Q.  From that area?

9    A.  Yeah, I mean --

10   Q.  How did you meet him?

11   A.  I used to be around there, I grew up around there,

12   around 37th Street.

13   Q.  Why were you always around there?

14   A.  My sister used to be around there, Jacara Baker.

15   Q.  Did you hang around your sister?

16   A.  Yeah.

17   Q.  And was there a specific house or location that you

18   would hang out with your sister at?

19   A.  Around 37th Street, like Cartoon's house, Royce and

20   Jermaine's.

21   Q.  Do you know what Cartoon's real name is?

22   A.  No.

23   Q.  How about Royce and Jermaine?  Do you know what their

24   last names are?

25   A.  Brown.

1  Q.  Do you know where Jerome Bass lived?

2  A.  Yes, I do.

3  Q.  And where is that?

4  A.  On 37th and Bedford.

5  Q.  And do you know what kind of car he drove?

6  A.  When?

7  Q.  At any time.

8  A.  He drove a Camaro T top.

9  Q.  What color was that?

10  A.  Like a greenish color.

11  Q.  Any other cars you ever saw him drive during the time

12  you knew him?

13  A.  He drove a black car.  His brother's car.  He drove a

14  green Cutlass with 22s on it.

15  Q.  22s, what does that mean?

16  A.  Rims, big rims.

17  Q.  Any other cars you remember?

18  A.  He had an SS.

19  Q.  What is that?

20  A.  Impala -- I mean, not Impala, but Monte SS, Impala, I

21  think.

22  Q.  What color was that?

23  A.  It was orange and blue.

24  Q.  Did it have rims, too?

25  A.  Yes, it did.

1    Q.  Sir, do you know Karlos Harper?

2    A.  Yes, I do.

3    Q.  Do you know Damian Jackson?

4    A.  Yes.

5    Q.  JeVaughn Erwin?   His street name is Pockets.

6    A.  Yes, I do.

7    Q.  Lamar Bass?

8    A.  Yes.

9    Q.  Did you ever have the occasion to do illegal business

10   with Jerome Bass?

11   A.  Yes, I did.

12   Q.  When was that?

13   A.  It was 2001 over at Royce -- in front of Royce's house,

14   Royce and Jermaine Brown's house.

15   Q.  Where was that house?

16   A.  I think it was on 38th and Grand, I think.

17   Q.  And can you tell me what type of illegal business that

18   you and Jerome Bass did?

19   A.  Yeah.  He sold me an eight-ball of crack cocaine.

20   Q.  How much is an eight-ball?

21   A.  3.5 grams.

22   Q.  How much did he charge you?

23   A.  I tried to have him charge me $125, but he charged me

24   $150.

25   Q.  So you were trying to negotiate?

1    A.  Yeah, you know what I am saying.

2    Q.  Did that only happen one time?

3    A.  No.  Twice.

4    Q.  Twice.  At that same location?

5    A.  No.

6    Q.  Let's talk about the second time then.  When was the

7    second time that you had illegal business with Jerome Bass?

8    A.  In front of his mom's house.

9    Q.  That was 37th and Bedford?

10   A.  Yes.

11   Q.  Describe that second deal for me.

12   A.  He was outside, I pulled up, what's up, you know what

13   I'm saying?  You on?  He's like yeah.

14   Q.  When you say are you on, what does that mean?

15   A.  Did he have some crack, you know what I am saying.

16   Q.  So you approached him?

17   A.  Yeah.  He was outside.

18   Q.  And he said he was on?

19   A.  Yes.

20   Q.  What does that mean?

21   A.  That he had some crack.

22   Q.  How much did you buy?

23   A.  Another eight-ball.

24   Q.  How much did it cost?

25   A.  He charged me $150 again.

1    Q.  Did you pay that?

2    A.  Yes, I did.

3    Q.  When was the next time you conducted any illegal

4    business with Jerome Bass?

5    A.  That was it.

6    Q.  Just two times?

7    A.  Yes.

8    Q.  Two eight-balls?

9    A.  Yes.

10   Q.  At some point, sir, was there some type of confrontation

11   between 37th Street and Crown Point?

12   A.  Not really.

13   Q.  There has been testimony that you had something to do

14   with a carjacking related to the defendant.

15   A.  Uh-huh.

16   Q.  Do you know anything about that?

17   A.  Yeah.  I heard about it, yeah.

18   Q.  What did you hear about it?

19   A.  They said I robbed him, I robbed him for his car,

20   whatever, snatched him out of his car or something.

21   Q.  Snatched whose car?

22   A.  Snatched Rommie out of the car or something.

23   Q.  And did you do that?

24   A.  No, I didn't.

25   Q.  Do you know who did do it?

1    A.  No, I didn't.  No.

2    Q.  After that happened, was there another confrontation

3    that you observed with Jerome Bass?

4    A.  Yes.

5    Q.  Can you describe that for me?

6    A.  One night me and my home boy Too Tall was riding around

7    and --

8    Q.  What is Too Tall's real name?

9    A.  I don't know.  I think Jamal Long.  I think.

10   Q.  Jamal Long?

11   A.  I think.

12   Q.  I don't want to get it wrong.  Go ahead.

13   A.  We was riding around one day.  We pulled up to BJ's and

14   there was a lot of people out there.

15           Too Tall got out of the car and he went up to

16   Rommie's window and hit Rommie and Rommie got out and they

17   started fighting.

18   Q.  He hit Rommie?

19   A.  He hit him.  He hit him with his fist.  He hit him in

20   jaw in the car.

21   Q.  So Too Tall punched Rommie?

22   A.  Yes.

23   Q.  And where was Rommie when that happened?

24   A.  He was in the car.

25   Q.  Was anyone with Rommie?

1    A.  Yes.

2    Q.  Who?

3    A.  Royce Brown.

4    Q.  And you saw that happen?

5    A.  Yes.

6    Q.  What happened after Too Tall punched Rommie?

7    A.  He started fighting and when they was fighting other

8    people jumped in.

9    Q.  Did you jump in?

10   A.  No, I didn't.

11   Q.  What did you do?

12   A.  I was just watching.

13   Q.  What happened after that?

14   A.  After that, they beat him up, whatever, you know what

15   I'm saying, and me and Too Tall pulled off.

16            And we was riding up Ames, about an hour later

17   riding up Ames, and we rolled past 37th street, 38th Street,

18   and Pockets and Lamar Bass hopped behind me and started

19   chasing me, and then after that they was trying to chase me

20   and they wrecked.

21   Q.  Pockets and Lamar.  Pockets is JeVaughn Erwin?

22   A.  Yeah.

23   Q.  Are those the only guys in the car?

24   A.  That's all I seen.

25   Q.  What kind of car were they in?

1    A.  They was in a green Cutlass.

2    Q.  And --

3    A.  In that same green Cutlass.

4    Q.  I think you said they came up on you.  What does that

5    mean?

6    A.  They tried chasing me.

7    Q.  And you were with Too Tall?

8    A.  Yes.

9    Q.  Were you with anyone else?

10   A.  No.

11   Q.  And you said it was about an hour later?

12   A.  Yeah.

13   Q.  Did they ever catch up with you?

14   A.  They wrecked.  They tried to, but they wrecked.

15   Q.  Did you guys ever get close enough that you could hear

16   what they were saying, if anything?

17   A.  No.

18   Q.  Was there ever a time that you bought crack from Lamar

19   Bass?

20   A.  Yes, there was.

21   Q.  Was there ever a time you called and ordered it from

22   Lamar and Rommie would show up and deliver it?

23   A.  No.

24   Q.  Did you ever deal with Jerome or Lamar Bass after that

25   confrontation you just described?

1    A.  No, I didn't.

2    Q.  How come?

3    A.  Because, I mean, they did them and I did me, you know

4    what I'm saying, they went their way and I went my way.

5    Q.  Was it because of this confrontation that --

6    A.  I believe so.

7    Q.  -- you guys parted ways?

8    A.  Yes.

9    Q.  Did you talk to anybody about your testimony here today?

10   A.  No, I didn't.

11          MS. DUGAN-HINRICHS:  May I have a moment to confer,

12   Your Honor?

13          THE COURT:  Yes, you may.

14   BY MS. DUGAN-HINRICHS:

15   Q.  Just a couple more.  Sir, you kind of hesitated when I

16   asked you if you talked to anybody about your testimony.

17   A.  Uh-huh.

18   Q.  Can you explain why you did?

19   A.  Why I hesitated?  Because like who are you talking

20   about?

21   Q.  Anybody.

22   A.  No, I didn't.

23   Q.  Did you talk to me before your testimony today?

24   A.  No, I didn't.

25   Q.  Did you talk with Officer Gassaway before your testimony

1    here today?

2    A.  No, I didn't.

3    Q.  Did anyone ever meet with you and let you review your

4    proffer in preparation for your testimony today?

5    A.  Yeah.

6    Q.  When did that happen?

7    A.  I think it was last Friday.

8    Q.  Do you remember who met with you?

9    A.  Officer Gassaway and you.

10          MS. DUGAN-HINRICHS:  I don't have any further

11   questions, Your Honor.

12          THE COURT:  Cross-examination, Mr. Levy?

13                 CROSS-EXAMINATION

14   BY MR. LEVY:

15   Q.  Lamar Bass informed on you, didn't he?

16   A.  Informed on me?

17   Q.  Yes.

18   A.  Yes, he did.

19   Q.  And Lamar Bass was one of the first ones to inform on

20   you?

21   A.  Right.

22   Q.  Lamar Bass is in large part why you find yourself where

23   you find yourself today; isn't that true?

24   A.  I believe so.

25   Q.  You know that if the prosecutor doesn't file a motion

1   for downward departure you're going to do ten years in

2   prison?

3   A.  Yes, I do.

4   Q.  And you know that in order to get the prosecutor to file

5   that motion you've got to make the prosecutor happy, don't

6   you?

7   A.  I don't know about that.  I'm just telling the truth.

8   Q.  Now, BG is your street name?

9   A.  Yes.

10  Q.  And Lamar Bass accused you of robbing his car?

11  A.  I guess.

12  Q.  And gave your name to the police?

13  A.  I guess so.

14  Q.  And so it's a false accusation?

15  A.  Yes, it is.

16  Q.  And Lamar Bass told the police that you were one of the

17  people that beat him up, didn't he?

18  A.  Lamar Bass?

19  Q.  I'm sorry.  Jerome told the police that you were one of

20  the people that beat him up and broke his jaw?

21  A.  I don't know.  I guess.

22  Q.  And that was a false accusation, wasn't it?

23  A.  Yes, it was.

24  Q.  Those false accusations didn't make you very happy, did

25  they?

1    A.   It really didn't matter to me because it wasn't true.

2    Q.   You have been accused of things that aren't true before,

3    haven't you?

4    A.   Yeah, I have.

5    Q.   Doesn't it bother you to be accused of things that

6    aren't true?

7    A.   Yeah, but I leave it in God's hands.

8    Q.   You said Too Tall is your homey.  What do you mean by

9    that?

10   A.   He was a friend from around my neighborhood.

11   Q.   Not every friend is a homey, is he?

12   A.   No.

13   Q.   You have to be a real good friend to be a homey?

14   A.   Well --

15   Q.   Real tight?

16   A.   I guess.

17   Q.   And so you know that Too Tall and Jerome didn't

18   particularly have any love for each other, did they?

19   A.   I guess not.

20   Q.   And a homey is somebody you protect, isn't it?

21   A.   No.

22   Q.   I'm not talking about protecting from violence; I'm

23   talking about a close friend who you love.  Isn't that

24   right?

25   A.   Yeah, I guess.

1    Q.  That's a homey?

2    A.  I mean --

3    Q.  When in 2001 did these sales of crack take place?

4    A.  It was in the summertime.

5    Q.  What month?

6    A.  I don't remember what month it was.

7    Q.  You don't remember the month?

8    A.  No.  I just remember it was the summertime.

9    Q.  What is summertime to you?

10   A.  It was hot.

11   Q.  You don't think in terms of June or July or August or

12   September?

13   A.  It had to be somewhere around there.  It was hot

14   outside.

15   Q.  What did you do with those eight-balls?

16   A.  I sold it.

17   Q.  You were addicted to crack, weren't you?  You were a

18   user?

19   A.  No, I wasn't.

20   Q.  You weren't a user of crack?

21   A.  No, I wasn't.

22   Q.  Never used crack?

23   A.  No, I have not.

24   Q.  Never smoked weed?

25   A.  Yes, I smoked weed before.

1    Q.  And you know that Lamar informed on your sister, Jacara

2    Baker, don't you?

3    A.  Yes.

4    Q.  And Lamar is one of the reasons that Jacara Baker is in

5    prison right now?

6    A.  Yes.

7              MR. LEVY:  That's all.

8              THE COURT:  Any redirect, Ms. Dugan-Hinrichs?

9              MS. DUGAN-HINRICHS:  Just a couple questions,

10   Judge.

11                      REDIRECT EXAMINATION

12   BY MS. DUGAN-HINRICHS:

13   Q.   Mr. Baker, this altercation you observed with Too Tall

14   and Rommie Bass, do you know if a police report was made as

15   a result of that?

16   A.  No, I don't.

17   Q.  So you don't have any idea what, if anything, Mr. Rommie

18   Bass told the police, do you?

19   A.  No, I don't.

20   Q.  You said that Too Tall was your homey.  What is a homey?

21   A.  He was a good friend.  We grew up around the same

22   neighborhood.  I had love for him, you know.

23   Q.  Sir, do you know whose proffers were used for your

24   indictment?

25   A.  Excuse me?

1    Q.  Do you know who talked on you that caused you to be

2    indicted?

3    A.  Yes, I do.

4    Q.  Who put the most weight on you?

5    A.  I don't remember.  I believe it was -- I don't remember.

6           MS. DUGAN-HINRICHS:  Okay.  I don't have any

7    further questions, Judge.

8           THE COURT:  Anything further, Mr. Levy?

9           MR. LEVY:  No.

10           THE COURT:  You may step down, sir.  I have talked

11   to the lawyers and we are still on track for finishing this

12   case and having it submitted to you by Friday.

13           And they're working hard to be sure they get all

14   the witnesses in so we can meet that schedule, so this half

15   hour we lose today probably won't make any difference in the

16   long run.

17           We'll start tomorrow morning at 9:00 o'clock and I

18   just remind you of my previous admonitions, and that is to

19   keep an open mind until you have heard all the evidence and

20   don't talk to anybody else about this case, because all the

21   evidence has to come inside this courtroom.

22           We'll see you tomorrow morning at 9:00 o'clock.  We

23   are in recess.

24                    (4:35 p.m. - Recess Taken)

25

```
 1
 2                     C-E-R-T-I-F-I-C-A-T-E
 3
 4          I, Allan G. Kuhlman, a duly-appointed Official
 5     Court Reporter for the United States District Court for the
 6     District of Nebraska, do hereby certify that the foregoing
 7     transcript is a true and accurate transcript of the
 8     proceedings held in this matter.
 9          In witness whereof I hereunto affix my signature on
10     October 24, 2005.
11
12                          /s/Allan G. Kuhlman
13                          Allan G. Kuhlman
14                          I-N-D-E-X
15
                             Direct     Cross     Redirect
16     WITNESSES:
       FOR THE PLAINTIFF:
17
       Jeffrey Gassaway..............            120       142
18     Terrell Jackson............... 164        222       246
       Jacara Baker.................. 256        280       292
19     Deandre Baker................. 295        310       314

20     EXHIBITS:                  OFFERED    RULED ON

21     3      Jackson Plea Agreement.... 165        165
       4      Baker Plea Agreement...... 297        297
22     7      Baker Plea Agreement...... 257        257
       11     Photo of Bass Residence... 187        188
23     12     Photo of Residence........ 188        188
       13     Photo of Residence........ 189        189
24     101    Drug Quantity Table....... 133        133
       102    Report of Stolen Vehicle.. 161        161
25     103    Emergency Room Record..... 223        223
```

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com